# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PERSONAL GROOMING CO LIMITED,<br><br>    Plaintiff,<br><br>v.<br><br>DRYFHOUT ENTERPRISES, LLC,<br>DRYFHOUT PROPERTIES, LLC,<br>MATTHEW DRYFHOUT, and<br>ANGELINA DRYFHOUT,<br><br>    Defendants. | Case No.: 1:25-cv-01047-RGA<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ORDER
TO SHOW CAUSE FOR AN ORDER PROHIBITING DEFENDANTS FROM
INTENTIONALLY DESTROYING, DAMAGING, SELLING OR
SECRETING THE SEIZED PROPERTIES OR IN THE ALTERNATIVE FOR
A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

 

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Plaintiff*
*Personal Grooming Co Limited*

Dated: August 29, 2025

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS. ........................................................................................................... 2

    A.      Shellco's Sale of Its Business and Assets to PGC. .............................................. 2

    B.      Defendant's Wrongful Seizure of PGC's Properties ........................................... 4

    C.      PGC's Discovery of the Seizure of Its Property .................................................. 6

    D.      Defendants' Refusal to Cease Any Use of the Unlawfully Seized Patents and Trademarks ................................................................................................................. 7

    E.      The Irreparable Injury PGC Will Suffer ............................................................. 7

ARGUMENT ................................................................................................................................ 10

    I.      THE COURT SHOULD ORDER DEFENDANTS NOT TO INTENTIONALLY DESTROY, DAMAGE, SELL OR SECRETE THE SEIZED PROPERTIES ................................................................................................................. 10

    II.      THE COURT SHOULD ENJOIN DEFENDANTS FROM USING THE SEIZED PROPERTIES ............................................................................................... 12

          1. PGC Has a Reasonable Probability of Eventual Success ............................. 13

          2. PGC Will Be Irreparably Injured Without Injunctive Relief ....................... 14

          3. Defendants Will Not Be Harmed by an Injunction ....................................... 15

          4. The Public Interest Favors PGC .................................................................... 16

CONCLUSION ............................................................................................................................ 16

# TABLE OF AUTHORITIES

**Cases**                                                                                                                                       Page(s)

*EA Sween Co., Inc. v. Deli Exp. of Tenafly, LLC*,
   19 F. Supp. 3d 560, 577 (D.N.J. 2014) ................................................................................. 16

*Falciani v. Zinszer*,
   2018 WL 3654903, at *2 (Del. Super. Jul. 31, 2018). ............................................................ 11

*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*,
   582 F.3d 721 ........................................................................................................................... 13

*Harlan and Hollingworth Corp. v. McBride*,
   69 A.2d 9, 11 (Del. 1949)). ...................................................................................................... 13

*Kos Pharm., Inc. v. Andrx Corp.*,
   369 F.3d 700, 726 (3d Cir. 2004)................................................................................. 14, 15, 16

*Falciani v. Zinszer*,
   2018 WL 3654903, at *2 (Del. Super. Jul. 31, 2018). ............................................................ 11

*Minard Run Oil Co. v. U.S. Forest Serv.*,
   670 F.3d 236, 255 (3d Cir. 2011 ............................................................................................. 14

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
   920 F.2d 187, 197 (3d Cir. 1990 ............................................................................................. 16

*Paul v. Sturevant*,
   2006 WL 1476888, at *1 ......................................................................................................... 13

*Reilly v. City of Harrisburg*,
   858 F.3d 173, 176 (3d Cir. 2017) ...................................................................................... 12,15

*Yamaha Motor Fin. Co., U.S.A. v. ML Country Club*,
   2020 WL 7334189, at *2-3 (D.N.J. Dec. 14, 2020)................................................................ 11

**Statutes**

15 U.S.C. § 1116(a). ...................................................................................................................... 15

Plaintiff Personal Grooming Co Limited ("PGC"), through its undersigned counsel, submits this memorandum of law in support of its proposed Order to Show Cause for an order under Rule 64 of the Federal Rules of Civil Procedure, applying Delaware law, to prohibit Defendants (and those acting in concert with them) from intentionally destroying, damaging, selling or secreting the properties they have seized from PGC, or, in the alternative, under Rule 65 of the Federal Rules of Civil Procedure, for temporary restraining order and preliminary injunction restraining Defendants (and those acting in concert with them) to cease and desist from any use of the seized properties, including not engaging in any acts to enforce purported rights in the seized properties against PGC or in any manner concerning it, and not selling, transferring, assigning or otherwise disposing of the seized properties pending the outcome of this lawsuit.

