# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| PERSONAL GROOMING CO LIMITED, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 25-1047-RGA |
| v. | ) ) | |
| DRYFHOUT ENTERPRISES, LLC, DRYFHOUT PROPERTIES, LLC, MATTHEW DRYFHOUT, and ANGELINA DRYFHOUT | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT DRYFHOUT PROPERTIES,
## <u>LLC'S MOTION FOR A PRELIMINARY INJUNCTION</u>

*Of Counsel:*

Carrie J. Richey
WOMBLE BOND DICKINSON (US) LLP
50 California Street, Suite 2750
San Francisco, California 94111
Telephone: (415) 433-1900
carrie.richey@wbd-us.com

Stephanie S. Riley (#5803)
Zachary Murphy (#6881)
Alexander P. Wharton (#7304)
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
stephanie.riley@wbd-us.com
zachary.murphy@wbd-us.com
alexander.wharton@wbd-us.com

*Counsel to Dryfhout Enterprises, LLC,*
*Dryfhout Properties, LLC, Matthew Dryfhout,*
*and Angelina Dryfhout*

Dated: October 16, 2025

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  NATURE OF THE PROCEEDINGS ...................................................................2

III.  SUMMARY OF ARGUMENT ...........................................................................2

IV.  STATEMENT OF FACTS ...................................................................................2

    A.  DP's Reputation and Goodwill in the BAKBLADE Marks ....................................2

    B.  Asset Purchase Agreement Transferring BAKBLADE Marks to Shellco ..............3

    C.  DP Regained Ownership of the BAKBLADE Marks Through Defendants' 2024 Lawsuit Against Shellco in this Court ...................................................................4

V.  ARGUMENT ........................................................................................................5

    A.  DP Has a Reasonable Probability of Succeeding on the Merits ...........................6

        1.  DP owns valid and protectable marks........................................................6

        2.  There is a likelihood of confusion under the *Lapp* factors .......................10

    B.  DP Will Be Irreparably Harmed by PGC's Continued Infringement...................15

    C.  Balance of Equities Favors DP ...........................................................................17

    D.  A PI Will Serve the Public Interest......................................................................18

VI.  CONCLUSION....................................................................................................19

# TABLE OF AUTHORITIES

**Cases**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*
  237 F.3d 198 (3d Cir. 2000).................................................................................. 6, 11

*Abraxis Bioscience, Inc. v. Navinta LLC*
  625 F.3d 1359 (Fed. Cir. 2010)................................................................................ 9

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*
  42 F.3d 1421 (3d Cir. 1994)................................................................................... 18

*Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*
  39 F.4th 95 (3d Cir. 2022) ..................................................................................... 18

*Astrazeneca AB v. Camber Pharm., Inc.*
  2015 WL 7307101 (D. Del. Nov. 19, 2015) ...................................................... 11, 12

*Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*
  583 F.3d 832 (Fed. Cir. 2009).................................................................................. 9

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*
  174 F.3d 1036 (9th Cir. 1999) ............................................................................... 12

*Buzz Bee Toys, Inc. v. Swimways Corp.*
  20 F. Supp. 3d 483 (D.N.J. 2014) ..................................................................... 13, 14

*E.A. Sween Co. v. Deli Exp. of Tenafly*
  19 F. Supp. 3d 560 (D.N.J. 2014) .......................................................................... 17

*GOLO, LLC v. Goli Nutrition, Inc.*
  2020 WL 520601 (D. Del. Sept. 1, 2020) .............................................................. 11

*Interpace Corp. v. Lapp, Inc.*
  721 F.2d 460 (3d Cir.1983)................................................................................. 6, 11

*Juul Labs, Inc. v. 4X PODS.*
  439 F. Supp. 3d 341 (D.N.J. 2020) .......................................................................... 7

*Kars 4 Kids Inc. v. Am. Can!*
  98 F.4th 436 (3d Cir. 2024) ..................................................................................... 7

*Kos Pharm., Inc. v. Andrx Corp.*
  369 F.3d 700 (3d Cir. 2004)............................................................................... 17, 18

*Maya Swimwear, Corp. v. Maya Swimwear, LLC*
  789 F. Supp. 2d 506 (D. Del. 2011) ................................................................. passim

*Med. Sec. Card Co., LLC v. Scriptwell, Inc.*
   2024 WL 5697438 (D. Del. Oct. 29, 2024) ........................................................ 13, 15

*Mercado-Salinas v. Bart Enterprises Int'l, Ltd.*
   747 F. Supp. 2d 265 (D.P.R.) ........................................................................... 6, 11

*Nichino Am., Inc. v. Valent U.S.A. LLC*
   44 F.4th 180 (3d Cir. 2022) ......................................................................... 15, 16, 17

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*
   290 F.3d 578 (3d Cir. 2002) ................................................................................. 16

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*
   920 F.2d 187 (3d Cir. 1990) ............................................................................ 17, 18

*Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*
   143 F.3d 800 (3d Cir.1998) ........................................................................ 12, 16, 18

*Prime Hookah Inc. v. FCM Online LLC*
   2022 WL 1115361 (D.N.J. Apr. 14, 2022) .......................................................... 18

*Reilly v. City of Harrisburg*
   858 F.3d 173 (3d Cir. 2017) .................................................................................. 5

