**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| PERSONAL GROOMING CO LIMITED,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>DRYFHOUT ENTERPRISES, LLC,<br>DRYFHOUT PROPERTIES, LLC,<br>MATTHEW DRYFHOUT, and<br>ANGELINA DRYFHOUT,<br><br>　　　　Defendants. | Case No.: 1:25-cv-01047-RGA |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT**
**DRYFHOUT PROPERTIES, LLC'S MOTION FOR A PRELIMINARY INJUNCTION**

OF COUNSEL:

Joel H. Rosner
*Admitted Pro Hac Vice*
TARTER KRINSKY & DROGIN LLP
1350 Broadway
New York, New York 10018
Tel. (212) 216-8000
jrosner@tarterkrinsky.com

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE  19803
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Plaintiff*
*Personal Grooming Co Limited*

Dated: October 30, 2025

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................ 1

ARGUMENT    .................................................................................. 3

   I. THE COURT SHOULD DENY DP'S MOTION FOR A PRELIMINARY INJUNCTION.3

     A. DP HAS NOT SHOWN A REASONABLE PROBABILITY OF EVENTUAL SUCCESS ................ 4

       1.  PGC OWNS THE TRADEMARKS AT ISSUE ....................................... 4

       2.  PGC OWNS THE TRADEMARKS AT ISSUE ........................................ 7

       3. Defendants Have Infringed on PGC's Copyrights ...................................... 12

     B. DP Has Failed to Show It Would be Irreparably Harmed ........................................... 14

     C.The Balance of Harms Favors PGC ................................................................. 15

     D. The Public Interest Favors PGC ..................................................................... 16

     E. An Evidentiary Hearing is Required to Address Disputed Facts ............................... 16

     F.A Substantial Bond Must be Posted if the Court Grants an Injunction ....................... 17

CONCLUSION .............................................................................................. 18

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                                    **Page(s)**

*Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC,*
    793 F.3d 313, 324 (3d Cir. 2015) ................................................................................. 17

*Burkhart v. Genworth Fin., Inc.,*
    275 A.3d 1259, 1269 ....................................................................................................11

*FdG Logistics LLC v. A&R Logistics Holdings, Inc.,*
    131 A.3d 842, 852-53 ...................................................................................................11

*Focus Financial Partners, LLC v. Holsopple,*
    250 A.3d 939, 970 .......................................................................................................11

*Globus Med., Inc. v. Vortex Spine, LLC,*
    605 F. App'x 126, 129 (3d Cir. 2015) ......................................................................... 17

*Mazurek v. Armstrong,*
    520 U.S. 968, 972 (1997) ......................................................................................... 3, 15

*Minard Run Oil Co. v. U.S. Forest Serv.,*
    670 F.3d 236, 255 (3d Cir. 2011) ............................................................................... 16

*NutraSweet Co. v. Vit-Mar Enterprises, Inc.,*
    176 F.3d 151, 153 (3d Cir. 1999)) .............................................................................. 3

*Reilly v. City of Harrisburg,*
    858 F.3d 173, 176 (3d Cir. 2017) ................................................................................ 3

*Singer v. Magnavox Co.,*
    380 A.2d 969, 981 .......................................................................................................11

*Spark Therapeutics, Inc. v. Bluebird Bio, Inc.,*
    2022 WL 605724 ........................................................................................................ 15

*Tasktop Techs. US Inc. v. McGowan,*
    2018 WL 4938570, at *4 (D. Del. Oct. 11, 2018) ........................................................ 3

*Zambelli Fireworks Mfg. Co. v. Wood,*
    592 F.3d 412, 426 (3d Cir. 2010) ............................................................................... 17

**<u>Statutes</u>**

6 Del. C. § 1304 ................................................................................................................ 8

Plaintiff Personal Grooming Co Limited ("PGC"), through its undersigned counsel, submits this memorandum of law in opposition to Defendant Dryfhout Properties, LLC's ("DP") further motion for a preliminary injunction to enjoin Plaintiff from using certain registered trademarks in commerce.

## PRELIMINARY STATEMENT

The motion should be denied because DP cannot satisfy the basic requirement of its request for injunctive relief: ownership of the trademarks whose use it seeks to enjoin. PGC has already presented unrefuted documentary evidence showing that it purchased those trademark registrations as part of its purchase of the business and assets of Shellco 2021 Limited ("Shellco"), including all of Shellco's intellectual property rights. DP admits that it sold the trademarks at issue to Shellco and concedes that PGC subsequently entered into a purchase agreement with Shellco to purchase those same trademarks. But DP contends that it, not PGC, should nevertheless be deemed the owner of the trademarks because PGC's purchase agreement purportedly required Shellco to deliver an intellectual property assignment to PGC before ownership of the marks transferred to PGC and it also contends that the intellectual property assignment supposedly was executed only on June 2, 2025, after Defendants obtained a writ of execution against those trademarks. As DP puts it, "The Writ seizing the IP Assets thus predated the IPA such that Shellco had no IP Assets to transfer." (D.I. 44, at 8.) Both of DP's contentions are wrong.

