# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PERSONAL GROOMING CO LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>DRYFHOUT ENTERPRISES, LLC,<br>DRYFHOUT PROPERTIES, LLC,<br>MATTHEW DRYFHOUT, and<br>ANGELINA DRYFHOUT,<br><br>Defendants. | Case No.: 1:25-cv-01047-RGA |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST DEFENDANTS AND FOR AN EXPEDITED HEARING ON OWNERSHIP

OF COUNSEL:

Joel H. Rosner
*Admitted Pro Hac Vice*
TARTER KRINSKY & DROGIN LLP
1350 Broadway
New York, New York 10018
Tel. (212) 216-8000
jrosner@tarterkrinsky.com


Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE  19803
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Plaintiff*
*Personal Grooming Co Limited*

Dated: November 11, 2025

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................. 1

STATEMENT OF FACTS................................................................. 5

    A.  PGC Owns the Intellectual Property Rights and Assets at Issue ................................. 5

    B.  Defendants Knew About PGC's Purchase of the Intellectual Property Rights and Asset at Issue ................................................................. 6

    C. Defendants' Wrongful Seizure of PGC's Intellectual Property ..................................... 9

    D.Defendants' Refusal to Coexist with PGC, and the Irreparable Damage This Will Cause to PGC................................................................. 10

        1.  Defendants' Takeover of the Bakblade Brand on Amazon ....................... 10

        2.  Defendants Can Now Block All PGC's Sales, Causing Irreparable Harm 11

        3.  Because of Defendants' Takeover of the Brand on Amazon, PGC's Business Will Be Terminated Unless Defendants Authorize It............................ 12

        4.  Defendants Refuse to Coexist with PGC, Refuse Authorize PGC to Continue Selling on Amazon, and Intend to Request the Removal of PGC's Product Listings ................................................................. 13

        5.  Defendants Will Not be Harmed by Injunctive Relief Permitting PGC to Continue Sales ................................................................. 15

ARGUMENT................................................................. 16

    I.THE COURT SHOULD REQUIRE DEFENDANTS TO COEXIST WITH PGC UNTIL THE OWNERSHIP DISPUTE IS RESOLVED ................................................. 16

        1.PGC Has a Reasonable Probability of Eventual Success ................................. 17

        2.PGC Will Be Irreparably Injured Without Immediate Injunctive Relief........... 18

        3.Defendants Will Not Be Harmed by the Requested Relief.............................. 19

        4.The Public Interest Favors PGC ................................................................. 20

CONCLUSION................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

**<u>Page(s)</u>**

*CrowdStrike, Inc. v. NSS Labs. Inc.*,
    2017 WL 588713, at *1 ................................................................................... 16

*EA Sween Co., Inc. v. Deli Exp. of Tenafly, LLC*,
    19 F. Supp. 3d 560 (D.N.J. 2014) .................................................................. 19

*GTE Sylvania Inc. v. Consumer Prod. Safety Comm'n*,
    404 F. Supp. 352 (D. Del. 1975) .................................................................... 19

*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*,
    582 F.3d 721 (7th Cir. 2009)). ....................................................................... 16

*Kos Pharm., Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir. 2004) ............................................................... 18, 19, 20

*Minard Run Oil Co. v. U.S. Forest Serv.*,
    670 F.3d 236 (3d Cir. 2011) ........................................................................... 18

*Opticians Ass'n of Am. v. Indep. Opticians of Am.,*
    920 F.2d 187 (3d Cir. 1990) ........................................................................... 19

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017). .................................................................... 16, 18

Plaintiff Personal Grooming Co Limited ("PGC"), through its undersigned counsel, submits this memorandum of law in support of its motion for a temporary restraining order and preliminary injunction against Defendants and for an expedited hearing on ownership.

## PRELIMINARY STATEMENT

The central issue in this case is who owns the Bakblade intellectual property rights and assets. Defendants assert they are the owners of that property because they seized it from Shellco 2021 Limited ("Shellco") pursuant to a May 2025 writ of execution. PGC asserts it is the owner of that property because it purchased it from Shellco in October 2024, meaning there was nothing to seize from Shellco in May 2025. PGC also asserts that Defendants were notified in October 2024 of PGC's purchase and given all details about the sale, and thus falsely represented to the Court in May 2025 that Shellco still owned the assets. In short, either PGC owns the Bakblade intellectual property rights and assets, or Defendants (or one of them) do.

However, based on the Court's decision on PGC's prior motion for injunctive relief, and the discussion at the October 30 scheduling conference, it was PGC's understanding that the Court preferred that the parties coexist while they worked to resolve the ownership issue. While PGC understandably was concerned about coexistence, given Defendants' hostile seizure of its property, it nevertheless has complied with the Court's perceived preference. Defendants, however, have now made plain that they will not be complying with that approach. Defendants have explicitly stated they will not coexist with PGC under any circumstances during this case. They intend to take every avenue available to them to terminate PGC's business, including directing Amazon to take down PGC's product listings.

