# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| PERSONAL GROOMING CO LIMITED, | ) |
| Plaintiff, | ) ) ) |
| v. | ) C.A. No. 25-1047-RGA ) ) |
| DRYFHOUT ENTERPRISES, LLC, DRYFHOUT PROPERTIES, LLC, MATTHEW DRYFHOUT, and ANGELINA DRYFHOUT | ) ) ) ) ) |
| Defendants. | ) ) |

**REPLY BRIEF IN SUPPORT OF
DEFENDANT DRYFHOUT PROPERTIES,
LLC'S MOTION FOR A PRELIMINARY INJUNCTION**

*Of Counsel:*

Carrie J. Richey
WOMBLE BOND DICKINSON (US) LLP
50 California Street, Suite 2750
San Francisco, California 94111
Telephone: (415) 433-1900
carrie.richey@wbd-us.com

Stephanie S. Riley (#5803)
Zachary Murphy (#6881)
Alexander P. Wharton (#7304)
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
stephanie.riley@wbd-us.com
zachary.murphy@wbd-us.com
alexander.wharton@wbd-us.com

*Counsel to Dryfhout Enterprises, LLC,
Dryfhout Properties, LLC, Matthew Dryfhout,
and Angelina Dryfhout*

Dated: November 11, 2025

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................1

II.    DP IS ENTITLED TO AN INJUNCTION.................................................................2

    A.    PGC Fails to Rebut DP's Reasonable Probability of Eventual Success..................2

    B.    PGC Has Not Rebutted the Irreparable Harm DP Will Suffer ................................9

    C.    Balance of Equities Does Favor DP.........................................................................9

    D.    A PI Serves the Public Interest ................................................................................9

III.    ONLY A NOMINAL BOND IS REQUIRED ..........................................................10

IV.    CONCLUSION ........................................................................................................10

# TABLE OF AUTHORITIES

Cases

*Boynes v. Limetree Bay Ventures LLC*
   110 F.4th 604 (3d Cir. 2024) ................................................................................................ 10

*In re Peregrine Ent., Ltd.*
   116 B.R. 194 (C.D. Cal. 1990) ................................................................................................ 3

*Kos Pharm., Inc. v. Andrx Corp.*
   369 F.3d 700 (3d Cir. 2004) .................................................................................................... 9

*LEGO A/S v. ZURU Inc.*
   799 Fed. Appx. 823 (Fed. Cir. 2020) ..................................................................................... 10

*Med. Sec. Card Co., LLC v. Scriptwell, Inc.*
   2024 WL 5697438 (D. Del. Oct. 29, 2024) ............................................................................. 9

*Orbital Techs., Inc. v. Cubewano IP, Ltd.*
   2016 WL 9047126 (M.D. Fla. Mar. 24, 2016) ........................................................................ 5

*Sensus USA, Inc. v. Franklin*
   2016 WL 1466488 (D. Del. Apr. 14, 2016) ........................................................................... 10

Statutes

15 U.S.C. § 1060 ............................................................................................................................ 3

35 U.S.C. § 261 .............................................................................................................................. 3

I.      **PRELIMINARY STATEMENT**

Since PGC has muddied and injected new issues not raised in DP's Motion, a re-framing of the issues is warranted. In simplest form, there are two competing arguments for chain of title, both of which begin with Shellco[1] f/k/a Bakblade purchasing the IP Assets from Defendants for consideration exceeding $13 million and Shellco breaching its promise to pay $4 million in Deferred Payments to Defendants. From here, the Parties' positions diverge. PGC contends it then purchased the IP Assets from Shellco (in administration) pursuant to the SPA and simultaneously obtained ownership thereof, predating any action taken by Defendants in the *Dryfhout Enterprises, LLC, et al. v. Shellco 2021 Ltd.* (the "Default Action"). Defendants' position on the other hand is that Defendants purchased the BAKBLADE Marks at a Marshal's Sale following a Writ, whereby the BAKBLADE Marks were seized by this Court *before* allegedly being transferred to PGC. In the alternative, Defendants contend that even if the IP Assets were purportedly transferred prior to the Writ in the Default Action, either (1) the transfer, and subsequent assignment, is void against Defendants as bona fide purchasers pursuant to 15 U.S.C. § 1060(a)(4) and 35 U.S.C. § 261, as assignments were not recorded with the USPTO within three months of the alleged transfer nor not recorded before the Writ seizing the BAKBLADE Marks, or (2) the transfer from Shellco to PGC was fraudulent and therefore void. Knowing it is in jeopardy, PGC all of a sudden provides a Deed that neither DP nor this Court has seen. If this Deed was executed alongside the SPA, this begs the question why it wasn't filed with the Court with the SPA itself two months ago.[2] (*See* D.I. 16.) In any event, DP is entitled to a preliminary injunction during the pendency of this action.