## PRELIMINARY STATEMENT

PGC has brought this action seeking the replevin of patents, trademarks, and applications, and website domains, which Defendants unlawfully seized by falsely representing to this Court that those properties belonged to Shellco 2021 Limited ("Shellco"), despite Defendants knowing that Shellco had sold those properties to PGC and no longer owned them. While Defendants certainly may challenge that sale in the proper forum—England, where the sale took place and where both PGC and Shellco are located—they have no right to pretend that sale has not occurred, misrepresent to this Court who owns the seized patents, trademarks, and applications, and website domains, or wrongfully deprive PGC of them. There is no legitimate reason for Defendants to have taken their unlawful actions, no good-faith basis upon which they have acted. Consequently, it is beyond doubt that they intend to make an illegitimate use of the seized properties, either to destroy PGC's business or to leverage the seized properties to obtain money. As Defendants have refused to agree not to make improper use of the seized properties they do not lawfully possess, including refusing to agree not to seek to use those properties to harm PGC, the Court should

restrain Defendants from doing so.

Under Delaware law, by bringing this replevin action, PGC is entitled to obtain an order prohibiting Defendants from taking any action to destroy, damage, sell, or secrete those properties. Alternatively, PGC is also entitled to obtain a temporary restraining order and preliminary injunction restraining Defendants from taking any action using the seized properties, as PGC has met every element: a strong likelihood of success on the merits; a showing of irreparable harm; a balance of interests favoring PGC; and the public interest also favoring PGC.

Accordingly, the Court should grant the relief requested and prevent Defendants from using the properties that do not belong to them.

## STATEMENT OF FACTS

### A. Shellco's Sale of Its Business and Assets to PGC

On October 24, 2024, PGC purchased the business and assets of Shellco 2021 Limited ("Shellco"), a private limited company incorporated and registered in England and Wales, which had entered into administration under British insolvency law. (Declaration of Ben Poynter, dated August 28, 2025) ("Poynter Decl."), ¶ 3 & Ex. A.) Shellco operated a business known as "Bakblade," which sold products in the back shaving and personal care category with sales primarily generated through the Amazon Marketplace. (Poynter Decl. ¶ 3.) Until October 23, 2024, Shellco was known as Bakblade Limited, but changed its name on October 23 in anticipation of the appointment of administrators and the sale of its business and assets to PGC. (Declaration of Joel H. Rosner, dated August 28, 2025 ("Rosner Decl."), ¶ 3 & Ex. A; Poynter Decl., Ex. C at 5.)

Between September 26, 2024, and October 11, 2024, Shellco marketed its business and assets for sale. (Poynter Decl. ¶ 6.) This marketing process included discussions with the existing creditors of Shellco, including Defendants, about purchasing its business and assets. (*Id.*) This

2

included Shellco's then-director Ran Oren emailed Defendant Matthew Dryfhout ("Mr. Dryfhout") on September 27, 2024, offering to introduce Mr. Dryfhout to the proposed administrators for Shellco and inviting Mr. Dryfhout to advise whether he was interested in purchasing Shellco's assets. (Poynter Decl. ¶ 7; Declaration of Fergus Niven, dated August 28, 2025 ("Niven Decl.") ¶ 4.) Shellco's marketing efforts were run by Hilco Valuation Services ("Hilco"), which previously had conducted a valuation of Shellco's business and assets and determined that the maximum value of the business was as a going concern, and that as a going concern, the business and assets were valued at £1,000,000-£1,075,000. (Poynter Decl. ¶ 8.)