*Sabinsa Corp. v. Creative Compounds, LLC*
   609 F.3d 175 (3d Cir. 2010) ................................................................................. 15

*Spark Therapeutics, Inc. v. Bluebird Bio, Inc.*
   2022 WL 605724 (D. Del. Jan. 25, 2022) ...................................................... 6, 7, 11, 15

**Statutes**

15 U.S.C. § 1115(a) ................................................................................................ 7

15 U.S.C. § 1116(a) .............................................................................................. 15

6 *Del. C.* § 1304 .................................................................................................. 10

## I.     INTRODUCTION

Defendant and Counter-Plaintiff Dryfhout Properties, LLC ("DP") is the owner of the wildly successful BAKBLADE brand that is instantly recognizable as a single source for razors, razor blade refills, and personal grooming supplies. Back in 2012, Matthew Dryfhout, a member of DP, built the BAKBLADE brand from the ground up. Recognizing the need for men to shave their own backs, he invented a series of back shavers and blade refills that would allow men to shave their own backs. Alongside his wife, named co-defendant Angelina (together, the "Dryfhouts"), the Dryfhouts created the BAKBLADE word mark and a series of distinctive word marks and Gorilla design marks, collectively known as the "BAKBLADE Marks[1]," so consumers could instantly recognize the BAKBLADE brand and quality of products. With their dedication, the Dryfhouts built a strong reputation as a market leader in the category of razors, razor blades, and personal grooming supplies and acquired substantial goodwill in the BAKBLADE Marks.

DP and the Dryfhouts sold the BAKBLADE brand in 2022 to Bakblade Ltd. (later Shellco 2021 Limited ("Shellco")) for a purchase price that included deferred future payments to be paid. However, Shellco never paid its deferred payments, leading Defendants[2] to sue Shellco in this Court. Instead of appearing in the lawsuit, Shellco fraudulently attempted to sell the BAKBLADE Marks to its sister company, Plaintiff and Cross-Defendant Personal Grooming Co Ltd. ("PGC") also a subsidiary of Olsam Opco Ltd. Instead of appearing in this Court, Shellco entered into a "pre-pack" sale (referred to herein as the "SPA") for PGC to purchase Shellco's assets, including its intellectual property. Under the terms of the SPA, title to the intellectual property did not transfer at the time of execution, instead requiring a subsequent assignment document, which was

---

[1] As defined in the Declaration of Matthew Dryfhout ("Dryfhout Decl.,"), ¶ 6, filed contemporaneously herewith.

[2] "Defendants" includes DP, the Dryfhouts, and Dryfhout Enterprises, LLC.

not executed and filed with the USPTO until after this Court had issued a writ of execution as to certain patents, trademarks, and domains (the "IP Assets") in Defendants' favor in partial satisfaction of the default judgment against Shellco, which include the BAKBLADE Marks. Now, as sole assignee of the BAKBLADE Marks, DP now brings this motion for preliminary injunction ("PI") (the "Motion") to enjoin PGC from using the BAKBLADE Marks.

## II.    NATURE OF THE PROCEEDINGS

PGC brought this action on August 20, 2025 for replevin of the IP Assets, a claim of conversion of the IP Assets, and a declaratory judgment as to the ownership of the IP Assets. (D.I. 1.) PGC moved for an order preventing Defendants from intentionally destroying, damaging, selling or secreting the IP Assets, or alternatively, to enjoin Defendants from using the IP Assets during the pendency of this litigation. (D.I. 12, 13.) Defendants opposed PGC motion in large part because DP is the owner of the IP Assets (D.I. 37, 38, 39) and now seeks to enjoin PGC's use of the BAKBLADE Marks.

## III.    SUMMARY OF ARGUMENT

PGC should be enjoined from using the BAKBLADE Marks as defined herein because DP meets all four factors for a PI: (1) DP is likely to succeed on the merits because DP is the owner of the BAKBLADE Marks and PGC's use of identical marks to sell identical products will cause a likelihood of confusion, (2) DP is and will continue to be irreparably harmed if PGC is not enjoined; (3) the balance of the hardships favors DP, and (4) an injunction will serve the public interest.

## IV.    STATEMENT OF FACTS

### A.    DP's Reputation and Goodwill in the BAKBLADE Marks

DP was the market leader in personal grooming for back shavers and blade refills. Since as early as 2012 through 2022, DP had been continuously offering back shavers and blade refills

under the BAKBLADE Marks across the United States and internationally. Dryfhout Decl., ¶¶ 3-8. Defendants' longstanding use of the BAKBLADE Marks had been both extensive and exclusive. There were no third-party registrations for the BAKBLADE Marks in connection with razors or razor blades, nor any other mark confusingly similar to BAKBLADE Marks in connection with razors and razor blades. *Id*. at ¶ 6. DP had promoted its products under the BAKBLADE Marks through extensive advertising and marketing. *Id.* at ¶ 7. DP sold products under the BAKBLADE Marks on various platforms, including Amazon, eBay, Shopify, Instagram, and Facebook. *Id*. DP also marketed and sold its products under the BAKBLADE Marks using various domains controlled by DP, such as bakblade.com. *Id.*

### B.   Asset Purchase Agreement Transferring BAKBLADE Marks to Shellco

The BAKBLADE brand and associated trademarks were so successful, that in October 2022, Defendants entered into an "Asset Purchase Agreement" ("APA") to sell the BAKBLADE Marks, among other assets, to Bakblade Ltd. (a UK company that changed its name in anticipation of the sale) (referred to herein as "Shellco" as Bakblade has subsequently changed its name again). Dryfhout Decl., ¶¶ 9-10. Pursuant to the APA, Shellco agreed to pay a "Purchase Price" comprised of, *inter alia*, an immediate "Upfront Payment" as well as certain "Deferred Consideration" payments to be paid in installments over time. (D.I. 38, Ex. A, § 1.04.)