First, the purchase agreement, the "Agreement for the Sale and Purchase of the Business and Assets of Shellco 2021 Limited (in administration)" ("SPA"), did not require any further document to transfer ownership of Shellco's intellectual property rights and assets to PGC. Rather, the SPA expressly transferred title to all of Shellco's assets, including its intellectual property rights and assets, to PGC when the purchase closed on October 24, 2024.

1

Second, even if the intellectual property assignment referred to in the SPA was required to be signed to transfer title to Shellco's intellectual property rights and assets, that, too, was executed on October 24, 2024, more than six months before Defendants applied for the writ of execution. What DP claims is a backdated document, the June 2, 2025, assignment, is not the assignment referred to in the SPA. Rather, its stated purpose was to memorialize, in a document that could be recorded in the U.S. Patent and Trademark Office ("USPTO"), that all necessary steps had been taken on October 24, 2024, to transfer of ownership of Shellco's intellectual property rights and assets to PGC.

Consequently, DP's assertion about the sequence of activities must be reversed: "The IPA transferring the IP Assets thus predated the Writ such that Shellco had no IP Assets to seize."

As PGC, not DP, is the owner of the trademarks at issue, DP cannot succeed on its trademark infringement claims. Nor can DP claim to be suffering irreparable harm. PGC is the party that will be irreparably harmed by DP's use of PGC's trademarks. Indeed, DP has not presented evidence that it has suffered any harm, including because it has not shown it is operating a genuine business. In fact, DP appears to have no more than a Potemkin business, which it has created by engaging in massive copyright infringement and appears intended for the purpose of manufacturing instances of actual confusion by suggesting Defendants are affiliated with PGC.

Given Defendants' misconduct, including their foundational wrongdoing in obtaining a writ of execution based on false pretenses by concealing from the Court that Defendants knew that Shellco did not possess the intellectual property rights and assets sought by the writ of execution and that all those rights and assets had been purchased by PGC, the balancing of equities strongly favors PGC.

Accordingly, the Court should deny the motion for a preliminary injunction.

## ARGUMENT

### I.  THE COURT SHOULD DENY DP'S MOTION FOR A PRELIMINARY INJUNCTION

A preliminary injunction is "a drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation omitted).

To obtain preliminary injunctive relief, a plaintiff must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured ... if relief is not granted.... [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). The first two are the "'most critical" factors: the plaintiff must "demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Id.* at 179. "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* "'A preliminary injunction is an extraordinary remedy that should be granted only if (1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest.'" *Tasktop Techs. US Inc. v. McGowan*, No. CV 18-1075, 2018 WL 4938570, at *4 (D. Del. Oct. 11, 2018) (quoting *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)). "'[F]ailure to establish any element in [a movant's] favor renders a preliminary injunction inappropriate." *Id.* (quoting *id.*). "Only if

the movant produces evidence sufficient that all four factors favor preliminary relief should the injunction issue." *Id.*

All four factors favor denying injunctive relief to DP, as it has not shown a reasonable probability of succeeding on its claim that PGC is infringing "US Reg. Nos. 4381008, 4876804, 4868219, 4968684, 5969146, 6188545, 6589364, 6465471, 6495368, 6436199, 88830361, 6334918,"[1] (D.I. 43), it cannot show irreparable injury, the balance of harm is in PGC's favor, and the public interest favors PGC. Accordingly, the Court should deny DP's motion.

### A.     DP Has Not Shown a Reasonable Probability of Eventual Success

As DP admits, a threshold requirement on its claim for trademark infringement is that DP show it "owns valid and protectable marks." (D.I. 44, at 6.) But DP has not shown that it has a reasonable probability of demonstrating ownership of the trademarks it seeks to enforce on this motion. The fact that DP may be identified as the owner of those trademarks on the USPTO records does not demonstrate its ownership, as PGC's claim in this case is that DP is listed as the owner only because Defendants unlawfully seized those trademarks by obtaining a writ of execution against them under false pretenses, by falsely representing to this Court that those trademarks were owned by Shellco and in its possession, and then recorded assignments of those marks to Defendants (and, then to DP). *See, e.g.*, Complaint, D.I. 1, ¶¶ 37-40, 49-57, 62, 64-68.