This is not an idle threat. Defendants have seized control of the Bakblade brand on Amazon and, as the new brand owner, Defendants can now immediately direct Amazon to remove all of PGC's product listings. Even a short takedown would cause irreparable harm to PGC; a permanent

1

removal would terminate PGC's business.  Defendants have refused to agree not to request that Amazon take down PGC's product listings.  But even if Defendants did not take that action, PGC's business will survive only six more months.  The Bakblade business is enrolled in Amazon's Transparency program, which permits only specially-labeled goods to be sold through Amazon. As only a brand owner or authorized user can obtain the required labeling, if Defendants do not authorize PGC to obtain that labeling, PGC will be unable to sell or ship any Bakblade products once its current stock runs out.  Defendants have refused to authorize PGC to obtain that labeling.

Defendants' strident and uncompromising posture is not in keeping with the spirit or letter of their promise not to damage the trademarks at issue in this action, nor the serious nature of the claim PGC has asserted, which alleges that Defendants obtained any rights they may have only by concealing from the Court their knowledge that PGC had already purchased the Bakblade intellectual property rights and assets.

But Defendants' threats against PGC are also bizarre and ultimately self-harming, as they will lead to the destruction of the Bakblade brand.  Defendants clearly are not able to begin selling Bakblade products.  Their website is an egregious copy of PGC's website (even after they modified it in response to the issues PGC raised in opposition to Dryfhout Properties' motion for a preliminary injunction) which Defendants created only hours before they filed their Answer and Counterclaims to the Complaint.  Defendants also have no products of their own to sell.  Instead, Defendants are passing off PGC's products as their own, purchasing products from PGC and then delivering those PGC-branded products in response to customer orders.  Consequently, if PGC is prevented from selling its products, the Bakblade brand will cease to exist in the market.  Notably, Defendants have given no indication that they have the means to continue this brand, advertise it—or even pay for the damage they are seeking to cause by shutting down PGC's business.

This situation cannot continue. Defendants refuse to coexist with PGC during the pendency of this suit. They refuse to allow PGC to continue selling its products on Amazon. If the Court enjoins Defendants from taking certain actions to harm PGC, they will simply pursue other actions. This will require PGC to fight a constant rearguard action against new tactics by Defendants, and to modify its commercial practices to protect against such eventualities. This is grossly inequitable, and it is unnecessary.

The only way to end this dispute is to expeditiously resolve the core ownership question.

There are only two known factual issues that potentially need to be addressed before the Court can resolve the ownership dispute: (1) when the "Deed of Assignment of Intellectual Property Rights and Goodwill" ("IPR Assignment Deed") was signed; and (2) whether Defendants had notice of PGC's October 2024 purchase of Shellco's business and assets. The first of those issues will be addressed this week, as PGC will be producing proof of the signing date to Defendants. Thus, only one factual issue will remain, and the necessary discovery concerning it is simple: Defendants must disclose the communications their counsel (and, potentially they themselves) had with Shellco's administrators, with the attorneys for those administrators, and with Shellco's personnel. Defendants have already agreed they can produce such communications. They can and should do so promptly. Given the anticipated clarity of the written record—documents already produced indicate Defendants had knowledge of the sale of the intellectual property to PGC—neither side may need a deposition to address these limited factual issues, but if they are needed, each side certainly can take one deposition in short order.

All the remaining issues to resolve the ownership dispute are legal in nature: (1) whether the contract documents concerning PGC's purchase show that it purchased Shellco's business and assets, including the trademarks, patents, and web domains at issue; (2) whether a creditor can use

a writ of execution to seize assets that are not owned by the debtor; and (3) to the extent it affects the determination of the previous issue, whether such a writ can be effective where the creditor has notice that the debtor no longer owns the property when it applies for and obtains the writ.

Accordingly, PGC seeks an order: (1) enjoining Defendants, until the Court resolves the ownership dispute, from taking any action to stop PGC's sales of Bakblade products, including by requesting the removal of its Amazon product listing; (2) directing Defendants, until the Court resolves the ownership dispute, to authorize PGC to print Transparency labeling or to remove the Bakblade products from the Transparency program, allowing PGC to sell unlabeled products; (3) setting a 60-day period for expedited discovery limited to the ownership dispute; (4) directing Defendants to disclose, within 21 days, the communications they and their counsel had with Shellco's administrators, with the attorneys for those administrators, and with Shellco's personnel; (5) directing Defendants to submit a supplemental brief (limited to 20 pages) concerning the ownership dispute within 21 days after the close of the 60-day expedited discovery period; and (6) directing PGC to submit a supplemental brief (limited to 20 pages) within 14 days after Defendants submit their supplemental brief.  To the extent either side asserts that the Court must consider foreign law to resolve the ownership dispute, they must address such law as part of their supplemental briefing, which may include a declaration concerning the applicable law.  Following this briefing, the Court should resolve the issue of who owns the intellectual property rights and assets at issue and determine what further injunctive relief is necessary.  If the Court believes there are triable issues of material fact, then it should set an evidentiary hearing on the ownership dispute, which is essentially equitable in nature, and then resolve the dispute thereafter.[1]

---

[1] None of the relief sought in this motion affects the timing of Defendants' litigation of their fraudulent transfer counterclaim.  While PGC has moved to dismiss that claim, Defendants remain free to seek discovery on that claim in the ordinary course as permitted by the Court.