---

[1] All abbreviations defined in DP's Opening Brief (D.I. 44) are incorporated herein.
[2] Schedule I, Parts II and III, which identify the trademarks and patents purportedly assigned (and are written in Dutch, oddly), don't include all of the BAKBLADE Marks at issue here. For example, it does not include U.S. Trademark Reg. No. 4,876,804 for the mark "DRYGLIDE." (D.I. 16, Ex. A.)

1

## II. DP IS ENTITLED TO AN INJUNCTION

### A. PGC Fails to Rebut DP's Reasonable Probability of Eventual Success

PGC provides no authority to evade the legally intact Default Judgment, Writ, and Marshal Sale from the Default Action. Although PGC claims that the seizure was "unlawful" or that the Writ was obtained "under false pretenses" (D.I. 58, at 4), the legal effect of these documents remains untouched. Recently, this Court issued an Order Confirming U.S. Marshal's Sale and Facilitating Transfer of Property Sold. *Default Action*, D.I. 24. Counsel for PGC admitted that he "[doesn't] think [PGC] can procedurally move to vacate." (*See* Declaration of Carrie Richey ("Richey Decl."), filed concurrently herewith, Ex. A at 8:13-14.) Shellco could and should have appeared in the Default Action at the time of the Writ, but it chose not to.[3] PGC offers zero precedent suggesting that a Court should disregard its own orders. PGC fails to mention that no other Court (in the UK or otherwise) is or has decided the ownership of the IP Assets.[4] The USPTO records indicate that DP is the owner of the BAKBLADE Marks. (*See* D.I. 44 at 7; D.I. 46.)

Even assuming the SPA with the newly produced Deed transferred legal title to PGC in October 2024, PGC fails to address its Achilles heel: the eight-month delay in recordation after the Writ was delivered to the Marshal. (*See* D.I. 44, at 10.) Under U.S. law, an assignment is void against a subsequent bona fide purchaser for valuable consideration without notice, unless the assignment was recorded at the USPTO within three months of the assignment or before the

---

[3] Shellco continues to exist. On October 8, 2025, Shellco's Administrators filed a Notice of Extension of Period of Administration with no explanation. (*See* Richey Decl., Ex. B.)

[4] When a company goes into administration, no U.K. court determines what assets the debtor owns. In fact, U.K. courts do not sanction or approve sales that are undertaken by an administrator, including pre-pack deals. Further, Administrators typically use standard legal language in pre-pack sales agreements, as here, to state that they are not providing any guarantees or representations about the business being sold. This is because administrators usually have no prior knowledge of the business and cannot verify the specifics of what is being sold. Therefore, it is the buyer's responsibility to conduct thorough due diligence to understand what they are purchasing.

2

subsequent purchase. 35 U.S.C. § 261 (patents); 15 U.S.C. § 1060 (trademarks). The "subsequent purchase" for "valuable consideration" occurred when Defendants received a Default Judgment, applied for the Writ, which was then delivered to the Marshal. *See, e.g., In re Peregrine Ent., Ltd.*, 116 B.R. 194, 207 (C.D. Cal. 1990) (judicial lien obtained in good faith without notice of earlier transfer trumps unperfected interest).