PGC offered £1,300,000 to purchase Shellco's business and assets, including £999,995 specifically for Shellco's intellectual property rights. (*Id.* ¶ 9.) (The remainder largely went to purchase physical stock. (*Id.*)) This turned out to be the highest bid made for Shellco's business and assets. (*Id.*) PGC and Shellco thereafter entered into an "Agreement for the Sale and Purchase of the Business and Assets of Shellco 2021 Limited (in administration)" ("SPA") on October 24, 2024, for PGC to purchase Shellco's business and assets. (Poynter Decl. ¶ 9 & Ex. A.) The SPA was signed on behalf of Shellco by James Hopkirk ("Mr. Hopkirk"), one of Shellco's administrators. (Poynter Decl., ¶ 10 & Ex. A, at 50.) The SPA provides that PGC purchased, among other things, all the intellectual property rights of Shellco, including all its trademarks, trademark applications, patents, and patent applications, including but not limited to those trademarks, trademark applications, patents, and patent applications that were identified on Schedule 2 of the SPA, i.e., including the Trademarks, Patents, and Website Domains. (Poynter Decl., Ex. A, § 2 & Sch. 2.)

Subsequently, by letter dated October 30, 2024, Shellco's other administrator, Andrew Tate, notified creditors of the appointment of the administrators. (Poynter Decl., ¶ 11 & Ex. B.)

3

The October 30 letter also made available, through a website link, a copy of the "Administrators Proposals" concerning Shellco. (Poynter Decl., Ex. B.) The Administrators Proposals were subsequently filed at Companies House, the UK registrar of companies, on November 14, 2024. (Rosner Decl. ¶ 4 & Ex. B.)

The Administrators Proposals described, among other things, the events leading up to the company's entry into administration and the actions the administrators proposed to take. (Poynter Decl., ¶ 12 & Ex. C.) The Administrators Proposals also included an "SIP16 Statement" describing similar information. (Poynter Decl., Ex. C, at 34.) The SIP16 Statement is more fully known as a Statement of Insolvency Practice 16. (Rosner Decl. ¶ 5 & Ex. C.) Statements of Insolvency Practice, or SIPs, are issued "to promote and maintain high standards by setting out required practice and harmonising the approach of insolvency practitioners to particular aspects of insolvency practice." (Rosner Decl. ¶ 5.) SIP16 covers pre-packaged sales concerning companies in administration. (Rosner Decl., Ex. 6 & Ex. C.) Both the Administrators Proposals and the SIP16 Statement discussed the sale of Shellco's business and assets to PGC in what they referred to as a "pre-pack sale." (Poynter Decl., ¶ 13; *E.g.*, Ex. C, at 42.)

### B. Defendant's Wrongful Seizure of PGC's Properties

On October 23, 2024, Defendants commenced an action in this Court against Shellco, entitled, *Dryfhout Enterprises, LLC et al v. Shellco 2021 Limited*, Case 1:24-cv-01184-RGA (the "2024 Suit"). (Rosner Decl. ¶ 7.) By that date, as noted above, Defendants were already aware that Shellco was engaged in the sale of its business and assets and had solicited offers to purchase them. Defendants were tracking the sale process so closely that they were already aware of Shellco's name change on October 23 when they filed the 2024 Suit the very same day.

On February 4, 2025, a default judgment was entered against Shellco in the 2024 Suit, awarding Defendants $4,263,143.97. (Rosner Decl. ¶ 8.)

4

On May 6, 2025, Defendants filed an application in the 2024 Suit for a writ of execution against certain assets Defendants falsely claimed belonged to Shellco, namely, certain trademarks, patents, and website domains identified therein (the "Trademarks, Patents, and Website Domains"). (Rosner Decl. ¶ 9 & Ex. D.)  Defendants knew this was false, and that the Trademarks, Patents, and Website Domains had been sold to PGC on October 24, 2025. (Poynter Decl. ¶ 3 & Exs. A, B.)  Defendants, as creditors of Shellco, were notified of the sale by Mr. Hopkirk, Shellco's administrator, in the letter dated October 30, 2024.  (Poynter Decl., Ex. B.)  They would also have been put on notice by the filing of the Administrators Proposals at Companies House on November 14, 2024.  On December 10, 2024, Defendants admitted their knowledge of the sale to PGC, in an email their counsel sent to Mr. Hopkirk to complain about the manner of the sale to PGC.  (Niven Decl., Ex. A, at 2-3.)  Defendants' counsel acknowledged in that email that its proper remedy was to challenge the validity of that sale.  (*Id.*)