As part of the APA, Defendants sold their "Business" including DP's Amazon Accounts and all ASINs (Amazon Standard Identification Numbers) (or equivalents outside of the Amazon Online Marketplace), intellectual property assets, and all goodwill associated therewith, and product inventory. (*Id.* at § 1.01.) After closing, Defendants initiated the Account Transfer Process to transfer all of its Amazon Seller Central accounts, including the login, business information and banking information to reflect Shellco's information for Shellco to maintain control and ownership of the Amazon Seller Central Accounts, as well as to transfer all of Defendants' other online

market accounts to Shellco. (*Id.* at § 6.01.) Defendants' Business Amazon Accounts transferred to Shellco is set forth on Schedule 1.01(a)(i) of the APA. (*Id.* at Schedule 1.01(a)(i).)

Defendants were subsequently contacted by Shellco on September 16, 2023, requesting the renegotiation of the outstanding payments due under the APA; Defendants obliged. (D.I. 38, ¶¶ 5-6.) On October 13, 2023, Defendants and Shellco entered into a First Amendment to the Asset Purchase Agreement ("AAPA") that, in part, restructured the remaining $4 million in deferred payments. (*Id.*)

### C.     DP Regained Ownership of the BAKBLADE Marks Through Defendants' 2024 Lawsuit Against Shellco in this Court

Even after entering into an amended AAPA to modify the timing of the deferred payments, in September 2024, Shellco made clear that it did not intend to pay the deferred payments, but instead was willing to settle the remaining $4 million of Deferred Payments for a substantial discount. (D.I. 38, Ex. C.) Upon Shellco's indication it would not fulfil its obligations under the AAPA (*id.*, at ¶ 7), Defendants filed suit in this Court for breach of contract and anticipatory repudiation on October 23, 2024 (*id.* at ¶ 8). The next day on October 24, 2024, Shellco appointed administrators in preparation for insolvency proceedings in the U.K. (D.I. 17, Ex. B at 15.) Service was effectuated on Shellco's administrators via the Hague Convention on November 12, 2024.4 (D.I. 38, ¶ 9.) Neither Shellco nor its administrators responded, and Defendants moved for a default judgment against Shellco on January 10, 2025 (*id.* at ¶ 11), which was granted on February 4, 2025, in the amount of $4,263,143.97 (*id.* at ¶ 12) (the "Default Judgment"). This judgment remains intact. On May 6, 2025, Defendants applied for a Writ of Execution ("Writ"), seeking to levy and sell the IP Assets originally transferred under the APA (*id.* at ¶¶ 13, 14), which was issued by this Court on May 21, 2025 (*id.* at ¶ 15), and served on Shellco's administrators (*id.* at ¶¶ 17, 18). Defendants also recorded the Writ at the USTPO on May 22, 2025. (*Id.* at ¶ 16; *see also* D.I.

39, ¶¶ 3, 4.) Defendants subsequently purchased the IP Assets for $100,000 at the Marshal's Sale held July 22, 2025 (the "Sale"). (D.I. 38, ¶¶ 18, 19; *see also* D.I. 1, Ex. G.) Defendants recorded their ownership of the IP Assets at the USPTO and transferred all rights and title to DP. (D.I. 39, ¶¶ 3, 4; *see also* D.I. 17, Ex. J.) At no time did Shellco, or its administrators appear, participate, or object to the aforementioned proceedings.

## V.    ARGUMENT

The Court should issue a PI when a movant demonstrates "that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)" and when the movant is more "likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017) (footnotes omitted). The Court also takes into consideration balance of the equities and the public interest. *Id.* at 177. Here, all factors favor DP.

DP brings this Motion now because the sheer scale and gravity of PGC's actions have only just come to light. Once DP purchased the BAKBLADE Marks at the Marshal's Sale that this Court ordered, the Bill of Sale was filed on the docket, and USPTO records were updated to reflect the same, DP rightly began the process to begin selling products under the BAKBLADE Marks. Dryfhout Decl., ¶ 15. This included ordering inventory and attempting to take control of the Domain Names. *Id.* at ¶¶ 15-16. However, PGC filed this lawsuit and a Motion to Show Cause, aiming to block Dryfhout from using the BAKBLADE Marks, all while continuing to sell the BAKBLADE products under the BAKBLADE Marks on Amazon and through the Domain Names that Defendants had purchased in the Marshal's Sale. (D.I. 12, 13.) It was only through this lawsuit and Benjamin Poynter's Declaration (D.I. 16) that DP discovered—much to its surprise—that PGC

plans to assert rights in the U.S. to use these IP Assets, claiming PGC had acquired them through the SPA, a document that DP saw for the first time a month ago. (D.I. 38, ¶ 21.)