### 1.     PGC Owns the Trademarks at Issue

But PGC has provided unrefuted evidence demonstrating that it acquired the trademarks at issue from Shellco on October 24, 2024, long before Defendants obtained a judgment against

---

[1] These are included among the 36 trademarks, 18 patents, and 79 website domains (collectively, "Trademarks, Patents, and Website Domains") identified in Paragraph 87 of the Complaint and in the application for a writ of execution, (Complaint, Ex. D), that Defendants submitted to this Court in *Dryfhout Enterprises, LLC et al v. Shellco 2021 Limited*, Case 1:24-cv-01184-RGA (the "2024 Suit"), except that there is no trademark registered under number 88830361. That appears to be the serial number for Reg. No. 6130422.

Shellco or sought a writ of execution against it.  DP admits that "Defendants sold their 'Business' including . . . intellectual property assets, and all goodwill associated therewith" to Shellco in October 2022.  (D.I. 44, at 3.)  PGC has presented evidence that Shellco subsequently sold all those intellectual property assets to PGC on October 24, 2024.  Specifically, PGC has provided the SPA, the purchase agreement, signed by PGC and Shellco on October 24, 2024, under which PGC acquired the business and assets of Shellco, including all its intellectual property rights and assets.  (D.I. 16, Ex. A.)  Neither DP nor the other Defendants have adduced evidence disputing the validity or effect of the SPA.  Instead, DP argues that the SPA did not effectuate a transfer of Shellco's intellectual property assets to PGC on October 24, 2024, because, according to DP, title to those assets would not transfer to PGC under the SPA until after PGC and Shellco executed the "IPR Assignment Deed" referred to in Section 6.2.1 of the SPA, and PGC and Shellco purportedly did not execute such an assignment until June 2, 2025.  (D.I. 44, at 9-10.)

But DP's argument suffers from two fatal flaws: (1) the SPA, itself, transferred title to Shellco's intellectual property assets to PGC on October 24, 2024; and (2) even if the IPR Assignment Deed was necessary to transfer that title, it, too, was executed on October 24, 2024.

First, the express language of the SPA shows that title to all assets transferred under the SPA once it was executed on October 24, 2024, regardless of whether the IPR Assignment Deed was executed.  Section 1 of the SPA defines "Completion" as "the completion of the sale and purchase of the Assets pursuant to and in accordance with Clause 6 (Completion)."  (D.I. 16, Ex. A, § 1.)  "Effective Time" is defined as "the date and time of Completion."  (*Id.*)  "Assets" are defined as "all the property, assets and rights of the Company in relation to the Business including without limitation all the items listed in Clause 2.1 but excluding in each case the Excluded Assets."  (*Id.*)  Section 2.1.2 lists Shellco's "Intellectual Property Rights" as among the assets that

are being sold to PGC, including its trademarks, patents, and website domains. (*Id.* § 2.1.2.) Section 6.1 provides, "Completion shall take place at the offices of the Administrators' Solicitors immediately after the execution of this Agreement or at such other place as the Parties may agree." (*Id.* § 6.1.) Section 7.1 provides that title to Shellco's assets would transfer upon completion of the sale, i.e., without the need for an assignment: "Such right, title and interest (if any) as the Company has in the Business and the Assets … shall pass to the Purchaser at the Effective Time." (*Id.* § 7.1.) Section 12.2 provides, "The Assets are sold in their condition and locations at the Effective Time." (*Id.* § 12.2.) Finally, the SPA states that it "has been executed as a deed and is delivered and takes effect on the date stated at the beginning of it," i.e., October 24, 2024. (*Id.* at 4, 50.)[2] Consequently, under the plain language of the SPA, title to Shellco's intellectual property rights and assets transferred to PGC immediately upon the execution of the SPA on October 24, 2024.

Second, the IPR Assignment Deed was also executed by PGC and Shellco on October 24, 2024. (Declaration of Ben Poynter, dated October 30, 2025 ("Poynter Decl." or "Poynter Declaration"), ¶ 12 & Ex. A.) The SPA defines "IPR Assignment Deed" as the "deed of assignment of the Intellectual Property Rights and Goodwill … in the agreed form, made between the Company [Shellco], the Administrators and the Purchaser [PGC] on the same date as the date of this Agreement." Exhibit A to the Poynter Declaration is the IPR Assignment Deed, the "Deed of Assignment of Intellectual Property Rights and Goodwill" "executed as a deed" by PGC, Shellco, and Shellco's administrators on October 24, 2024. (Poynter Decl., Ex A, at 1, 3, 25-27.)[3] The IPR

---

[2] As the SPA's internally-marked page numbering is not consecutive, and does not number certain pages, the citation is to the page numbers that would apply if counting from the first page of the document.