## STATEMENT OF FACTS

A.     **PGC Owns the Intellectual Property Rights and Assets at Issue**

On October 24, 2024, PGC purchased the business and assets of Shellco 2021 Limited ("Shellco"), a private limited company incorporated and registered in England and Wales, which had entered into administration under UK insolvency law.  (Declaration of Ben Poynter, dated November 11, 2025) ("Poynter Decl."), ¶ 3.  Shellco operated a business known as "Bakblade," which sold products in the back shaving and personal care category with sales primarily generated through its Amazon storefront.  (*Id.*)  PGC purchased Shellco's business and assets, including all intellectual property associated with the Bakblade business, by purchasing them from Shellco's administrators on October 24, 2024, through an "Agreement for the Sale and Purchase of the Business and Assets of Shellco 2021 Limited (in administration)" ("SPA").  (Poynter Decl. ¶¶ 4-5; D.I. 16, Ex. A.)  In connection with the SPA, the parties also executed a "Deed of Assignment of Intellectual Property Rights and Goodwill" ("IPR Assignment Deed") on October 24, 2024. (Poynter Decl. ¶ 6; D.I. 60, Ex. A.)

Both the SPA and the IPR Assignment Deed show that PGC acquired title to the Bakblade intellectual property on October 24, 2024.

The SPA defines the "Assets" being sold as "all the property, assets and rights of the Company in relation to the Business including without limitation all the items listed in Clause 2.1 but excluding in each case the Excluded Assets."  (D.I. 16, Ex. A § 1.)  Section 2.1.2 lists Shellco's "Intellectual Property Rights" as among the assets that are being sold to PGC, including its trademarks, patents, and website domains.  (*Id.* § 2.1.2.)  Section 6.1 provides that "Completion" of the purchase "shall take place at the offices of the Administrators' Solicitors immediately after the execution of this Agreement or at such other place as the Parties may agree."  (*Id.* § 6.1.) Section 7.1 of the SPA provides that title to Shellco's assets would transfer upon completion of the

sale: "Such right, title and interest (if any) as the Company has in the Business and the Assets …
shall pass to the Purchaser at the Effective Time." (*Id.* § 7.1.) Section 12.2 provides, "The Assets
are sold in their condition and locations at the Effective Time." (*Id.* § 12.2.) ("Effective Time" is
defined as "the date and time of Completion." (*Id.* § 1.).) Finally, the SPA states that it "has been
executed as a deed and is delivered and takes effect on the date stated at the beginning of it," i.e.,
October 24, 2024. (*Id.* at 4, 50.)[2]

The IPR Assignment Deed is referred to in the SPA as the "deed of assignment of the
Intellectual Property Rights and Goodwill … in the agreed form, made between the Company
[Shellco], the Administrators and the Purchaser [PGC] on the same date as the date of this
Agreement," and was to be provided to PGC following the completion of the sale. (*Id.* §§ 1, 6.4.2.)
The IPR Assignment Deed provides that, "the Assignor [Shellco] hereby assigns to the Assignee
[PGC] absolutely all such right, title and interest as the Assignor may have in and to the Intellectual
Property Rights and the Goodwill." (D.I. 60, Ex. A § 2.2.)

### B.    Defendants Knew About PGC's Purchase of the Intellectual Property Rights and Asset at Issue

PGC's purchase of Shellco's business and assets, including all its intellectual property
rights and assets, was fully disclosed to Defendants. Shellco had marketed its business and assets
for sale between September 26, 2024, and October 11, 2024, including discussions with
Defendants about purchasing the business and assets. (D.I. 16 ¶¶ 6-7; D.I. 18 ¶ 4.) In connection
with that process, Shellco retained Hilco Valuation Services ("Hilco"), which performed a
valuation of Shellco's business and assets and determined that the maximum value of the business
was as a going concern, and that as a going concern, the business and assets were valued at

---

[2] As the SPA's internally-marked page numbering is not consecutive, and does not number certain
pages, the citation is to the page numbers that would apply if counting from the first page of the
document.

£1,000,000-£1,075,000.  (D.I. 16 ¶ 8.)  Defendants appear to have bid on that purchase.  *See* D.I. 36 ¶ 31 (denying the allegation that, "Defendants did not submit an offer to purchase Shellco's business and assets.").  Ultimately, PGC's bid of £1,300,000 to purchase Shellco's business and assets was determined to be the highest offer, and PGC and Shellco then prepared and entered into the SPA and IPR Assignment Deed on October 24, 2024.  (D.I. 16, ¶¶ 6, 9 & Ex. A; D.I. 60, ¶¶ 4-13 & Ex. A.)