PGC claims that it did not have "notice" of the Default Action, but DP was not required to provide PGC notice of the Default Action. As of February 2025, PGC had not filed any assignment for the BAKBLADE Marks at the USPTO, and DP therefore had no knowledge of PGC's purported interest. (D.I. 39, ¶¶ 3-6, Apps. I, II.) Before PGC recorded any assignments at the USPTO, Defendants applied to this Court to issue a Writ as to the BAKBLADE Marks, and this Court issued the Writ, preventing Shellco from transferring the BAKBLADE Marks. (D.I. 38, ¶¶ 13, 15.) Only after issuance of the Writ and it being filed at the USPTO did PGC file any assignments to the BAKBLADE Marks with the USPTO. (*Compare* D.I. 39, ¶¶ 3-6, Apps. I, II with D.I. 45, Ex. A.)[5]

In any event, PGC assumed the risk that title may have been encumbered. Under the SPA, PGC assumed the "sole risk of there not being good title to the Assets" and "being subject to an Encumbrance" (D.I. 16, Ex. A, at § 2.2). The SPA defines "encumbrance" to include a "third party right or interest (legal or equitable) including any assignment by way of security, reservation of title or other security interest of any kind, howsoever created or arising or any other agreement or arrangement having similar effect." (*Id.* at § 1.1 ("Encumbrance".) Dryfhout had a legal and

---

[5] While this Motion does not concern the patents underlying the BAKBLADE products, PGC did not file assignments for all IP Assets prior to July 29, 2024, the day Defendants filed its assignments. (D.I. 39, ¶¶ 3-6, Apps. I, II; D.I. 1 at ¶ 63 (PGC admitting that it did not file assignments for all IP Assets prior to July 29, 2025).) In fact, none of the USPTO records for the 18 patents identified in the Bill of Sale include an assignment to PGC. (D.I. 39, ¶ 3, App. I.)

3

equitable interest as to the IP Assets by virtue the Writ before PGC recorded its interest at the USPTO.[6]

PGC argues that because Defendants "knew" that the BAKBLADE Marks had been sold to PGC in October 2024, they had no right to request the Writ. (D.I. 58, at 2.) PGC attempts to rely on other information to prove notice—but none of these documents are assignments, nor do they identify any specific intellectual property or contain any language from which an assignment can be deduced (i.e., present intention to transfer title of the IP). (*See* D.I. 16, Ex. B; D.I 17, ¶ 6, Ex. C; D.I. 18, Ex. A; *see also* D.I. 37 at 15-16.) PGC now claims to have found "additional evidence" but none of this evidence again shows an assignment. (D.I. 58 at 9-10 (e.g., attorney time sheets, emails, Amazon storefront).) Tellingly, PGC does not rely on the June 2, 2025 IP Assignment or the Deed *because these were never provided to Defendants before they applied for and obtained the Writ.* (*See* Declaration of Matthew Dryfhout ("Dryfhout Decl."), filed contemporaneously herewith, ¶ 7.) This is detrimental to PGC's claim of ownership. At best, the evidence puts DP on inquiry notice to search USPTO records for an assignment, which it did many times before the Court issued the Writ and found none. (D.I. 45, ¶ 12.)

PGC also argues that "DP does not come close to satisfying its burden to show it is likely to succeed on its fraudulent transfer claim" (D.I. 58, at 7-12), but DP did not move for a PI on the

---

[6] Apparently aware of the risk, the SPA sought to exclude the 2022 APA from Business Contracts conveying from Shellco to PGC to curtail Defendant's collection efforts (D.I. 16, § 8; *see also id.* at § 1.1 (excluding the "2022 APA" under the definition of "Business Contracts")), but the SPA did not exclude the 2023 Amendment to the APA—a renewed commitment by Shellco to pay PGC the deferred payments for the IP Assets (*id.*) PGC cannot feign ignorance that Shellco had not satisfied its obligations under the 2022 APA; Mr. Poynter, for example, is a director of PGC, Shellco's parent Olsam Opco, and testified based on "personal knowledge" as to Shellco's "marketing of its business and assets for sale during the period of September 26, 2024 through October 11, 2024." (D.I. 60, ¶¶ 2, 4; *see also* D.I. 18, ¶ 4 (Fergus Niven, director of Olsam Opco, who was "involved in and knowledgeable of the actions of Shellco").)