In their May 2025 application to this Court for a writ of execution against Shellco to seize the Trademarks, Patents, and Website Domains, Defendants did not disclose to this Court that Shellco had sold those properties to PGC in October 2024.  (Rosner Decl. ¶ 10.)  On the contrary, Defendants falsely asserted that the Trademarks, Patents, and Website Domains belonged to Shellco.  (Rosner Decl., Ex. D, ¶¶ 7, 9.)  Defendants also did not give PGC any notice that they were proposing to seize its assets.  (Poynter Decl. ¶¶ 15, 17.)

On May 21, 2025, the Court issued the writ of execution based on Defendants' false representations.  (Rosner Decl. ¶ 11 & Ex. E.)  Defendants did not give PGC notice that a writ of execution had been issued to seize PGC's Trademarks, Patents, and Website Domains.  (Poynter Decl. ¶¶ 15, 17.)  The writ of execution directed the U.S. Marshals Service to seize and sell the Trademarks, Patents, and Website Domains.  (Rosner Decl., Ex. E.)  The U.S. Marshals Service

5

subsequently filed a report in the 2024 Suit, advising that it had seized "Property Held by Defendant, [Shellco]" and identified the Trademarks, Patents, and Website Domains as the seized property. (Rosner Decl., ¶ 12 & Ex. F.)

On July 22, 2025, the U.S. Marshals Service conducted an ostensible sale of the Trademarks, Patents, and Website Domains, under the false assertion that this was property of Shellco. (Rosner Decl., Ex. 13 & Ex. G.) Defendant Dryfhout Properties, LLC was the high bidder, with a bid of $100,000, and purported to purchase the Trademarks, Patents, and Website Domains, even though Defendants knew none of that property belonged to Shellco or could be seized or sold pursuant to an execution of judgment against Shellco. (Rosner Decl., Ex. G.)

On July 29, 2025, Defendants recorded trademark assignments with the United States Patent and Trademark Office ("USPTO"), dated July 25, 2025, assigning to themselves the 27 trademarks and trademark applications identified in the writ of execution and bill of sale, and then, by way of a further assignment, to Dryfhout Properties alone. (Rosner Decl. ¶ 14 & Ex. H.) Defendants filed their assignments despite the fact that assignments to PGC had already been recorded with the USPTO for eight trademarks. (Rosner Decl., ¶ 15 & Ex. I.) On July 29, 2025, Defendants also recorded patent assignments with USPTO, dated July 25, 2025, assigning to themselves the 18 patents identified in the writ of execution and bill of sale to themselves, and then, by way of a further assignment, to Dryfhout Properties alone. (Rosner Decl., ¶ 16 & Ex. J.)

C.  **PGC's Discovery of the Seizure of Its Property**

On August 12, 2025, PGC learned that assignments had been recorded with the USPTO, transferring PGC's trademarks and patents, including applications, to Defendants. (Poynter Decl. ¶ 14.) The transferred trademark and patent properties are included among the Trademarks, Patents, and Website Domains. (*Id.*) Since August 12, PGC has learned that Defendants recorded these assignments in connection with a judgment they obtained against Shellco in this Court, by

6

filing the writ of execution with the Court to seize PGC's Trademarks, Patents, and Website Domains, on the false pretense that they belonged to Shellco. (*Id.* ¶ 16.) Prior to August 12, PGC was unaware that Defendants were attempting to enforce a judgment they had obtained against Shellco by seizing PGC's property, much less on the pretense that it belonged to Shellco. (*Id.* ¶ 17.) Defendants did not give notice to PGC of this judgment enforcement effort. (*Id.*) Defendants also have not brought any legal action against PGC in which Defendants sought to determine any claim they had to the ownership of the Trademarks, Patents, and Website Domains. (*Id.*)