### A.    DP Has a Reasonable Probability of Succeeding on the Merits

To obtain a PI enjoining use of a trademark, a movant "must first establish that it is likely to succeed on the merits of its likelihood of confusion claim under the Lanham Act." *Spark Therapeutics, Inc. v. Bluebird Bio, Inc*., 2022 WL 605724, *3 (D. Del. Jan. 25, 2022); *see also Maya Swimwear, Corp. v. Maya Swimwear, LLC*, 789 F. Supp. 2d 506, 512-13 (D. Del. 2011); *Mercado-Salinas v. Bart Enterprises Int'l, Ltd*., 747 F. Supp. 2d 265, 274-75 (D.P.R.), *order amended on denial of reconsideration*, 747 F. Supp. 2d 275 (D.P.R. 2010), *aff'd*, 671 F.3d 12 (1st Cir. 2011), *and aff'd and remanded*, 671 F.3d 12 (1st Cir. 2011) (awarding PI to party that demonstrated entitlement to protection and consumer confusion). The Third Circuit applies the *Lapp* factors in evaluating whether there is a likelihood of confusion. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 211 (3d Cir. 2000) (citing *Interpace Corp. v. Lapp, Inc*., 721 F.2d 460 (3d Cir.1983)); *Maya Swimwear*, 789 F. Supp. 2d at 513.

### 1.    DP owns valid and protectable marks

However, "[a]s a threshold matter, [DP] owns valid and protectable marks." *See Spark*, 2022 WL 605724, at *4; *Maya Swimwear*, 789 F. Supp. 2d at 513 ("A plaintiff proves trademark infringement by demonstrating that: (1) the mark is valid and legally protectable; (2) plaintiff owns the mark; and (3) the defendant's use of its mark to identify goods or services is likely to create confusion concerning the origin of the goods or services."). PGC cannot seriously dispute that the BAKBLADE Marks are valid and legally protectable; suggesting otherwise would undermine the validity of PGC's complaint for declaratory judgment of ownership (D.I. 1) and its Motion to Show Cause (D.I. 12).

Second, DP also owns the BAKBLADE Marks. "A federal registration is prima facie evidence of ownership and validity." *Spark*, 2022 WL 605724, at *4; *see also Kars 4 Kids Inc. v. Am. Can!*, 98 F.4th 436, 447-48 (3d Cir. 2024); 15 U.S.C. § 1115(a) (establishing that mark registered on the principal register "shall be admissible in evidence and shall be prima facie evidence of the ... registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration."). Per USPTO records, DP is the owner of the BAKBLADE Marks, as evidenced by the "Current Owner(s) Information" and the latest "Assignment Abstract of Title Information" sections of the USPTO's TSDR pages of each of the BAKBLADE Marks.[3] Richey Decl., ¶¶ 3-14; *see also* Richey Decl., Ex. A. This prima facie evidence should be sufficient at the PI stage for a likelihood of success as to ownership. *Juul Labs, Inc. v. 4X PODS.*, 439 F. Supp. 3d 341, 352 (D.N.J. 2020) (finding a likelihood of success as to the first two elements of trademark infringement [(validity and ownership)] where plaintiff had certificate of registration as to the mark).

However, in preempting PGC's attempted rebuttal, in the simplest form as not to repeat in detail arguments made previously in opposition (D.I. 37) to PGC's Motion to Show Cause (D.I. 12), DP's claim to title predates and is superior to PGC's. On May 21, 2025, this Court issued a Writ seizing the IP Assets, including the BAKBLADE Marks. (D.I. 38, ¶ 15.) The Writ was served on Shellco on June 9, 2025, whereby the service documents were accepted by a Mr. James Sudorth of Kreston Reeves LLP (Administrators of Shellco, and to whom the Writ directed service), who

---

[3] DP reiterates Defendants' previous request for judicial notice (D.I. 39, fn. 1) pursuant to Fed. R. Evid. 201 as to the USPTO records for the IP Assets, including the BAKBLADE Marks, and including those specific records depicted in the Declaration of Carrie Richey ("Richey Decl."), ¶¶ 3-14.

confirmed he was authorized to accept service. (D.I. 38, Ex. I.) It was not until *after* the Writ was issued, however, that an Intellectual Property Assignment ("IPA"), purporting to convey the BAKBLADE Marks from Shellco to PGC, was signed.[4] Dryfhout Decl., ¶ A. The Writ seizing the IP Assets thus predated the IPA such that Shellco had no IP Assets to transfer.

Notwithstanding the propriety of a transfer of levied property, the language of the IPA recognizes that Shellco could transfer only the "right, title and interest in and to the Intellectual Property (if any) held by the Assignor and the registration thereof"—a title that was subject to a Default Judgment and Writ. Dryfhout Decl., ¶ A (emphasis added). The IPA did not purport to transfer title free and clear of any liens, encumbrances and the like; it transferred the title in the form held by Shellco—and in this case, a form that prevented Shellco from transferring title. The IPA language mirrors the terms of the Purchase Agreement ("SPA") between Shellco and PGC (*id.*), which is the basis for the IPA, and states as follows:

> The Purchaser acknowledges that *if the Company does not have title or unencumbered title to any or all of the Assets*, or if the Purchaser cannot exercise any right conferred or purported to be conferred on it by this Agreement, this shall not be a ground or grounds for rescinding, avoid or varying any or all of the provisions of this Agreement, or for any reduction or payment of any part of the Purchase Price.