[3] As the IPR Assignment Deed's internally-marked page numbering is not consecutive, and does not number certain pages, the citation is to the page numbers that would apply if counting from the first page of the document.

Assignment Deed provides that, "the Assignor [Shellco] hereby assigns to the Assignee [PGC] absolutely all such right, title and interest as the Assignor may have in and to the Intellectual Property Rights and the Goodwill." (Poynter Decl., Ex. A § 2.2.)

The June 2, 2025, assignment that DP refers to in its moving brief is not the IPR Assignment Deed. Rather, as it explicitly states, it merely memorialized the October 24, 2024, transfer (and confirmed all title was transferred that day): "The assignment of the intellectual property rights was agreed upon and formalized as of October 24th, 2024 and the Assignee acquired such right, title and interest in and to the Intellectual Property (if any) held by the Assignor and the registration thereof. This Intellectual Property Assignment memorializes the transfer and assignment of the Intellectual Property …." (D.I. 17, Ex. I, at 3.) The June 2 assignment indicates that it was signed as a document that "may be recorded by Assignee in its sole discretion as it deems appropriate with the applicable government office or administrative agency." (*Id.*)

Therefore, contrary to DP's argument, there was no eight-month delay in the transfer to PGC of all of Shellco's intellectual property rights and assets. That transfer occurred on October 24, 2024, prior to Defendants' service of their lawsuit on Shellco on November 12, 2024, the entry of default judgment against it on February 4, 2025, or the issuance of the writ of execution on May 21, 2025. (D.I. 44, at 4.) By the time Defendants obtained that writ of execution, the assets they sought to obtain were no longer owned or possessed by Shellco and could not be seized from it, as they were owned and possessed by PGC.

### 2. The Delaware Uniform Fraudulent Transfers Act Claim is Defective

DP also argues that the Court should simply disregard this transfer of the intellectual property rights and assets at issue, contending that Shellco, a named defendant, should not be permitted to transfer its assets "mid-suit." (D.I. 44, at 10.) This argument is both factually and legally incorrect, and DP does not come close to satisfying its burden to show it is likely to succeed

on its fraudulent transfer claim. DP's sole showing as to that claim is a citation to 6 Del. C. § 1304 of the Delaware Uniform Fraudulent Transfers Act ("DUFTA") for the proposition that a debtor may not transfer assets with the actual intent to hinder, delay or defraud any creditor of the debtor. (*Id.*) DP does not describe any facts to support its contention that transfer to PGC was actually fraudulent transfer. Regardless, PGC's conduct did not violate the Delaware statute or constitute a fraudulent transfer.

The transfer of Shellco's intellectual property rights and assets to PGC did not occur "mid-suit." Rather, the sale closed one day after the lawsuit against Shellco was filed on October 23, 2024, and nearly three weeks before Defendants served Shellco with that lawsuit on November 12. Moreover, the sale effort began long before the lawsuit and had nothing to do with it. The unrefuted evidence submitted by PGC in previous motion practice shows that the sale process began on September 26, 2024, when Shellco began marketing its business and assets for sale. (D.I. 16 ¶ 6.) This marketing process included discussions with the existing creditors of Shellco, including Defendants, about purchasing its business and assets. (*Id.*) It also included Shellco's then-director Ran Oren emailing Defendant Matthew Dryfhout ("Mr. Dryfhout") on September 27, 2024, offering to introduce Mr. Dryfhout to the proposed administrators for Shellco and inviting Mr. Dryfhout to advise whether he was interested in purchasing Shellco's assets. (D.I. 16 ¶ 7; D.I. 18 ¶ 4.) Defendants appear to have submitted a bid to purchase Shellco's assets (and thus were well aware of what was being sold). (D.I. 36 ¶ 31 (denying the allegation that, "Defendants did not submit an offer to purchase Shellco's business and assets.")). Ultimately, the marketing period ended on October 11, 2024, PGC's bid was determined to be the highest purchase offer, and PGC and Shellco then prepared and entered into the SPA and IPR Assignment Deed on October 24, 2024. (D.I. 16 ¶¶ 6, 9 & Ex. A; Poynter Decl., ¶¶ 4-13 & Ex. A.)