On October 30, 2024, one of Shellco's administrators, Andrew Tate, sent a notice to Defendants that he and James Hokirk had been appointed as Shellco's administrators.  (D.I. 16 ¶ 11 & Ex. B.)  "I write to advise you that James Hopkirk and I were appointed Administrators of the Company on 24 October 2024 . . . shortly after appointment I effected a sale of the Company and assets to Personal Grooming Co Limited."  (D.I. 16, Ex. B, at 1.)  The October 30 letter also made available, through a website link, a copy of the "Administrators Proposals" and "SIP 16 disclosure" concerning Shellco and the sale to PGC.  (D.I. 16, Ex. B.)  The Administrators Proposals were subsequently filed at Companies House, the UK registrar of companies, on November 14, 2024.  (D.I. 17 ¶ 4 & Ex. B.)  Defendants admit receiving the October 30 letter.  (D.I. 36 ¶ 41; D.I. 1, Ex. B.)

The Administrators Proposals and the SIP16 disclosure described, among other things, the events leading up to Shellco's entry into administration, the details of the sale to PGC, and the actions the administrators proposed to take.  (D.I. 16 ¶ 12 & Ex. C.)  The Administrators' Proposals state that, "[i]mmediately upon our appointment, the business and assets of the Company were sold to a connected party, Personal Grooming Co Limited.  Attached to these proposals is a statement [the SIP16] disclosing full details of the sale …."  (D.I. 16, Ex. C, at 3.)  The "SIP16 Statement" described similar information, including more information about the sale.  (D.I. 16,

Ex. C, at 34-52.)  Both the Administrators Proposals and the SIP16 Statement discussed Hilco's valuation of Shellco's business and assets, that PGC's offer included £999,995 to purchase all of Shellco's intellectual property rights and assets, and that, because PGC was a "connected party" to Shellco under UK insolvency law, PGC's offer had been required to be validated by an independent evaluator, J9 Advisory, which had determined that PGC's offered consideration was reasonable.  *See* D.I. 16, Ex. C.

Defendants received the Administrators Proposals (including the attached SIP16 Statement).  Their then-counsel's billing records submitted in the lawsuit Defendants commenced against Shellco indicate that their counsel reviewed the Administrators Proposals on December 8, 2024.  (D.I. 38, Ex. G, internal Ex. B, at 14.)  On December 10, 2024, Defendants' then-counsel wrote to Shellco's administrators, complaining about "the purchase of Bakblade by Personal Grooming Company," and discussing the contents of the Administrators Proposals.  (D.I. 18, Ex. A.)  In their December 10 email, Defendants' counsel indicated they understood that all of Shellco's assets concerning Bakblade, including all the intellectual property rights and assets that Defendants had sold to Shellco, had been transferred to PGC.  (*Id.*)  In fact, Defendants' counsel asserted this was a fraudulent transfer of the assets that Defendants had sold to Shellco.  (*Id.* at 2-3.)

In addition, Defendants' then-counsel's time records reflect that, between October 1, 2024, and December 19, 2024, they had extensive communications with Shellco's director Ran Oren, with Shellco's administrators, and with UK counsel for the administrators, Daniel Andrews (of Stephenson Harwood LLP).  (D.I. 38, Ex. G, internal ex. B, at 5-16; internal ex. C, at 5-6, 8.)

Defendants were also put on notice of PGC's purchase of the Bakblade business, including all intellectual property rights and assets, by or before November 3, 2024, as PGC promptly took

steps after the purchase to have Amazon identify PGC as the owner of the Amazon storefront for the Bakblade business and updated the bakblade.com website to indicate PGC owned the business. (Poynter Decl. ¶¶ 8-9; D.I. 60 ¶¶ 15-20.)  Both the Amazon storefront and bakblade.com website have continuously identified PGC as the owner of the Bakblade business since then.  (D.I. 60 ¶¶ 16, 20.)

### C.    <u>Defendants' Wrongful Seizure of PGC's Intellectual Property</u>

On October 23, 2024, Defendants commenced an action in this Court against Shellco, entitled, *Dryfhout Enterprises, LLC et al v. Shellco 2021 Limited*, Case 1:24-cv-01184-RGA (the "2024 Suit").  (D.I. 17 ¶ 7.)  By that date, as noted above, Defendants were already aware that Shellco was engaged in the sale of its business and assets and had solicited offers to purchase them. Defendants were tracking the sale process so closely that they were already aware of Shellco's name change on October 23 when they filed the 2024 Suit that very same day.  *See id.* ¶ 3.  On February 4, 2025, a default judgment was entered against Shellco in the 2024 Suit, awarding Defendants $4,263,143.97.  (*Id.* ¶ 8.)