4

basis of its fraudulent transfer counterclaim, only its Lanham Act counterclaims. (*See generally* D.I. 44.) DP established a prima facie case of trademark ownership. (*Id.*) In response, PGC has challenged DP's ownership by presenting new evidence of a Deed transfer and argues that DP was put on notice, to which DP now responds. Even if the Deed transferred title in October 2024 and DP was on notice of the assignment, the assignment is void as a thinly veiled and fraudulent attempt to escape creditors—Defendants—and therefore the assignment from Shellco to PGC is void.

PGC's argument that Delaware law does not apply to the fraudulent transfer falls flat. (D.I. 58, at 11.) These events have sufficient nexus with Delaware for DUFTA to apply. Shellco, a debtor to Defendants, agreed to pay over $13M for the IP Assets, pursuant to the APA and AAPA governed by Delaware law without giving effect to any choice or conflict of law provisions. (D.I. 38, ¶¶ 4-6, Exs. A, B.) Rather than pay the Deferred Payments under the AAPA, Shellco attempted to transfer the IP Assets to its sister company, PGC, before wiping out the debt owed to Defendants. This amounted to Shellco breaching the APA and AAPA, requiring Defendants to file suit. (*Id.* at ¶ 8.) Defendants obtained a Default Judgment against Shellco and a Writ—Defendants thereby becoming judgment creditors. (*Id.* at ¶¶ 12, 15.) Thus, the fraudulent transfer from Shellco to PGC seeks to thwart Defendants' collection efforts in this Delaware Court. This is more than enough to show a nexus to Delaware. The UK administration proceeding also does not affect DP's right as creditors, nor do they affect Shellco as the "debtor." *See, e.g., Orbital Techs., Inc. v. Cubewano IP, Ltd.*, 2016 WL 9047126, at *3 (M.D. Fla. Mar. 24, 2016) (Although Schedule B1 of the Insolvency Act of 1986 in the United Kingdom provides that "[n]o legal process . . . may be instituted or continued against the company [in Administration] . . . except (a) with the consent of the administrator; or (b) with the permission of the court," it "*is authoritatively established that*

5

*the moratorium does not extend to proceedings brought in foreign courts.*") (emphasis added). DP was free to pursue its collection efforts against Shellco as a debtor and can now bring a DUFTA claim against PGC as the transferee of the fraudulent transfer.

Even without discovery on these issues, DP has uncovered facts that satisfy all the indicia of fraud: the transfer was to an insider, debtor had been sued or threatened with a suit, the transfer was substantially all of Shellco's assets, Shellco became insolvent, and the transfer occurred after a substantial debt was incurred (Denali's security interest (*see* D.I. 1, ¶¶ 13-15)). Brothers Ollie and Sam Hörbye co-founded Olsam Group and Olsam Opco Limited and served as Directors. (Richey Decl., ¶¶ 4, 5.) Olsam Opco Limited's ("Olsam") business was to identify e-commerce brands and offer a buyout. (*Id.* at Ex. C.) Ollie and Sam set up numerous subsidiaries under Olsam, such as Shellco and PGC, for each of the acquired brands that they controlled as Directors. (*Id.* at ¶¶ 6, Ex. E.) Denali European Opportunities DAC ("Denali") funded these initial efforts through an initial security agreement. (*Id.* at ¶ 7, Ex. F.) As quoted in an article from the Business Insider, "the model works by promising high-growth sellers an 'earnout' payment structure when they sell their business to Olsam, providing certain benefits to the original owner when the business hits relevant targets, meaning they continue to share in the upside." (*Id.* at Ex. C.) Demonstrably, it is Olsam's business practice to negotiate deferred payments to acquire brand rights, only to not pay the deferred payment or, in this case, attempt to discharge that debt through a pre-pack sale to another one of its other subsidiaries.

Historically, Ollie and Sam Hörbye controlled Olsam, PGC, and Shellco**.** (*Id.* at ¶ 5, Ex. D.) To make it appear that PGC and Shellco were not one in the same prior to administration—Ollie and Sam resigned as directors of Shellco on September 17, 2024, having been replaced shortly before by Ran Oren. (*Id.* at Ex. G.) Ollie resigned from Director of PGC and on September

6

25, 2024 and Ben Poynter was appointed on October 1, 2024. (*Id.* at Ex. H.) Ollie and Sam also resigned from Olsam and Ben Poynter became Director. (*Id.* at Ex. D.) However, even though the Directors of Bakblade and PGC have changed, the same entity—Fairweather Bidco Limited ("Fairweather")—continues to control all entities. (*Id.* at ¶ 10, Ex. I.) Fairweather owns more than 75% of the shares and voting rights in Olsam, and has the right to appoint and remove the majority of board of directors of the company. (*Id.* at Ex. K.) In turn, Fairweather controls PGC and Shellco, wholly-owned subsidiaries of Olsam.