### D.   Defendants' Refusal to Cease Any Use of the Unlawfully Seized Patents and Trademarks

On August 21, 2025, counsel for PGC emailed Mr. Dryfhout, advising Defendants of this lawsuit, demanding that they return the Trademarks, Patents, and Website Domains, and also demanding they agree not to make any use of the Trademarks, Patents, and Website Domains pending the outcome of this lawsuit. (Rosner Decl., Ex. K.) But Defendants have not responded to this email or otherwise confirmed they will refrain from using the Trademarks, Patents, and Website Domains to harm PGC. (Rosner Decl. ¶ 18.) But it is clear Defendants are aware of this lawsuit and PGC's demand—and have rejected it—as Defendants' counsel subsequently emailed PGC's Delaware counsel concerning this lawsuit and effectively invited PGC to file this TRO, stating, "if you choose to file a TRO, we request notification and request a hearing on the matter before the Judge." (Rosner Decl., Ex. L.)

### E.   The Irreparable Injury PGC Will Sufffer

Defendants' actions to seize the Trademarks, Patents, and Website Domains are incredibly dangerous for PGC. (Poynter Decl. ¶ 18.) The trademarks and patents Defendants seized are critical to the operation of PGC's personal care and shaving products business, as they cover

7

product names, design, and function. (*Id.* ¶ 19.) For example, Defendants seized the BAKBLADE trademark that identifies the entire business and the primary product line. (*Id.*) With control of PGC's trademarks and patents, Defendants can cause an immediate halt to PGC's business on the Amazon Marketplace, where nearly all its sales take place, including nearly PGC's entire business with respect to the Bakblade products. (*Id.* ¶ 20.)

When a trademark or patent owner reports to Amazon that a seller is using the owner's trademark or patent without authorization from the owner, Amazon will promptly prevent that seller from selling the offending products on Amazon Marketplace until such time as the seller either provides authorization from the trademark or patent owner or a court order permitting the seller to resume operations. (*Id.* ¶ 21.) Amazon will not itself reach any determination as to which of the seller or the trademark or patent owner is correct, even where it is presented with evidence undeniably supporting the seller's position. (*Id.*) In other words, an intellectual property owner can easily cause the long-term shutdown of a seller from selling products on Amazon. (*Id.* ¶ 22.)

By virtue of the assignments that Defendants filed with the USPTO for the trademarks and patents in the Trademarks, Patents, and Website Domains, Defendants are now identified as the owners of those trademarks and patents, and Amazon will treat them as such. (*Id.* ¶ 23.) (It appears that some of the Defendants subsequently recorded an assignment transferring all those trademarks and patents to one Defendant, Dryfhout Properties, LLC, but that merely affects which of the Defendants can formally issue the takedown request to Amazon. (*Id.*)) A suspension of PGC's sales on the Amazon Marketplace would cause massive damage to the company and potentially cripple it, as nearly all PGC's sales, including nearly all sales concerning the Bakblade business, would cease indefinitely. (*Id.* ¶ 24.) PGC is not in a position to weather such a halt in its sales, not least because its overhead and other costs would continue during that period, including

payments to employees and property rental fees. (*Id.*) Even if the halt in PGC's sales was relatively short, it would cause irreparable harm to PGC. (*Id.* ¶ 25.) PGC competes on the Amazon Marketplace with other companies in the back shaver and personal care products space. (*Id.* ¶ 26.) This is a highly competitive space, and PGC has maintained a high ranking due to its volume of sales, product availability, and reviews, earning coveted "Amazon's Choice" designations on multiple products. (*Id.* ¶ 27.) In doing so, PGC has benefitted from the strong patents securing the designs and functions of its products. (*Id.*) The "Amazon's Choice" designation is of critical importance in persuading consumers to purchase PGC's products, as it elevates the status of PGC's products to consumers choosing among many competing products, including because the "Amazon's Choice" designation cannot be purchased by sellers. (*Id.* ¶ 28.) Amazon describes the value of the designation this way:

> Amazon's Choice makes it easy to discover products that other customers frequently choose for similar shopping needs. Products highlighted as Amazon's Choice are highly rated, well-priced and available to ship immediately. They are also, on average, delivered faster and returned less frequently than alternative products. Amazon's Choice highlights products we think customers may like, and customers can always shop from the vast selection of products available in our store.