(D.I. 16, Ex. A, § 12.6 (emphasis added).[5]) By the clear language of PGC's own agreement, PGC accepted title **as-is**. (*Id.*) The "as-is" title to the BAKBLADE Marks was burdened by a Default Judgment and seized by the Writ. Subsequently, it was DP that purchased the BAKBLADE Marks at the Marshal's Sale, not PGC. (D.I. 38, ¶ 20.) Thus, title is DP's.

---

[4] The Administrators of Shellco executed the IPA on June 2, 2025, and PGC did not record this assignment with the USPTO until July 5, 2025. Dryfhout Decl., ¶ A.

[5] *See also* D.I. 16, Ex. A, § 7.2 ("Risk in the Assets [] shall pass to the Purchaser").

Lastly, any effort by PGC to backdate the IPA by over eight months would be futile. The SPA states that "the Company (acting by the Administrators) <u>shall sell</u>" and "Purchaser <u>shall purchase</u> for the Consideration" certain assets including "Intellectual Property Rights," which includes domain names, websites, trademarks, and patents, at the "Effective Time." (D.I. 16, Ex. A, § 2.1 (emphasis added).) Use of the term "shall" indicates no title is presently conveyed, instead it reflects a mere promise to assign rights in the future, requiring a subsequent written instrument to effectuate the transfer. *See, e.g., Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1365 (Fed. Cir. 2010) (use of the term "shall" in an Asset Purchase Agreement indicated transfer of the patents was to occur in the future); *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 841 (Fed. Cir. 2009), *aff'd*, 563 U.S. 776 (2011) ("contract language 'agree to assign' reflects a mere promise to assign rights in the future, not an immediate transfer of expectant interests."). That transfer did not occur until June 2, 2025. *See* Dryfhout Decl., Ex. A. The SPA's remaining provisions concerning title transfer are circular and do not amount to a transfer of title. As contemplated in Clause 2.1, the Intellectual Property Rights shall be sold at the "Effective Time" which is defined as the "date and time of Completion." *Id.* at § 1.1. "Completion" under the SPA means "the completion of the sale and purchase of the Assets pursuant to <u>and in accordance with Clause 6 (*Completion*)</u>." D.I. 16 at §1.1 (emphasis added). Pursuant to Clause 6, Purchaser was required to deliver an executed IPR Assignment Deed, *id.* at §6.2-6.2.1, which did not occur. Additionally, Clause 7 provides title and interest (if any) <u>shall</u> pass to the Purchaser at the Effective Time, which is defined as "Completion," requiring "the completion of the sale" pursuant to Clause 6, which requires an executed IPR Assignment Deed, *id.* at §6.2-6.2.1, that was never executed. Collectively, these provisions establish that the parties were to execute a separate IPR Assignment Deed at some time in the future to transfer title. At

9

best, that occurred on June 2, 2025 when the IPA was executed. By this, it is clear from the record that Shellco could not have transferred legal title due to the Default Judgment and Writ.

*Even if* the Court credits language in the SPA requiring completion of an Intellectual Property Rights ("IPR") Assignment Deed at "Completion," (D.I. 16, Ex. A, § 6.2.1(a)), PGC cannot now seek to avoid the consequences of its own eight-plus month delay in executing and recording the necessary documents contemplated in the SPA. The IPA cannot be given retroactive effect because title only transfers with a properly executed subsequent agreement—which at best would be the executed IPA on June 2, 2025. *See Abraxis Bio*, 625 F.3d at 1365-1366.

*Even if* the Court were to consider an eight-month backdating of the IPA to the date of the SPA (Oct. 24, 2024) or the date of the Administrators Proposals accepting the SPA (Oct. 30, 2024), Defendants' lawsuit against Shellco was initiated before both, on Oct. 23, 2024 (D.I. 38, ¶ 8.). On the principles of equity and fairness alone, a named-defendant should not, and cannot, purport to transfer all of its assets mid-suit, and have both the transferor and transferee "shrug off" any subsequent judgment; otherwise all defendants in this District when faced with a likely unfavorable judgment would transfer all of its assets to a sister subsidiary mid-suit and escape free and clear. Delaware law makes clear that a debtor's attempt to transfer its assets with the intent to hinder, delay, or defraud a creditor, is a fraudulent transfer. 6 *Del. C.* § 1304.

As such, while the USPTO registration records to the BAKBLADE Marks should be sufficient at this stage as prima facie evidence of ownership, all alternative sequences of events result in the same: DP owns the BAKBLADE Marks.

### 2. There is a likelihood of confusion under the *Lapp* factors

The inevitable confusion of PGC's use of identical BAKBLADE Marks is evident here under the *Lapp* factors, clearly supporting a finding of a likelihood of confusion. Much like the validity of the BAKBLADE Marks, PGC cannot genuinely dispute a likelihood of confusion: PGC

and DP sell the same products from the same vendors using the same marks. Dryfhout Decl., ¶ 22. To suggest otherwise would render this entire proceeding moot. The marks and products at issue were sold from DP to Shellco and subsequently repurchased by DP in satisfaction of a judgment against Shellco. This is not a situation of overlapping independently developed marks and products. Nonetheless, DP proceeds through the likelihood of confusion analysis as is necessary for a PI. *See Spark*, 2022 WL 605724 at *3-*4; *Mercado-Salinas*, 747 F. Supp. 2d at 274-75.