Defendants undoubtedly were aware of all these developments. PGC has previously described the evidence concerning the communication that Shellco's administrators sent to Defendants on October 30, 2024, advising of their appointment and providing information about the sale to PGC sufficient to put Defendants on notice that the intellectual property rights and assets had been sold. (D.I. 41, at 5-6.) Defendants admitted their knowledge of the sale of Shellco's intellectual property rights and assets to PGC when they complained to Shellco's administrators about "the purchase of Bakblade by Personal Grooming Company," including all the intellectual property rights and assets that Defendants had sold to Shellco. (D.I. 18, Ex. A, at 2-3.)

PGC has now found additional evidence from Defendants themselves. In the Shellco lawsuit, their then-counsel (who initially represented Defendants in this case) submitted their time records as part of the motion for default judgment. (D.I. 38, Ex. G, internal exs. B, C.) Those time records reflect extensive correspondence between Defendants' counsel and Shellco and between Defendants' counsel and Shellco's administrators (both before and after their appointment). For example, between October 1, 2024, and October 23, 2024, Defendants' counsel exchanged at least fourteen emails with Ran Oren and had a telephone call with him. (D.I. 38, Ex. G, internal ex. B, at 4-11.) During this same period, Defendants' counsel received at least two emails from James Hopkirk and Andrew Tate, who subsequently were appointed as Shellco's administrators, and as alleged in the Complaint, Mr. Dryfhout also had at least one call with Mr. Hopkirk during this period. (D.I. 38, Ex. G, internal ex. B, at 5-6; D.I. 1 ¶ 20.) Thereafter, Defendants' counsel exchanged emails with Mr. Hopkirk and Mr. Tate, including emails exchanged on October 28, 29, 30, November 18, December 10, and December 19, 2024. (D.I. 38, Ex. G, internal ex. B, at 12-15; internal ex. C, at 5-6, 8.) Notably, the time records reflect "numerous emails between M.

Rannells, counsel for Bakblade, and administrators regarding status of administration and litigation and potential settlement negotiations" on October 30, 2024, the date Defendants received the October 30, 2024, letter from Shellco's administrators, advising of their appointment and of the sale of Shellco's business and assets to PGC.  (D.I. 38, Ex. G, internal ex. C, at 5; D.I. 36 ¶ 41 (admitting receipt of the October 30 letter).)  In addition, on December 8, 2024, Defendants' counsel reviewed the Administrator Proposals prepared by Shellco's administrators (which had been transmitted to Defendants on October 30, 2024) before writing to Mr. Hopkirk on December 10, 2024, to discuss, among other things, the contents of those Proposals.  (D.I. 38, Ex. G, internal Ex. B, at 14; D.I. 18, Ex. A.)  Section 6.1 of the Administrators Proposals confirms Shellco's intellectual property assets, valued at £999,995, were sold to PGC, and the "Statement of Financial Affairs as at 24 October 2024" confirms that those assets were the entirety of Shellco's intellectual property assets.  (D.I. 16, Ex. C, at 10, 28.)

In addition, PGC's ownership and operation of the Bakblade business has been clear and public since October 2024.  Following the purchase of Shellco's business and assets on October 24, 2024, PGC promptly notified Amazon of the change in ownership; it updated the Bakblade storefront to identify PGC as the owner.  (Poynter Decl., ¶ 15.)  PGC also promptly updated the entire bakblade.com website to reflect that it was operating the Bakblade business.  (*Id.* ¶¶ 17-19.) Both the Amazon storefront and bakblade.com website have continuously displayed this information since then.  (*Id.* ¶¶ 16, 20.)  While DP argues it lacked notice of the sale to PGC because it did not see the intellectual property assignment recorded at the USPTO, it does not address the clear statements of PGC's ownership on bakblade.com and Amazon storefront. Certainly, DP and the other Defendants were aware of that website and the storefront because they created them.  (D.I. 45 ¶¶ 4, 7, 10.)  Yet neither DP nor Mr. Dryfhout explains why those statements

of PGC's ownership were not sufficient to notify them of its purchase of Shellco's business and assets.