On May 6, 2025, Defendants filed an application in the 2024 Suit for a writ of execution against certain assets Defendants which they falsely claimed belonged to Shellco, namely, certain trademarks, patents, and website domains identified therein (the "Trademarks, Patents, and Website Domains").  (*Id.* ¶ 9 & Ex. D.)  Defendants knew this was false because they knew the Trademarks, Patents, and Website Domains had been sold to PGC as part of its purchase of Shellco's business and assets on October 24, 2024.  While Defendants may have believed the sale was improper, they knew their remedy was to file a claim for fraudulent transfer.  (D.I. 18, Ex. A, at 2-3.)  But Defendants did not do so.  Instead, they concealed their knowledge of the sale to PGC from the Court.  *See* D.I. 17, Ex. D.  Relying on Defendants' false representations, the Court issued the writ of execution on May 21, 2025.  (D.I. 17, Ex. E.)  Notably, the writ of execution was

expressly limited to property of Shellco.  (*Id.*)  Defendants did not serve PGC with notice of the application for a writ of execution, or with a copy of the issued writ.  (D.I. 16 ¶¶ 15, 17.)  On July 22, 2025, the U.S. Marshals Service conducted an ostensible sale of the Trademarks, Patents, and Website Domains, under the false assertion that this was property of Shellco.  (D.I. 17, Ex. G.)  Defendant Dryfhout Properties, LLC was the high bidder, with a bid of $100,000, and purported to purchase the Trademarks, Patents, and Website Domains, even though Defendants knew none of that property belonged to Shellco or could be seized or sold pursuant to an execution of judgment against Shellco.  (*Id.*)  On July 29, 2025, Defendants recorded trademark assignments with the United States Patent and Trademark Office ("USPTO"), dated July 25, 2025, assigning to themselves the 27 trademarks and trademark applications identified in the writ of execution and bill of sale, and then, by way of a further assignment, to Dryfhout Properties alone.  (D.I. ¶ 14 & Ex. H.)

> **D.     Defendants' Refusal to Coexist with PGC, and the Irreparable Damage This Will Cause to PGC**

> **1.     Defendants' Takeover of the Bakblade Brand on Amazon**

On November 6, 2025, PGC learned that Amazon.com has removed PGC as the owner of the Bakblade intellectual property on the Amazon Brand Registry.  (Poynter Decl. ¶ 10.)  The Amazon Brand Registry is a program offered by Amazon to help intellectual property owners secure their brands and enforce their rights against third-party infringers.  (*Id.* ¶ 11.)  As PGC is no longer the owner of the Bakblade intellectual property on the Amazon Brand Registry, it cannot enforce its rights in that intellectual property, which means it is  unable to prevent third-party infringers or counterfeiters of the Bakblade products.  (*Id.* ¶ 12.)  This makes it more likely that knockoffs of its products will proliferate, posing a risk of physical harm to PGC's customers (from

poorly-made products) and long-term damage to PGC's reputation and customer goodwill. (*Id.* ¶ 13.)

## 2. Defendants Can Now Block All PGC's Sales, Causing Irreparable Harm

Defendants, one of which is the new brand owner on Amazon, are now entitled to request that Amazon take down PGC's Bakblade product listings on the grounds that they are infringing on Defendants' intellectual property rights. (Poynter Decl. ¶ 14; Declaration of Joel H. Rosner, dated November 11, 2025 ("Rosner Decl."), ¶ 13.) If Defendants ask Amazon to take down PGC's Bakblade product listings, that takedown will likely be immediately granted (as is routine on Amazon) and all of PGC's product listings will be permanently removed until Defendants withdraw the request or PGC obtains a court order requiring Amazon to restore its listings. (Poynter Decl. ¶¶ 14-15.)

PGC will be irreparably harmed if its Amazon product listings are removed or if it is prevented from shipping products through Amazon, as PGC fulfills all its Bakblade products orders—whether made on its website or on its Amazon storefront—through Amazon's "Fulfilled by Amazon" ("FBA") shipping program. (*Id.* ¶ 16.) The FBA shipping program allows merchants such as PGC to store products in Amazon's warehouses and have Amazon process orders and ship the products to the customer. (*Id.*) If Defendants direct Amazon to bar PGC from selling Bakblade products on Amazon, then PGC's Bakblade business will cease to exist as it will be unable to fulfill any orders—all of PGC's inventory is stored in Amazon's warehouses. (*Id.* ¶ 17.)