In December 2023, Olsam entered into a second Security Agreement with Denali. (*Id.* Ex. L.) In the Security Agreement, Olsam leveraged all the current subsidiaries of Olsam, including Shellco and PGC. (*Id.*) Ben Poynter, as the CFO of all Olsam entities, including Shellco and PGC, and Ollie, as the Director of all Olsam entities, including Shellco and PGC, signed this agreement on December 21, 2023. (*Id.*) Each of the signatories—including PGC and Shellco as well as 20+ other subsidiaries—were joint and severally liable for the debt incurred. (*Id.*) And PGC was a co-signor of the Security Agreement.

The relatedness does not end there. Fairweather's director (and PGC's director), Mr. Scott Christopher, is the COO of Northwall Capital LLC. (*Id.* at ¶¶ 9, 14.) Denali entered into an investment management agreement with Northwall which serves as its "Investment Manager." (*Id.* at Ex. J.) The purpose of Denali is to "provide loan origination facilities to a variety of borrowers across industries." (*Id.*) Thus, even though Northwall controls Olsam Opco, Shellco, and PGC, Northwall is beholden to Denali.

Around September 26, 2024, Shellco, through its then Director, Ran Oren (who was appointed by and can be removed as Director by Northwall), advised Defendants that Shellco's parent company and affiliates were in financial distress. Mr. Oren informed Defendants that Denali

7

would only continue to support Olsam if it could reach a full and final settlement of Shellco's $4 million dollar debt. If that could not be achieved, Denali threated to call the loan. Thus, this is the agreement that supposedly obligated Shellco to be placed into administration in UK. PGC's purchase of Shellco was woefully under market value. On or around December 31, 2022, Shellco filed a financial statement indicating the value of the IP assets and goodwill associated with those assets alone was £12,878,767.00. (D.I. 38, ¶ 24; *see also* D.I. 38-1.) However, less than two years later, October 2024, through Administration the value was less than £1 million. (D.I. 1, at pdf pg. 78; D.I. 60, ¶ 5.) Mr. Poynter now admits that sales of the Bakblade business are over $10 million annually (D.I. 60, ¶ 21.) This valuation makes no sense.

       The actions described above constitute a clear and deliberate scheme to defraud creditors and manipulate asset ownership for unjust enrichment in violation of the DUFTA. By discharging a $4 million debt, Shellco evades its obligation to pay $1 million annually over four years, despite the IP Assets generating $10 million in revenue each year. This maneuver not only deprives Defendants of their rightful compensation but also exploits the financial structure to benefit related entities. The transfer of these valuable IP Assets to PGC for a suspiciously low sum of £1.3M further indicates an intent to undervalue assets for the advantage of insiders—Fairweather, NorWall, and Denali. Moreover, PGC's position as a co-signer in the Security Agreement with Denali enables strategic financial manipulation, allowing Mr. Poynter and Mr. Carpenter to perpetuate this fraudulent scheme across all subsidiaries wiping out any and all deferred payments and switching the IP Assets into the name of another subsidiary of Olsam. This business model reveals a systematic approach to circumvent legitimate financial obligations and inappropriately shift liabilities at the expensive of unassuming creditors.

### B. PGC Has Not Rebutted the Irreparable Harm DP Will Suffer

PCG's only argument against irreparable harm is that "DP cannot rely on the rebuttable presumption of irreparable harm by reason of its trademark infringement claim because it cannot show it is the lawful the owner [*sic*] of the trademarks at issue…" (D.I. 58, at 14.) As established above, DP has met its burden as to ownership of the BAKBLADE Marks. PGC further appears to suggest that because Defendant Matthew Dryfhout's declaration did not "identify which products he ordered or what quantity he ordered," DP is not at risk of suffering irreparable harm. (D.I. 58, at 15 (citing D.I. 45, ¶ 15).) This argument is equally as toothless, as this District has recognized, "[p]otential damage to a mark holder's reputation or goodwill or likely confusion between parties' marks constitutes irreparable injury for the purpose of granting a preliminary injunction." *Med. Sec. Card Co., LLC v. Scriptwell, Inc.*, 2024 WL 5697438, at *7 (D. Del. Oct. 29, 2024) (citation omitted). These are the very harms DP has demonstrated it will suffer. (*See* D.I. 44, § V.B.)