(*Id.* ¶ 29 (quoting https://www.amazon.com/b?ie=UTF8&node=21449952011).) In fact, many of PGC's products often earn the higher designation of "Amazon's Choice: Overall Pick," which is applied to products that are "Rated 4+ stars[,] Purchased often[, and] Returned infrequently." (*Id.* ¶ 30.) But the Amazon's Choice and Overall Pick designations can be lost as easily as they are obtained. (*Id.* ¶ 31.) If a seller's business is halted, preventing it from selling products or earning new reviews, Amazon will remove the designation and give it to the next qualifying seller. (*Id.*)

If PGC's business on the Amazon Marketplace is blocked by Defendants, it will lose the Amazon's Choice and Overall Pick designations, immeasurably damaging its business. (*Id.* ¶ 32.) Even if PGC's right to sell on the Amazon Marketplace eventually were restored, PGC would be

9

competing against other sellers which have the substantial advantage of the Amazon's Choice and Overall Pick designations it lost. (*Id.*) Moreover, even if PGC eventually was able to once again qualify for the Amazon's Choice or Overall Pick designations, it would forever be unable to recover the unknown number of sales or customers it would have lost in the interim while others had those prestigious Amazon designations and thus had improved access Amazon customers. (*Id.*) This would result in permanent damage to PGC's ability to sell its products. (*Id.*)

Defendants can also use the patents and trademarks they unlawfully seized to cause even greater harm to PGC than merely preventing it from selling on the Amazon Marketplace. (*Id.* ¶ 33.) Defendants can instruct U.S. Customs and Border Patrol ("CBP") to block the importation of foreign goods bearing the patents or trademarks Defendants have seized. (*Id.*) With such a directive, Defendants can block PGC's entire business selling back shaver and personal care products. (*Id.*) And, as with Amazon, CBP will not lift a block on foreign importation unless PGC obtains a court order establishing its ownership of its trademarks or patents. (*Id.*)

Consequently, it is critical that Defendants be prevented from using their control over PGC's trademarks and patents to shut down or halt PGC's business. (*Id.* ¶ 34.)

## ARGUMENT

### I. THE COURT SHOULD ORDER DEFENDANTS NOT TO INTENTIONALLY DESTROY, DAMAGE, SELL OR SECRETE THE SEIZED PROPERTIES

Under Rule 64 of the Federal Rules of Civil Procedure, the Court can grant any remedy available under state law to ensure property is available to satisfy a judgment, including, specifically, replevin. Fed. R. Civ. P. 64.

Under Delaware's statutory procedure for seeking a writ of replevin, 10 Del. C. §§ 9631 *et seq.*, the initiation of a replevin action immediately entitles a plaintiff to a directive "instructing the defendant not to intentionally destroy, damage, sell or secrete the item in question with the

further proviso that the violation thereof could result in a civil contempt violation in accordance with § 9506 of this title." 10 Del. C. § 9633(b); *see also Falciani v. Zinszer*, No. N18C-03-199, 2018 WL 3654903, at *2 (Del. Super. Jul. 31, 2018) (in a replevin action, noting the statute provides for the issuance of the directive to a defendant "not to intentionally destroy, damage, sell or secrete the item in question"). While under the Delaware procedure, this directive is to be included in the summons to the defendant (or in a certified letter from the court if a summons cannot be served), that was not feasible in this action because a summons in federal court must be in a prescribed form. Nevertheless, the Court can issue that replevin directive under Rule 64, which authorizes the Court to apply state remedies for securing property to ensure it is available to satisfy a judgment.