"No single *Lapp* factor is determinative in a likelihood of confusion analysis, and each factor must be weighed and balanced against the others. The Third Circuit does not discount the strength of one factor because of the weakness of another factor. Not all of the *Lapp* factors are present in every case." *Maya Swimwear*, 789 F. Supp. 2d at 513 (citations omitted; cleaned up). And where, as here, "the goods involved in a trademark infringement action directly compete with each other, a court 'need rarely look beyond the mark itself' to determine the likelihood of confusion. *A & H Sportswear*, 237 F.3d at 211 (citing *Interpace*, 721 F.2d at 462); *see also Astrazeneca AB v. Camber Pharm., Inc.*, 2015 WL 7307101, at *3 (D. Del. Nov. 19, 2015) (same). Nonetheless, while the *Lapp* factors "may be used to determine the likelihood of confusion in cases of directly competing goods," *A & H Sportswear*, 237 F.3d at 214, "the different factors may properly be accorded different weights depending on the particular factual setting," *Astrazeneca*, 2015 WL 7307101 at *3 (cleaned up).

Relevant here, this Court need not look beyond the marks themselves, as DP's and PGC's products not only compete with each other but are *the exact same items*. *See A & H Sportswear*, 237 F.3d at 211; *see also GOLO, LLC v. Goli Nutrition, Inc.*, 2020 WL 520601, *2 (D. Del. Sept. 1, 2020). PGC currently offers for sale items including the BAKBLADE 3.0 Stealth, BAKBLADE 2.0, BAKBLADE 1.0, ODBARBER 11-in-1 Kit, BODBLADE PLUS Ergonomic Body Shaver,

and replacements blades for the BAKBLADE 3.0 and 2.0 and BAKBLADE 1.0. Dryfhout Decl., ¶¶ 19, 21, 22, Exs. B-D. DP does too. *Id.* at ¶¶ 20, 22, Exs. B-D. Further, these products are advertised and sold using *the exact same marks*, hence the present ownership dispute. *Id.* at ¶¶ 19-22, Exs. B-D. These circumstances render a fulsome analysis under the *Lapp* factors redundant, as factor 1, "degree of similarity," is sufficient to end the inquiry and find a likelihood of confusion, as discussed *infra*. *Maya Swimwear*, 789 F. Supp. 2d at 514 (use of identical marks makes a likelihood of confusion "inevitable."). Nonetheless, each *Lapp* factor is addressed below for completeness as the balance of the factors underscores the likelihood of confusion present here.

*Degree of similarity (#1)*: In indisputable fashion, PGC and DP not only use identical marks, but the exact same marks as registered with the USPTO. Dryfhout Decl., ¶ 22. Exs. B-D. "Where the identical mark is used concurrently by unrelated entities, the likelihood of confusion is inevitable." *Maya Swimwear*, 789 F. Supp. 2d at 514 (citing *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 804 (3d Cir.1998)). "Therefore, this factor favors [DP]." *See id.; see also Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1056 (9th Cir. 1999) ("In light of the virtual identity of marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course.").

*Strength of mark (#2)*: DP avers that neither party here contends that the strength of the BAKBLADE Marks is in question, and thus this factor likely needs no consideration. However, the BAKBLADE brand is "of long duration, of value, and strong," thus weighing in favor of DP. *See Astrazeneca*, 2015 WL 7307101 at *3. The brand has been around for over a decade, with many of the BAKBLADE Marks having been registered for over five years. Dryfhout Decl., ¶ 3-7, Exs. B-D. Its value is also demonstrated by the eight-figure purchase price under the APA (D.I.

38, Ex. A) and eight-figure valuation in a 2022 financial statement issued by Bakblade (*id.* at ¶ 24).

*Consumer care in purchase (#3)*: The back razors sold under the BAKBLADE Marks vary in price from $44.95 through $89.95 for the razor that is typically purchased once, with the refill razor blades at $2.95 each, that are repeatedly purchased. Thus, these products are either inexpensive in today's dollars (*Buzz Bee Toys, Inc. v. Swimways Corp.*, 20 F. Supp. 3d 483, 507 (D.N.J. 2014) (considering goods priced between $2.49 and $14.99 "inexpensive")), or moderately inexpensive, but certainly not highly expensive (*Maya Swimwear*, 789 F. Supp. 2d at 515 (considering goods priced between $185 and $240 as "high")). Under this factor, courts also consider the sophistication of the buying class. *Buzz Bee*, 20 F. Supp. 3d at 507-08. Here, the purchasers are ordinary consumers—men who have shaving needs. This factor therefore weighs in DP's favor because, given the inexpensive cost of goods and the targeted audience of ordinary consumers, consumers are not likely to exercise substantial care and attention in making their product decisions.