The sale to PGC did not violate 6 Del. C. § 1304.  As will be addressed at greater length in PGC's anticipated motion to dismiss that claim, the statute does not apply to the sale to PGC because it occurred entirely in the United Kingdom and was not a transaction by the debtor.  Under Delaware law, there is "a presumption that a law is not intended to apply outside the territorial jurisdiction of the State in which it is enacted."  *FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 852-53 (Del. Ch. 2016) (quoting *Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del. 1977)).  The Delaware courts have held that Delaware statutes apply only "where there is a sufficient nexus between Delaware and the transaction at issue."  *Id.* at 853.  "[A]bsent clear legislative intent, it is impermissible to punish an individual under Delaware law for an action occurring exclusively in another state."  *Focus Financial Partners, LLC v. Holsopple*, 250 A.3d 939, 970 (Del. Ch. 2020) (quotation omitted).  Here, there is no Delaware nexus at all.  No conduct occurred in Delaware; all the relevant conduct occurred in the United Kingdom.  Both PGC and Shellco are incorporated in the United Kingdom and are headquartered there.  (D.I. 1 ¶¶ 2, 11; D.I. 16 ¶¶ 2-3.)  Shellco's administrators, James Hopkirk and Andrew Tate, and PGC's director, Ben Poynter (who signed the SPA and IPR Assignment Deed), are also located in the United Kingdom. (D.I. 16 ¶ 1 & Ex. C, at 3.)  Moreover, Mr. Hopkirk and Mr. Tate were appointed as administrators pursuant to United Kingdom insolvency law and under the supervision of the High Court of Justice in the United Kingdom.  (D.I. 16, Ex. B; Ex. C, at 3, 6.)  None of the Defendants reside in or are incorporated in Delaware.  (D.I. 36 ¶¶ 3-7.)

Further, DUFTA does not apply to transactions by non-debtors.  *Burkhart v. Genworth Fin., Inc.*, 275 A.3d 1259, 1269 (Del. Ch. 2022).  Shellco did not make a private transfer of its assets to

PGC.  Shellco was placed into administration under United Kingdom insolvency law, equivalent to a U.S. bankruptcy proceeding, and the administrators, equivalent to bankruptcy trustees, elected to sell Shellco's assets as they were authorized to do under United Kingdom law.  It is of no moment that the sale was made to PGC, a subsidiary of the same parent as Shellco, as administrators are explicitly permitted by United Kingdom insolvency law to engage in such transactions provided certain procedures were followed (as they were here).  The administrators obtained two different valuations of Shellco's business and assets, which confirmed that PGC's £1,300,000 bid was reasonable and exceeded the valuation of that business and assets.  (D.I. 16, ¶ 8 & Ex. C, at 39-40, 52.)  Defendants apparently submitted their own, lower bid for Shellco's business and assets, and thus cannot contend that PGC's bid was not reasonable.  (D.I. 36 ¶ 31 (denying the allegation that, "Defendants did not submit an offer to purchase Shellco's business and assets."); D.I. 16, Ex. C, at 41 (noting that one bidder offered £95,000 to purchase Shellco's intellectual property and access to its digital channels and another bidder offered £3,800 to acquire Shellco's business and assets).

### 3.  Defendants Have Infringed on PGC's Copyrights

PGC is the owner of all copyrights, registered or unregistered, concerning the Bakblade business, including copyrights concerning the content on the bakblade.com website and the Amazon storefront.  Defendants transferred all their copyrights to Shellco when it purchased the Bakblade business from them.  The Asset Purchase Agreement concerning that purchase expressly provides that Shellco acquired all Defendants' "Intellectual Property Assets."  (D.I. 38, Ex. A §§ 1.01(a)(ii), 1.01(b), 4.09.)  Those Assets were defined as including all "Intellectual Property," which, in turn, included all copyrights.  (*Id.* § 9.16.)  When Shellco sold its intellectual property rights and assets to PGC, that sale included all copyrights held by Shellco.  (D.I. 16, Ex. A §§ 1.1 (defining "Intellectual Property Rights" as including all copyrights), § 2.1.2 (selling all Intellectual

Property Rights to PGC).)  Defendants have never sought to seize any of those copyrights, whether in the writ of execution or otherwise.  *See* D.I. 17, Ex. E.

Yet Defendants blatantly copied the bakblade.com website when they set up their bakbladeco.com website.  A comparison of these two websites easily reveals the massive extent of that copying, as both sites have an identical layout and look and feel and nearly identical text. (Declaration of Joel H. Rosner, dated October 30, 2025 ("Rosner Decl."), ¶ 2 & Exs. A-F.)  The wholesale nature of that copying is demonstrated by the fact that Defendants failed to update all the hyperlinks on their site, meaning that many of those links still point to bakblade.com as they did in the page Defendants copied.  (Rosner Decl. ¶ 3 & Ex. G.)  In at least one instance, the "Contact Us" page, Defendants did not even bother to change the contact information that was on PGC's site, so Defendant's site directs their customers to contact PGC about the Bakblade products.  (Rosner Decl., Ex. B.)  Moreover, it appears Defendants copied PGC's website months ago, as their home page prominently touts a Memorial Day sale.  (Rosner Decl., Ex. A.)  (Notably, Defendants were not yet the owners of any rights concerning the Bakblade business this past Memorial Day.)  But while Defendants may have copied PGC's website months ago, they did not set up their own competing website until October 6, 2025, ten days before DP filed its motion for a preliminary injunction.  (Rosner Decl., ¶ 4 & Ex. H.)