Even a short halt in PGC's sales would cause it irreparable harm. (*Id.* ¶ 18.) PGC competes on Amazon with other companies in the back shaver and personal care products space. (*Id.* ¶ 19.) This is a highly competitive space, and PGC has maintained a high ranking due to its volume of sales, product availability, product quality and reviews, earning coveted "Amazon's Choice" designations on multiple products. (*Id.* ¶ 20.) The "Amazon's Choice" designation is of critical

importance in persuading consumers to purchase PGC's products, as it elevates the status of PGC's products to consumers choosing among many competing products, including because the "Amazon's Choice" designation cannot be purchased by sellers. (*Id.* ¶¶ 21-22.) Many of PGC's products also often earn the higher designation of "Amazon's Choice: Overall Pick," which is applied to products that are "Rated 4+ stars[,] Purchased often[, and] Returned infrequently." (*Id.* ¶ 23.) But these designations can be lost as easily as they are obtained: if a seller's business is halted, preventing it from selling products or earning new reviews, Amazon will remove the designation and give it to the next qualifying seller. (*Id.* ¶ 24.) If PGC's business on the Amazon is blocked by Defendants, it will lose the Amazon's Choice and Overall Pick designations, immeasurably damaging its business. (*Id.* ¶ 25.) This because, even if PGC's right to sell on Amazon eventually were restored, PGC would be competing against other sellers that have the substantial advantage of the Amazon's Choice and Overall Pick designations it lost. (*Id.*) Later qualification for the Amazon's Choice or Overall Pick designations would not remedy this harm, as PGC would forever be unable to recover the unknown number of sales or customers it would have lost in the interim while others had those prestigious Amazon designations and thus had improved access Amazon customers. (*Id.*) This would result in permanent damage to PGC's ability to sell its products. (*Id.*)

PGC will also lose customer goodwill and brand reputation if it disappears from the market. (*Id.* ¶ 26.)

### 3.   <u>Because of Defendants' Takeover of the Brand on Amazon, PGC's Business Will Be Terminated Unless Defendants Authorize It</u>

But PGC's business will soon be destroyed even if Defendants do nothing, as affirmative action is required to ensure PGC's continued operations on Amazon. (*Id.* ¶ 27.) This is because the Bakblade products are enrolled in Amazon's Transparency program, which is offered to help

brands prevent counterfeiting and other misuse.  (*Id.* ¶ 28)  A unique code is placed on each product, typically by applying a label containing a QR code (a type of barcode), which, when scanned by a customer using the "Transparency" phone application issued by Amazon, opens a webpage on the customer's phone that takes them to the authentic product page. (*Id.*)  Only certain persons, such as brand owners and authorized users, can print Transparency labels for use in the program.  (*Id.* ¶ 29.)  Amazon will not ship products enrolled in the Transparency program unless Transparency labeling has been applied to the products.  (*Id.* ¶ 30.)  Because Defendants removed PGC as the owner of the Bakblade intellectual property on the Amazon Brand Registry, PGC can no longer print new Transparency labels.  (*Id.* ¶ 32.)  Once PGC sells through its current stock of products already bearing Transparency labels, it will be unable to sell any Bakblade products on Amazon.  (*Id.* ¶ 33.)  PGC estimates it currently has about six months' stock of Transparency-labeled Bakblade products.  (*Id.* ¶ 34.)  Once that stock is sold, the only way for PGC to continue sales on Amazon is if Defendants either agree to permit PGC to print additional Transparency labels or agree to remove the Bakblade products from the Transparency program, allowing unlabeled products to be sold.  (*Id.* ¶ 35.)  Unless Defendants take one of those affirmative steps, PGC's Bakblade business will be terminated.  (*Id.* ¶ 36.)  Similarly, if Defendants ask Amazon to take down PGC's product listings, PGC's Bakblade business will be immediately terminated; it could not then sell even the Transparency-labeled product it still has in stock.[3]  (*Id.* ¶ 37.)

### 4. <u>Defendants Refuse to Coexist with PGC, Refuse Authorize PGC to Continue Selling on Amazon, and Intend to Request the Removal of PGC's Product Listings</u>

On November 6, 2025, PGC emailed Defendants about their takeover of the Bakblade brand on Amazon and requested a meet and confer.  (Rosner Decl., Ex. A, at 6-7.)  PGC noted that

---

[3] While monetary damages are not sufficient to make PGC whole if its business is terminated, PGC's annual sales in the Bakblade business exceed $10 million.  (D.I. 60 ¶ 21.)

Defendants could now immediately direct Amazon to remove PGC's product listings, and that the brand takeover also prevented PGC from enforcing Bakblade intellectual property rights against third-party infringers and counterfeiters. (*Id.* at 6) PGC also pointed out that removal of PGC's enforcement violated Defendants' commitment not to damage the trademarks at issue in this action, as that damage would be the inevitable result of PGC no longer being able to police the marks. (*Id.* at 6.) PGC asked Defendants to agree to refrain from seeking to remove PGC's product listings, that PGC and Defendants both be permitted to engage in their own sales of their own Bakblade products on Amazon until the Court decides the ownership issue, and that Defendants either authorize PGC to continue enforcing Bakblade intellectual property rights against third-party infringers and counterfeiters, or commit to promptly taking action against such persons identified by PGC. (*Id.* at 6-7.) Defendants did not respond at all until November 7, at which time they promised a response would be forthcoming. (*Id.* at 4.) When PGC still had not received a response at the end of the day, it wrote again, adding that PGC had learned it would be unable to sell any further products once its stock ran out, and that the parties needed to work out a coexistence arrangement. (*Id.* at 3.)