### C. Balance of Equities Does Favor DP

PGC argues that DP "has not attempted to start a genuine business" (D.I. 58, at 16), despite the Dryfhouts having founded the Bakblade business in the first place. DP's efforts to sell products under the BAKBLADE Marks have been thwarted by PGC's presence in the marketplace. Any "harm to [PGC] may be discounted as harm that it brought upon itself." *Med. Sec. Card.*, 2024 WL 5697438 at *8 (citing *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 728 (3d Cir. 2004)). As such, this factor weighs in favor of DP.

### D. A PI Serves the Public Interest

PGC suggests "[i]t is not in the public interest to protect parties which obtain their rights through inequitable means." (D.I. 58, at 16.) Yet Defendants pursued their remedy by the book, by filing a complaint, obtaining a judgment, seeking a Writ, noticing the Marshal's Sale, and then filing the Bill of Sale with the USPTO. Nonetheless, a likelihood of confusion is sufficient

9

justification that the public interest is served. *See Med. Sec. Card*, 2024 WL 5697438 at 8. As PGC could not be bothered to address likelihood of confusion and has therefore waived any argument thereto, this factor follows in turn favoring DP.

### III. ONLY A NOMINAL BOND IS REQUIRED

DP does not suggest it is free from its obligation to post a bond under Fed. R. Civ. P. 65(c). However, PGC has offered little to no information relevant to assisting this Court determining the amount of such a bond, which some appellate courts have considered to justify the imposition of a nominal bond. *See, e.g., LEGO A/S v. ZURU Inc.*, 799 Fed. Appx. 823, 838 (Fed. Cir. 2020) (affirming the district court's imposition of a nominal $25,000 bond where the non-moving party "did not suggest an appropriate amount for bond, instead stating only that 'it is appropriate to require Plaintiff's to post a bond'"). Nonetheless, "the court is free to exercise its discretion over the amount it deems proper." *Sensus USA, Inc. v. Franklin*, 2016 WL 1466488, at *9 (D. Del. Apr. 14, 2016) (Andrews, J.). Per the Third Circuit, "it may not be possible to set a bond high enough to fully compensate the [PGC] but low enough that the [DP] can pay it. *Boynes v. Limetree Bay Ventures LLC*, 110 F.4th 604, 611 (3d Cir. 2024). As such, any injunction bond, if not nominal, must be "low enough that [DP] can pay it." *Id*. PGC paid approximately $1.3M for Shellco's intellectual property worldwide, not only the BAKBLADE Marks. Here, DP is only seeking to enjoin U.S. sales, thus, this would make sense that the bond's ceiling be only a fraction of the supposed overall value that PGC was willing to pay. Further, as to DP's ability to pay, t is run by a husband and wife with limited liquidity. It is not a publicly traded corporation.

### IV. CONCLUSION

For all the reasons stated above, the Court should grant DP's motion and enjoin PGC from using the BAKBLADE Marks during the pendency of this action.

Dated: November 11, 2025

*Of Counsel:*

Carrie J. Richey
WOMBLE BOND DICKINSON (US) LLP
50 California Street, Suite 2740
San Francisco, California 94111
Telephone: (415) 433-1900
carrie.richey@wbd-us.com

Respectfully submitted,

*/s/ Stephanie S. Riley*
Stephanie S. Riley (#5803)
Zachary Murphy (#6881)
Alexander P. Wharton (#7304)
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
stephanie.riley@wbd-us.com
zachary.murphy@wbd-us.com
alexander.wharton@wbd-us.com

*Counsel to Dryfhout Enterprises, LLC, Dryfhout Properties, LLC, Matthew Dryfhout, and Angelina Dryfhout*