PGC is entitled under the Delaware replevin statute to have the Court issue an order directing Defendants "not to intentionally destroy, damage, sell or secrete" the Trademarks, Patents, and Website Domains. By initiating this action, PGC has met the only condition required by the replevin statute to obtain such relief. 10 Del. C. § 9633(b). The statute does not require PGC to show any other basis for relief, such as the factors considered when seeking injunctive relief under Rule 65 of the Federal Rules of Procedure. (But as set forth below, PGC can also satisfy those factors.) Under Rule 64, PGC need only satisfy the state procedural requirement of initiating the replevin action. *Yamaha Motor Fin. Co., U.S.A. v. ML Country Club*, No. 1: 20-cv-04696, 2020 WL 7334189, at *2-3 (D.N.J. Dec. 14, 2020) (motion seeking writ of replevin under New Jersey law only had to show compliance with the single state requirement that there be a "probability of final judgment" in plaintiff's favor, not the elements required by Federal Rule 65 when seeking injunctive relief). "[I]f a motion for replevin, or arrest or attachment for that matter, were governed by Rule 65, a Rule which also provides for interim relief, there would no need for

11

Rule 64." *Id.* at *3.

Accordingly, the Court should issue an order directing Defendants "not to intentionally destroy, damage, sell or secrete" the Trademarks, Patents, and Website Domains they have seized from PGC.

## II. THE COURT SHOULD ENJOIN DEFENDANTS FROM USING THE SEIZED PROPERTIES

In the alternative to granting relief to PGC under Federal Rule 64, the Court also may grant injunctive relief to PGC under Federal Rule 65. To obtain a temporary restraining order or preliminary injunctive relief, a plaintiff must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured ... if relief is not granted.... [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). The first two are the "'most critical" factors: the plaintiff must "demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Id.* at 179. "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* "'How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief.'" *Id.* quoting (*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). All four factors favor granting injunctive relief to PGC.

### 1. **PGC Has a Reasonable Probability of Eventual Success**

PGC has a strong probability of succeeding on the merits of its replevin claim.[1] "Replevin is primarily a form of action for the recovery of possession of personal property which has been taken or withheld from the owner unlawfully." *Paul v. Sturevant*, No. 05-07-0135AP, 2006 WL 1476888, at *1 (citing *Harlan and Hollingworth Corp. v. McBride*, 69 A.2d 9, 11 (Del. 1949)). "Replevin may be brought to recover any specific property unlawfully detained from the owner thereof . . . Examples of the type of goods and chattels which may be recovered include deeds, . . . certificates of deposit, stock certificates, and promissory notes." *Id.* at *2.

PGC has established it owns the Trademarks, Patents, and Website Domains: it purchased them from Shellco on October 24, 2024. It has also shown that Defendants unlawfully obtained them by falsely representing to the Court that the Trademarks, Patents, and Website Domains belonged to Shellco, even though Defendants knew PGC owned them, and indeed admitted this in discussions with Shellco's administrator. While Defendants may contend that PGC's purchase was a fraudulent transfer, their only remedy (as they acknowledged) is to bring an action to set aside the sale to PGC. Until and unless Defendants bring such an action and prevail in it, PGC is and will remain the owner of the Trademarks, Patents, and Website Domains. Defendants could not engage in self-help by improperly not disclosing to this Court in their May 2025 application for the writ of execution that Defendants merely contended Shellco should be the owner of the assets (because they contended a sale should be set aside) but knew they were owned by someone else. Had they disclosed that information to the Court, Defendants' writ of execution undoubtedly

---

[1] PGC has also asserted claims for conversion (in the event Defendants have disposed of the Trademarks, Patents, and Website Domains) and for declaratory relief establishing that PGC owns the Trademarks, Patents, and Website Domains and that Defendants cannot take any actions against the Trademarks, Patents, and Website to enforce a judgment against Shellco. *See* Complaint, ECF 1, ¶¶ 100-23.

would not have been granted.  Defendants' failure to give notice to PGC of their intention to seize PGC's assets to satisfy a judgment against Shellco further demonstrates their wrongful intent.

Consequently, PGC has shown it is likely to succeed on the merits of its claims.