*Length of time of PGC's use of the BAKBLADE Marks without evidence of actual confusion arising (#4, #6)*: As expressed in *Buzz Bee*, this factor cannot be assessed when the infringement only recently began. 20 F. Supp. 3d at 508. PGC's infringing use only began after July 29, 2025, when DP became owner of the BAKBLADE Marks. Nevertheless, actual confusion is not required. *Maya Swimwear*, 789 F. Supp. 2d at 515; *Med. Sec. Card Co., LLC v. Scriptwell, Inc.*, 2024 WL 5697438, *6 (D. Del. Oct. 29, 2024) ("while evidence of actual confusion would strengthen [DP's] case, it is not essential to establish a likelihood of confusion") (cleaned up). But here there is strong circumstantial evidence of actual confusion. The sheer number of orders on Amazon over the last month suggests that consumers are purchasing PGC's products because of

the goodwill and recognizability of the BAKBLADE Marks. PGC has managed to sell over 2,000+ BAKBLADE 2.0 shavers on Amazon in the last month alone which are backed by over 40,000 reviews for authentic BAKBLADE products. Dryfhout Decl., Ex. D at 1. This fact alone favors DP.

*Intent of PGC in adopting the BAKBLADE Marks (#5)*: A party's "intent is significant because 'evidence of intentional, willful and admitted adoption of a mark [] weighs strongly in favor of finding the likelihood of confusion." *Buzz Bee*, 20 F. Supp. 3d at 508. Indeed, PGC's use of the BAKBLADE Marks is at the highest level of intentionality, evidenced by the present litigation in which PGC seeks a declaratory judgment of ownership over the BAKBLADE Marks (D.I. 1) over the rights of DP and has admitted its intent and desire to use the BAKBLADE Marks during the holiday selling season (D.I. 13). PGC's intent has risen to the level of incorrectly claiming ownership. This factor therefore weighs in favor of DP.

*Competition and overlap (#7 - #9)*: Again, there is likely little dispute to the remaining *Lapp* factors, which address the parties' marketing channels, target consumers, and how closely related the products are. *See Maya Swimwear*, 789 F. Supp. 2d at 516. Here, the "goods are marketed through the same sales channels… over the internet, through [the parties'] respective websites." *Id.* Further, "the URLs of the parties' websites are nearly identical" (*id.*), where PGC currently controls the domain babklade.com and DP uses bakbladeco.com (Dryfhout Decl., ¶¶ 16-20). *See also* Dryfhout Decl., Exs. B-D. PGC also cannot reasonably dispute that the targeted consumers are identical, i.e., men with certain shaving needs. This identical target audience favors a finding of a likelihood of confusion, and thus DP. *See Maya Swimwear*, 789 F. Supp. 2d at 516. Lastly, because "[t]he goods sold by the parties are identical, namely, [Bakblade-branded razor blades]," this factor favors [DP]." *Id.*; *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175,

189 (3d Cir. 2010) (finding *Lapp* factor 9 "clearly weigh[ing]" in favor of the movant where the products were "physically identical.").

As such, use of identical marks with identical products, as here, renders a finding of a likelihood of confusion "inevitable" (*Maya Swimwear*, 789 F. Supp. 2d at 514) and "a matter of course" (*Brookfield*, 174 F.3d at 1056), with *Lapp* factor 1 being the first and only necessary point of analysis. However, even under the complete *Lapp* analysis, *supra*, the factors weigh in favor of a finding of a likelihood of confusion. In turn, DP is likely to succeed on the merits and is entitled to a PI. *See Spark,* 2022 WL 605724 at *3; *Med. Sec.*, 2024 WL 5697438 at *7; *Maya Swimwear*, 789 F. Supp. 2d at 516.

**B.    DP Will Be Irreparably Harmed by PGC's Continued Infringement**

With the enactment of the Trademark Modernization Act of 2020 ("TMA"), a plaintiff seeking injunctive relief under the Lanham Act is entitled to a rebuttable presumption of irreparable harm on a finding of success on the merits:

> "courts . . . shall have power to grant injunctions . . . to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title. A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding . . . of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order."

15 U.S.C. § 1116(a).

The Third Circuit has applied this statutory presumption of irreparable harm as shifting the evidentiary burden of production. *See Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 184-86 (3d Cir. 2022). The *Nichino* court ruled that, upon a showing of a likely violation of the Lanham Act, "the TMA is triggered, and the burden of production shifts to the defendant to introduce evidence sufficient for a reasonable factfinder to conclude that the consumer confusion is unlikely to cause irreparable harm. . . The focus trains on the defendant's evidence, and whether it is

sufficient to rebut the TMA's presumption." *Id*. at 186. If the presumption is rebutted, "the burden of production returns to the plaintiff to point to evidence that irreparable harm is likely absent an injunction." *Id*. PGC cannot rebut this presumption simply by pointing to a lack of evidence. *See id.* at 187.

Even if PGC could present evidence to rebut the statutory presumption—which they cannot—DP has suffered, and will continue to suffer, irreparable harm. Dryfhout Decl., ¶¶ 17-18. Notably, PGC cannot deny that DP is facing irreparable harm, as PGC itself claims it would be irreparably harmed if DP interferes with its Amazon's Choice and Overall Pick designations. (D.I. 13 at 14.) Despite PGC's concerns that "Defendants can easily cripple PGC's Amazon Marketplace business by alleging trademark or patent infringements," the actual infringer is PGC. (*Id.*). Furthermore, PGC acknowledges that "[a] suspension of PGC's sales on Amazon Marketplace would cause massive damage to the company and potentially cripple it." (*Id.* at 8.) However, it is DP that is being irreparably harmed by PGC's control of Amazon accounts and Domain Names. *See* Dryfhout Decl., ¶¶ 17-18. This control threatens DP's sales, especially during the holiday season, if PGC is not enjoined. *Id*. Nor can monetary damages adequately compensate DP. The entire business of DP, which involves selling products under the BAKBLADE Marks and leveraging established goodwill, is jeopardized by PGC's actions. *Id*. This cripples DP's ability to sell its BAKBLADE branded products through established channels familiar with the BAKBLADE Marks. *Id*.; *Pappan*, 143 F.3d at 805.