Based on Defendants' blatant copying of PGC's and the tactical establishment of their own alleged business website just days before seeking injunctive relief concerning purported harm to that business, it is clear theirs is a Potemkin business, a stand-in to give the appearance of a business that does not genuinely exist so that Defendants can essay to shut down PGC's business. If any actual confusion has occurred to date, it has surely been created by Defendants' manufactured business, which by willfully copying PGC's site is seeking to confuse customers

into conflating Defendants with PGC. Such inequitable conduct should bar Defendants from obtaining any equitable relief against PGC.[4]

Consequently, DP has failed to show a reasonable probability of success on its claims. As DP concedes that title to Shellco's intellectual property rights and assets would have transferred to PGC upon the execution of the IPR Assignment Deed, and that document was executed on October 24, 2024, there is no dispute that title to Shellco's intellectual property rights and assets transferred to PGC on October 24, 2024. Defendants had notice of the sale and knew that Shellco no longer possessed the intellectual property rights and assets yet misrepresented to the Court that Shellco did possess that property and concealed that PGC was now the owner. Defendants' belief that the sale of the property to PGC was improper did not privilege them to conceal relevant information from the Court to manufacture a basis on which to obtain the writ of execution. Ultimately, as the writ of execution explicitly was limited to seizing "Property held by Shellco 2021 Limited," (D.I. 17, Ex. E, at 2), it could not be used to seize the trademarks at issue from PGC, which was the owner (and holder) of those trademarks.

### B.    DP Has Failed to Show It Would be Irreparably Harmed

DP has not demonstrated any basis on which to find that this factor favors it. DP cannot rely on the rebuttable presumption of irreparable harm by reason of its trademark infringement claim because it cannot show it is the lawful the owner of the trademarks at issue and thus it has no viable claim for infringement. Even if a rebuttable presumption existed, it has been rebutted by PGC's evidence of Defendants' unlawful seizure of PGC's property under false pretenses and

---

[4] Given that PGC's lawful ownership of the trademarks at issue disposes of any trademark infringement claims, there is no need to address the *Lapp* factors. However, it bears noting that DP fails to adduce specific factual information about the current state of the Bakblade business or consumer views about that business, instead relying on speculation about PGC's intent, old business valuations, and generic and/or inapposite case law.

by Defendants' fake business and willful copyright infringement. DP has not presented any evidence to show Defendants have a functioning business. While Defendant Matthew Dryfhout has submitted a declaration asserting he ordered product inventory, he has not identified which products he ordered or what quantity he ordered. (D.I. 45 ¶ 15.) While he complains that it has been difficult to sell products on his new website, or that the new site is not well-known, that likely is because his website was established only ten days before he submitted his declaration and it is simply a copy of PGC's site. (*Id.* ¶ 18.) Therefore, any risk of harm that DP conceivably might face under the current scenario is minimal, at best.

### C.    The Balance of Harms Favors PGC

This factor, sometimes characterized as the balancing of equities, strongly favors PGC. "A preliminary injunction is an extraordinary remedy that should be granted only if … granting the injunction will not result in irreparable harm to the defendant." *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999); *Spark Therapeutics, Inc. v. Bluebird Bio, Inc.*, No. CV 21-00705, 2022 WL 605724, at *22 (D. Del. Jan. 25, 2022) (the court must "balance the irreparable harms we have identified against the harm to defendants if the preliminary injunction is granted"; quotation omitted).

PGC will suffer severe and irreparable harm if enjoined, as it would be forced to shut down its business. As PGC previously submitted to the Court, a suspension of PGC's sales on its Amazon storefront, even for a short period, would cause massive damage to the company and potentially cripple it, as nearly all PGC's sales, including nearly all sales concerning the Bakblade business, would cease indefinitely. (D.I. 16 ¶¶ 24-32.) But an injunction for the length of time sought by DP—Defendants have proposed that the trial on ownership (the first stage of this case) not occur until as late as 2028—would permanently terminate PGC's business. (Poynter Decl. ¶ 21.) PGC cannot sustain such a sales halt, not least because its overhead and other costs would continue

15

during that period, including payments to employees and property rental fees. (*Id.*)  This harm constitutes irreparable injury to PGC. *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011) (a purely economic loss can constitute irreparable injury to a party where the potential loss is so great as to threaten the existence of that party's business)."