On November 10, shortly before the parties' scheduled meet and confer, Defendants rejected PGC's requests, writing that, "Defendants cannot agree not to assert to Amazon that PGC is infringing because PGC is infringing. Nor can Defendants agree to allow PGC to infringe its rights on Amazon." (*Id.* at 1.) At the subsequent meet and confer, Defendants confirmed that they were refusing to coexist with PGC, and that they would seek to use all means to take down PGC's product listings and block its sale under all circumstances, even if the Court denies Dryfhout Properties' pending motion for a preliminary injunction. (Rosner Decl. ¶ 12.)

**5.** **Defendants Will Not be Harmed by Injunctive Relief Permitting PGC to Continue Sales**

Defendants have no known risk of harm from PGC being permitted to continue sales. Indeed, Defendants are not genuinely engaged in selling products of their own. While Defendants have established a website (bakbladeco.com) to engage in sales of their products, that website is little more than a copy of PGC's own website staged to look like a real business. As PGC showed in its opposition to Defendants' motion for a preliminary injunction, a comparison of the parties' websites easily revealed the massive extent of Defendants' copying, as both sites have an identical layout and look and feel and nearly identical text. (D.I. 58, at 13-14; D.I. 59, ¶¶ 2-3 & Exs. A-G.) The wholesale nature of that copying was demonstrated by the fact that Defendants had failed to update all the hyperlinks on their site, meaning that many of those links still pointed to bakblade.com as they did in the page Defendants copied, and the "Contact Us" page directed customers contact PGC about Bakblade products. (D.I. 59, ¶ 3 & Exs. A, B, G.) Similarly, the fact that the website displayed an advertisement for a Memorial Day sale—in October—indicated the website was not in active use. (D.I. 59, Ex. A.) Notably, the website was only created on October 6, 2025, hours before Defendants filed their Answer and Counterclaims. (D.I. 59, ¶ 4 & Ex. H; D.I. 36.)

PGC has now also learned that Defendants are not even selling their own products. Rather, Defendants are fulfilling orders placed on their bakbladeco.com site by purchasing PGC's products and passing them off as their own products. (Rosner Decl. ¶¶ 14-17.) The products PGC received through a test purchase clearly show PGC's name on the packaging and one product even includes the Transparency label that PGC applies to its products. (*Id.* ¶ 16.)

Consequently, Defendants face no real risk of harm from an injunction requiring them to coexist with PGC while this action is pending. This would be true even if they were selling their

own product, but it is especially the case where Defendants have no independent business of their own and appear intent on pretending to be PGC.

## ARGUMENT

### I.   THE COURT SHOULD REQUIRE DEFENDANTS TO COEXIST WITH PGC UNTIL THE OWNERSHIP DISPUTE IS RESOLVED

To obtain a temporary restraining order or preliminary injunctive relief, a plaintiff must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured ... if relief is not granted.... [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). The first two are the "'most critical' factors: the plaintiff must "demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Id.* at 179. "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* "'How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief.'" *Id.* quoting (*Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). *See also CrowdStrike, Inc. v. NSS Labs. Inc.*, No. 17–146, 2017 WL 588713, at *1 (D. Del. Feb. 13, 2017 ("where a party faces the possibility of irreparable harm before the court can hold a hearing on the motion for a preliminary injunction, a temporary restraining order may be appropriate to preserve the status quo and prevent such irreparable harm").

All four factors favor granting injunctive relief to PGC.

### 1. **PGC Has a Reasonable Probability of Eventual Success**

PGC has a strong probability of succeeding on the merits of its claim to be determined as the owner of the Trademarks, Patents, and Website Domains that PGC purchased from Shellco. PGC has provided the contract documents evincing its purchase of that intellectual property on October 24, 2024. Thus, the Defendants could not seize that intellectual property from Shellco in May 2025 because Shellco neither owned nor possessed it.

While Defendants contend they could still seize that intellectual property if they did not know about Shellco's sale to PGC, that contention is unavailing because it is abundantly clear Defendants knew about the sale long before they applied for the writ of execution. PGC has shown that Defendants were given full disclosure about PGC's purchase on October 30, 2024, and knew all pertinent information no later than December 8, 2024, including reviewing the extensive Administrators Proposals that disclosed all information about the sale. Defendants, who knew that Shellco did not own or possess the Trademarks, Patents, and Website Domains, nevertheless falsely represented to the Court in May 2025 that Shellco owned that intellectual property, concealing their knowledge of PGC's purchase, to induce the Court to issue a writ of execution to seize that intellectual property from Shellco. Consequently, whether or not a lack of notice might be a defense, Defendants had notice and have no defense. Defendants' fraudulent transfer counterclaim does not serve as a defense because, until and unless they prevail on that counterclaim, PGC remains the lawful owner of the Trademarks, Patents, and Website Domains. Moreover, as addressed at greater length in PGC's motion to dismiss, that counterclaim is invalid as a matter of law and fact. (D.I. 65, at 1-10.)