## 2. PGC Will Be Irreparably Injured Without Injunctive Relief

The damage Defendants can cause to PGC through their unlawful seizure of its Trademarks, Patents, and Website Domains is profound.  Defendants, as the listed owners of PGC's trademarks and patents, can easily cripple PGC's Amazon Marketplace business by telling Amazon that PGC is infringing on "Defendants'" trademarks or patents.  Defendants can inflict even greater damage by directing CBP to block PGC from importing any products bearing those trademarks or patents.  Either of these actions will immediately halt PGC's Bakblade business and cause it to lose the Amazon's Choice and Overall Pick designations for an indefinite length of time, lose an unknown number of customers, and surely lose its brand reputation (a basis for its Overall Pick designation) following its disappearance from the marketplace.  Moreover, these actions cannot be undone until a final judgment in this matter establishes PGC's ownership and rights.  This harm constitutes irreparable injury to PGC.  *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011) (purely economic loss can constitute irreparable injury where the business would suffer a substantial loss of business absent injunctive relief); *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will.").  In addition, any use Defendants might make of the trademarks they have seized from PGC would constitute infringement of PGC's trademarks, which as a matter of law causes a rebuttable presumption of irreparable injury.  15 U.S.C. § 1116(a).

Defendants, in effect, are holding a loaded weapon pointed at PGC's business and can fire at will.  Indeed, causing such harm is the obvious purpose of Defendant's unlawful seizure of

PGC's properties. Defendants made false representations to the Court for the purpose of seizing properties they knew they had no right to obtain. The only logical purpose for such misconduct is to cause harm to PGC, either as leverage to obtain money from PGC in exchange for the release of its properties or as retaliation for the perceived acts of Shellco. Nevertheless, PGC gave Defendants the opportunity to undo the harm they have caused, by returning the Trademarks, Patents, and Website Domains and promising not to make any use of them, particularly any use that might harm PGC. Defendants responded by inviting this application for injunctive relief, an unmistakable rejection of PGC's request and a warning about what Defendants will do if PGC does not obtain injunctive relief.

Therefore, PGC has shown that it is "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179.

### 3. Defendants Will Not Be Harmed by an Injunction

This factor, sometimes characterized as the balancing of equities, strongly favors PGC. "[T]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor." *Kos Pharm.*, 369 F.3d at 729 (quotation omitted). PGC has clearly shown its ownership of the Trademarks, Patents, and Website Domains, and its entitlement to their return. Moreover, Defendants will not be harmed in any way by being prevented from using PGC's Trademarks, Patents, and Website Domains. Defendants obtained those properties only by misrepresenting to the Court that they were owned by Shellco. "The only 'hardship' imposed upon Defendant[s] is that [they] refrain from engaging in unlawful conduct." *EA Sween Co., Inc. v. Deli Exp. of Tenafly, LLC*, 19 F. Supp. 3d 560, 577 (D.N.J. 2014) (granting injunctive relief). In addition, this factor also weighs "the 'goal[ ] of the preliminary injunction analysis [of] maintain[ing] the status quo, defined as the last peaceable, noncontested status of the parties,'" i.e., "'[b]efore this controversy began.'" *Kos Pharm.*, 369 F.3d at 729 (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.*,

15

920 F.2d 187, 197 (3d Cir. 1990)). Here, that status was PGC's ownership and possession of the Trademarks, Patents, and Website Domains before Defendants seized them.

### 4. The Public Interest Favors PGC

"As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Kos Pharm.*, 369 F.3d at 732 (quotation omitted). As PGC has shown a strong likelihood of success on the merits, and irreparable injury absent injunctive relief, the public interest favors PGC. Moreover, the public interest certainly favors protecting the lawful owner of trademarks, patents, and other properties, and is against shielding those who unlawfully take such properties.

As all four factors considered on applications for injunctive relief favor PGC, the Court should issue a temporary restraining order and preliminary injunctive relief restraining Defendants from making any use of PGC's Trademarks, Patents, and Website Domains pending the outcome of this lawsuit.

### CONCLUSION

For the foregoing reasons, the Court should grant PGC's motion in its entirety, together with such other and further relief as the Court may deem just and proper.

Dated: August 29, 2025

OF COUNSEL:

Joel H. Rosner
*Admitted Pro Hac Vice*
TARTER KRINSKY & DROGIN LLP
1350 Broadway
New York, New York 10018
Tel. (212) 216-8000
jrosner@tarterkrinsky.com

/s/ Cortlan S. Hitch
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
500 Delaware Ave., Suite 1500
Wilmington, DE 19801-1494
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Plaintiff
Personal Grooming Co Limited*