If not enjoined, PGC will continue to sell its counterfeit BAKBLADE products on Amazon, which has already led to DP losing market share. As affirmed in *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co*., 290 F.3d 578, 595-96 (3d Cir. 2002), "loss of market share constitutes irreparable harm," particularly when the sale of a defendant's product

has a measurable impact on the plaintiff's market share. Currently, DP effectively has no market share due to PGC's presence in the marketplace as the alleged brand owner of BAKBLADE on Amazon, coupled with their control of Domain Names. Dryfhout Decl., ¶¶ 17-18. Beyond the loss of market share, DP has endured additional irreparable harm, including lost business and damage to its reputation and goodwill. *Id.* Because of PGC's actions, DP cannot sell the inventory it has on hand. *Id.* This situation is further exacerbated by the damage to DP's reputation and goodwill, as it must compete against PGC, which falsely claims ownership of the BAKBLADE Marks. These factors collectively constitute irreparable harm and justify the need for preliminary relief.

Because DP has submitted proof that it is the rightful owners of the BAKBLADE Marks, a denial of Defendants' motion for injunctive relief will cause irreparable harm to DP. *See Nichino*, 44 F.4th at 186.

## C.    Balance of Equities Favors DP

The goal of balancing the equities serves "to ensure that the issuance of an injunction would not harm the infringer more than a denial would harm [the party enforcing rights under the Lanham Act]." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990). Here, denying injunctive relief would prolong DP's irreparable harm, whereas the only hardship granting an injunction would impose on PGC would be to stop their unlawful conduct – which has continued even upon notification of the breach of contract claim against its sister company, Shellco, for its failure to pay for the BAKBLADE Marks; the Default Judgment; Liens; Writ seizing the BAKBLADE Marks; Marshal Sale sanctioned by this Court resulting in DP obtaining ownership of the BAKBLADE Marks; and notification of PGC's infringement. *E.A. Sween Co. v. Deli Exp. of Tenafly*, 19 F. Supp. 3d 560, 577 (D.N.J. 2014); *see also Kos Pharm., Inc. v. Andrx Corp.,* 369 F.3d 700, 728 (3d Cir. 2004) ("We have often recognized that the injury a defendant might suffer

if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself.") (cleaned up; internal quotations omitted).

By contrast DP – and the public – stand to suffer ongoing and irreparable harm absent injunctive relief. *See supra* § IV.B. Because PGC's conduct "clearly violates the Lanham Act and serves no legitimate purpose," the balance of equities weighs in favor of an injunction. *Prime Hookah Inc. v. FCM Online LLC*, 2022 WL 1115361, at *4 (D.N.J. Apr. 14, 2022).

Because DP has made a strong showing of likelihood of success on the merits that it is the rightful owner of the BAKBLADE Marks, the balance of hardships tips heavily in DP's favor.

### D.    A PI Will Serve the Public Interest

Lastly, the public interest weighs heavily in favor of a PI. To start, "if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury," as DP has done here, "it almost always will be the case that the public interest will favor the plaintiff." *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 109 (3d Cir. 2022) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n. 8 (3d Cir. 1994)). The Third Circuit instructs that "the most basic public interest at stake in all Lanham Act cases [is]: the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy." *Kos*, 369 F.3d at 730. As such, public interest "is most often a synonym for the right of the public not to be deceived or confused." *Pappan*, 143 F.3d at 807 (quoting *Opticians*, 920 F.2d at 197). This precedent is squarely in play here, whereby the public interest is favored upon DP's showing of likelihood of success on the merits and irreparable injury. *See Amalgamated Transit Union*, 39 F.4th at 109. Granting DP's requested PI furthers the public's interest in preventing consumer confusion. *See Kos*, 369 F.3d at 730.

## VI.   CONCLUSION

For all the reasons stated above, the Court should grant DP's motion and enjoin PGC from using the BAKBLADE Marks during the pendency of this action.


Dated: October 16, 2025

*Of Counsel:*

Carrie J. Richey
WOMBLE BOND DICKINSON (US) LLP
50 California Street, Suite 2740
San Francisco, California 94111
Telephone: (415) 433-1900
carrie.richey@wbd-us.com

Respectfully submitted,

*/s/ Stephanie S. Riley*
Stephanie S. Riley (#5803)
Zachary Murphy (#6881)
Alexander P. Wharton (#7304)
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
stephanie.riley@wbd-us.com
zachary.murphy@wbd-us.com
alexander.wharton@wbd-us.com

*Counsel to Dryfhout Enterprises, LLC,*
*Dryfhout Properties, LLC, Matthew Dryfhout,*
*and Angelina Dryfhout*