In contrast, DP has not demonstrated it would suffer any actual harm, including because it has not attempted to start a genuine business, but instead has infringed on PGC's copyrights by copying its website to give the appearance of such a business.

### D.    The Public Interest Favors PGC

This factor also favors PGC.  It is not in the public interest to protect parties which obtain their rights through inequitable means.  PGC lawfully purchased the business and assets of Shellco as permitted by UK law.  DP and the other Defendants had notice of PGC's purchase.  But rather than disclose that purchase to the Court or bring a proper fraudulent transfer claim against Shellco's administrators or PGC (as Defendants' then-counsel threatened to do in their December 10, 2024, email to Shellco's administrators), Defendants chose to conceal that information from the Court so they could obtain an execution against Shellco on the false pretense that it still possessed the intellectual property rights and assets at issue.  It would be deeply inequitable and not in the public interest to now reward DP for its misconduct by granting it injunctive relief.

### E.    An Evidentiary Hearing is Required to Address Disputed Facts

It does not appear that any facts concerning PGC's purchase of Shellco's intellectual property rights and assets on October 24, 2024 can be meaningfully disputed, as that purchase is evidenced by the SPA and the IP Assignment Deed, which DP effectively has conceded is sufficient to have transferred title in Shellco's intellectual property rights and assets to PGC.  Nor does it appear that any facts concerning Defendants' knowledge of PGC's purchase can be meaningfully disputed.  They were amply provided with information about that purchase in the Administrators

Proposals and undoubtedly learned (or should have learned) any missing information from their communications with Shellco's administrators or the open and obvious nature of PGC's ownership and operation of the Amazon storefront and the bakblade.com website.

However, to the extent the Court finds there to be disputed issues of fact concerning the issue of PGC's ownership of the intellectual property rights and assets at issue, or concerning the relief sought by DP on this motion, PGC respectfully requests that the Court hold an evidentiary hearing. *Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 324 (3d Cir. 2015) ("a district court cannot resolve a motion for a preliminary injunction that depends upon the resolution of disputed issues of fact without first holding an evidentiary hearing").

### F.    <u>A Substantial Bond Must be Posted if the Court Grants an Injunction</u>

Rule 65(c) of the Federal Rules of Civil Procedure permits courts to issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Rule 65(c) constrains a district court's authority to enter a preliminary injunction, making it contingent upon the posting of a bond." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010). A court must "interpret this requirement strictly." *Globus Med., Inc. v. Vortex Spine, LLC*, 605 F. App'x 126, 129 (3d Cir. 2015). "Although the amount of the bond is left to the discretion of the court, the posting requirement is much less discretionary." *Zambelli*, 592 F.3d at 426 (quotation omitted). "While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory." *Id.* A court must make "specific findings" to support any such exception. *Id.*

Here, PGC has demonstrated it would suffer substantial harm from an injunction, even if only granted for a short period. The lengthy injunction sought by Defendants, which would stretch to 2028 in just the first stage of the case under their proposed schedule, would cause PGC to suffer

tens of millions of dollars in damages. To the extent the Court intends to grant the injunction DP has sought, DP should be directed to obtain a bond to cover those damages.

## CONCLUSION

For the foregoing reasons, DP's motion for a preliminary injunction should be denied, as it has failed to meet any, let alone all, of the factors considered on an application for injunctive relief. It cannot show a reasonable probability of success on the merits or irreparable harm and the balance of harms and the public interest favor PGC.

Notwithstanding the foregoing, in an effort to simplify the Court's handling of this action, if the Court does not intend to deny DP's motion outright, then PGC is willing to stipulate to the same limitations as Defendants, namely, that PGC will not sell, transfer, or damage the trademarks, patents, and website domains specified in the Complaint through the pendency of this action, provided that such limitations shall be understood to not restrict PGC from continuing to operate its business and sell products via the bakblade.com website and PGC's Amazon store front.

Accordingly, the Court should deny DP's motion in its entirety, together with such other and further relief as the Court may deem just and proper.

Dated: October 30, 2025

OF COUNSEL:

Joel H. Rosner
*Admitted Pro Hac Vice*
TARTER KRINSKY & DROGIN LLP
1350 Broadway
New York, New York 10018
Tel. (212) 216-8000
jrosner@tarterkrinsky.com

   */s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (No. 3726)
Cortlan S. Hitch (No. 6720)
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Plaintiff*
*Personal Grooming Co Limited*