Consequently, PGC has shown it is likely to succeed on the merits of its claims.

## 2. __PGC Will Be Irreparably Injured Without Immediate Injunctive Relief__

The damage Defendants can cause to PGC absent injunctive relief is profound and will inevitably cause the termination of PGC's business unless it is granted injunctive relief until the ownership dispute is resolved.  Now that Defendants are the listed brand owners on Amazon, they can immediately terminate PGC's business by directing Amazon to remove PGC's product listings on the ground that PGC is infringing on the Bakblade intellectual property rights.  Even if Defendants take no action against PGC, they can achieve the same result by simply refusing to allow PGC to continue selling Bakblade products on Amazon, as PGC needs authority to continue using Transparency labels (or to have the Bakblade brand removed from that program).  Even a short-term halt in PGC's business would cause it a loss of reputation and customer goodwill.  But a permanent termination of its business is clear irreparable injury to PGC.  *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011) (a purely economic loss can constitute irreparable injury to a party where the potential loss is so great as to threaten the existence of that party's business); *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 726 (3d Cir. 2004) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will.").

Therefore, PGC has shown that it is "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly*, 858 F.3d at 179.  PGC's showing of extreme, permanent harm would warrant an injunction even absent its strong claim on the merits. *Id.* ("the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief").  Moreover, the destruction of PGC's business would impair the Court's ability to effectively remedy Defendants' conduct by assigning ownership of the Bakblade intellectual property to PGC.  "A preliminary injunction is especially appropriate where the action sought to be enjoined would 'impair the court's ability to grant an effective remedy.'"

*GTE Sylvania Inc. v. Consumer Prod. Safety Comm'n*, 404 F. Supp. 352, 373-74 (D. Del. 1975) (quoting 11 Wright & Miller, Federal Practice and Procedure Sec. 2948, p. 434 (1973)).

### 3.  Defendants Will Not Be Harmed by the Requested Relief

This factor, sometimes characterized as the balancing of equities, strongly favors PGC. "[T]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor." *Kos Pharm.*, 369 F.3d at 729 (quotation omitted).  PGC has clearly shown its ownership of the Trademarks, Patents, and Website Domains, and its entitlement to their return.  Moreover, Defendants will not be harmed by being required to coexist with PGC until the Court resolves the dispute over the ownership of the Trademarks, Patents, and Website Domains.  Defendants obtained any rights they have to those properties only by misrepresenting to the Court that they were owned by Shellco.  "The only 'hardship' imposed upon Defendant[s] is that [they] refrain from engaging in unlawful conduct." *EA Sween Co., Inc. v. Deli Exp. of Tenafly, LLC*, 19 F. Supp. 3d 560, 577 (D.N.J. 2014) (granting injunctive relief).  In addition, this factor also weighs "the 'goal[ ] of the preliminary injunction analysis [of] maintain[ing] the status quo, defined as the last peaceable, noncontested status of the parties,'" i.e., "'[b]efore this controversy began.'" *Kos Pharm.*, 369 F.3d at 729 (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.,* 920 F.2d 187, 197 (3d Cir. 1990)).  Here, that status included PGC's operation of the Bakblade business.

In addition, all evidence suggests that Defendants are not operating a genuine business. Instead, they operate a website that is a copy of PGC's website and pass off PGC's products as their own.  But even if Defendants intend to operate a real business, the proposed injunctive relief will not prevent them from doing so.  All PGC seeks is the right to coexist and continue its product sales while the Court resolves the ownership dispute.

### 4. **The Public Interest Favors PGC**

"As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Kos Pharm.*, 369 F.3d at 732 (quotation omitted). As PGC has shown a strong likelihood of success on the merits, and irreparable injury absent injunctive relief, the public interest favors it. It also certainly favors protecting companies such as PGC, which lawfully held intellectual property rights and assets, from those who scheme to unlawfully take them.

As all four factors considered on applications for injunctive relief favor PGC, the Court should issue a temporary restraining order and preliminary injunctive relief directing the relief described above and in the proposed order attached to the motion, namely, requiring Defendants to co-exist with PGC and cease efforts to terminate its business while the Court resolves the ownership dispute and setting a schedule for expedited discovery and an expedited resolution of that dispute.

### CONCLUSION

For the foregoing reasons, the Court should grant PGC's motion in its entirety, together with such other and further relief as the Court may deem just and proper.

Dated: November 11, 2025

        /s/ Kenneth L. Dorsney
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)

OF COUNSEL:                MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Joel H. Rosner             Wilmington, DE  19803
*Admitted Pro Hac Vice*     (302) 888-6800
TARTER KRINSKY & DROGIN LLP    kdorsney@morrisjames.com
1350 Broadway            chitch@morrisjames.com
New York, New York 10018
Tel. (212) 216-8000
jrosner@tarterkrinsky.com    *Attorneys for Plaintiff*
*Personal Grooming Co Limited*

21