## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PERSONAL GROOMING CO LIMITED, | ) |
| Plaintiff, | ) ) ) |
| v. | ) C.A. No. 25-1047-RGA-LDH ) |
| DRYFHOUT ENTERPRISES, LLC, DRYFHOUT PROPERTIES, LLC, MATTHEW DRYFHOUT, and ANGELINA DRYFHOUT | ) **JURY TRIAL DEMANDED** ) ) ) ) |
| Defendants. | ) ) ) |

### DEFENDANT DRYFHOUT PROPERTIES, LLC'S
### FIRST AMENDED COUNTERCLAIMS

Defendant/Counterclaim Plaintiff Dryfhout Properties, LLC ("Dryfhout"), by and through its undersigned counsel, hereby submit its Amended Counterclaims to the Complaint filed by Plaintiff Personal Grooming Co Limited ("PGC" or "Plaintiff").

### DRYFHOUT'S AMENDED COUNTERCLAIMS

For its Counterclaims against PGC, Dryfhout states as follows:

### NATURE OF ACTION

1.      This is an action for trademark infringement against PGC for infringement of U.S. Trademark Registration Nos. 4,381,008, 4,876,804, 4,868,219, 4,968,684, 5,969,146, 6,188,545, 6,465,471, 6,140,422, 6,334,918, 6,495,368, 6,589,364, and 6,436,199 (collectively, the "Asserted Trademarks" or "BAKBLADE Marks"), and for false designation of origin against PGC, arising under the Lanham Act, 15 U.S.C. § 1051 *et seq*.

2.      This is also an action for patent infringement against PGC for infringement of U.S. Patent Nos. 8,739,411, 9,718,200, 9,937,629, 10,131,062, 10,500,744, 10,543,609,

11,077,570, 11,104,018, 12,280,512, D825,852, D826,474, D917,097, D946,285, and D1,004,289 (collectively, the "Asserted Patents"), arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq*.

3.    This is also an action for fraudulent transfer against PGC pursuant to the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301 *et seq*., or in the alternative, pursuant to Section 423 of the UK Insolvency Act 1986. This is further an action for unjust enrichment.

## THE PARTIES

4.    Dryfhout is an Illinois limited liability company with a principal place of business at 25 Colonel Winstead Drive, Brentwood, Tennessee.

5.    Based on the facts alleged in the Complaint, PGC is a private limited company incorporated and registered in England and Wales with company number 13679662 whose registered office is at 124 City Road, London, Greater London, England, EC1V 2NX.

## JURISDICTION AND VENUE

6.    This action arises under the trademark laws of the United States, 15 U.S.C. § 1051 *et seq*, generally*,* and 15 U.S.C. 1121, specifically, and under the patent laws of the United States, 35 U.S.C. § 1 *et seq*, generally, and 35 U.S.C. § 271, specifically, such that this Court has jurisdiction over the subject matter of this action pursuant to the provisions of 28 U.S.C. §§ 1331, 1338(a). This court also has subject matter jurisdiction over the entirety of this proceeding pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367(a) because all claims in this action form part of the same case or controversy under Article III with claims over which this Court has original jurisdiction.

7.      This Court has personal jurisdiction over PGC at least because PGC has availed itself of the rights and privileges of the State of Delaware and has subjected itself to the jurisdiction of this forum by suing Defendants in this District, and because PGC has marketed and sold products throughout the United States, including in this District. By virtue of filing its complaint against Defendants, PGC has consented to the personal jurisdiction of this Court over any counterclaims filed against it, including the Counterclaims asserted here which arise from or relate to the same transaction or occurrence that is the subject matter of PGC's claim.

8.      As a result of PGC's complaint, PGC has submitted itself to the jurisdiction and venue of this Court. Alternatively, venue is proper in this district under 28 U.S.C. §§ 1391(b)(3), (c)(3).

## **BACKGROUND**

### A.      The Asset Purchase Agreement between Dryfhout and Shellco

9.      On October 28, 2022, Dryfhout executed an Asset Purchase Agreement (the "APA") with Bakblade Limited, later renamed as Shellco (referred to herein as "Shellco").

10.     Under the APA, Shellco purchased intellectual property and domains from Defendants, some of which is at issue in the present matter (referred to herein as the "IP Assets").

11.     The purchase price included, in part, three deferred payments and four yearly earnouts.

12.     In the APA, Shellco and its principals warranted that it had "sufficient cash on hand or other sources of immediately available funds" to pay the full purchase price.

13.     This turned out to be false, however, and at Shellco's request, Defendants agreed to an amendment to the APA on October 13, 2023 (the "AAPA").

14.     The AAPA restructured the outstanding payments under the APA to include $1 million in four annual payments.

15.     Shellco failed to pay.

**B.     Dryfhout 2024 Lawsuit Against Shellco in this Court**

16.     Upon Shellco's indication it would not fulfil its obligations under the AAPA, Defendants filed suit in this District for breach of contract and anticipatory repudiation on October 23, 2024. *See Dryfhout Enterprises, LLC et al., v. Shellco 2021 Ltd.*, Case No. 24-cv-1184 (D. Del.) ("Default Action").

17.     The next day on October 24, 2024, Shellco appointed administrators in preparation for insolvency proceedings in the U.K.

18.     Service of the Complaint from the Default Action was effectuated on Shellco's administrators via the Hague Convention on November 12, 2024.

19.     Neither Shellco nor its administrators responded, and Defendants moved for a default judgment against Shellco on January 10, 2025, which was granted on February 4, 2025, in the amount of $4,263,143.97.

20.     This judgment remains intact.

21.     On or about February 5, 2025, Defendants perfected liens against the IP Assets and recorded the liens with the USPTO, State of Delaware, and Washington D.C.

22.     On May 6, 2025, Defendants applied for a Writ of Execution, seeking to levy and sell the intellectual property covered by the APA, which was issued by this Court on May 21, 2025 ("Writ"), and served on Shellco Administrators.

23.     Defendants recorded the Writ at the USTPO on May 22, 2025.

24.     Defendants subsequently purchased the encumbered intellectual property for $100,000 at the Marshal's Sale held July 22, 2025.

25.     Defendants recorded their ownership of the intellectual property at the USPTO. Each of the defendants in this action assigned all of their rights in the IP Assets to Dryfhout.

26.     At no time did Shellco, or its administrators appear, participate, or object to the aforementioned proceedings.

27.     On October 31, 2026, the Court issued an order confirming the Marshal's Sale and ordered GoDaddy.com and any other registrars of the domain names sold during the Marshal's Sale to be transferred to Defendants.

**C.     The Urgent Transfer of Shellco's Assets to PGC**

28.     According to the Declaration of Fergus Niven filed in this proceeding (D.I. 18), Shellco "entered administration" on October 24, 2024.

29.     According to the Declaration of Ben Poynter filed in this proceeding (D.I. 60), "PGC purchased the business and assets of Shellco" on October 24, 2024.

30.     According to the same Declaration, Ben Poynter and the Administrators of Shellco executed an Agreement for the Sale and Purchase of the Business and Assets of Shellco 2021 Limited (in administration)" ("SPA") on October 24, 2024.

31.     Apparently, Kreston Reeves LLP, the Administrators of Shellco, issued an email on October 30, 2024 "to all know [*sic*] creditors" notifying recipients that Andrew Tate and James Hopkirk were appointed as Administrators on October 24, 2024 and "shortly after appointment" "effected a sale of [Shellco's] business and assets to [PGC]." D.I. 16, Ex. B.

32.     Various documents issued for the benefit of creditors were dated October 30, 2024, after the SPA was already executed. *Id.*

33.     The Administrators Proposals were also issued on October 30, 2024, *after* the sale to PGC was purportedly executed. D.I. 16, Ex. C. These Proposals were purportedly administered to creditors on November 1, 2024. *Id.*

34.    According to these Proposals, "James Hopkirk and [Andrew Tate] were appointed by the Director as Administrators of [Shellco] and took over from the Board responsibility for the management of the affairs, business and property of [Shellco]." *Id.* On the same day that the Administrators "took over from the Board responsibility for the management of [Shellco]," the Administrators purportedly managed to conduct a fulsome analysis and evaluation of Shellco and its creditors and sell Shellco's assets to PGC.

35.    According to the Proposals, the Administrators "spent a total of 23 hours undertaking tasks."

## THE ASSERTED TRADEMARKS

36.    Dryfhout is the owner of valid and subsising United States Trademark Registration No. 4,381,008 on the Principal Register in the United States Patent and Trademark Office for BAKBLADE ("BAKBLADE Mark"). Attached as **Exhibit A** is a true and correct copy of the registration certificate for the BAKBLADE Mark, which was issued by the United States Patent and Trademark Office on August 6, 2013.

37.    Dryfhout is the owner of valid and subsising United States Trademark Registration No. 4,876,804 on the Principal Register in the United States Patent and Trademark Office for DRYGLIDE ("DRYGLIDE Mark"). Attached as **Exhibit B** is a true and correct copy of the registration certificate for the DRYGLIDE Mark, which was issued by the United States Patent and Trademark Office on December 29, 2015.

38.    Dryfhout is the owner of valid and subsising United States Trademark Registration No. 4,868,219 on the Principal Register in the United States Patent and Trademark Office for ESCAPE YOUR APE ("ESCAPE YOUR APE Mark"). Attached as **Exhibit C** is a true and correct copy of the registration certificate for the ESCAPE YOUR APE Mark, which

was issued by the United States Patent and Trademark Office on December 8, 2015.

39.    Dryfhout is the owner of valid and subsisting United States Trademark Registration No. 4,968,684 on the Principal Register in the United States Patent and Trademark Office for WE'VE GOT YOUR BAK ("WE'VE GOT YOUR BAK Mark"). Attached as **Exhibit D** is a true and correct copy of the registration certificate for the WE'VE GOT YOUR BAK Mark, which was issued by the United States Patent and Trademark Office on May 31, 2016.

40.    Dryfhout is the owner of valid and subsisting United States Trademark Registration No. 5,969,146 on the Principal Register in the United States Patent and Trademark Office for BODBLADE ("BODBLADE Mark"). Attached as **Exhibit E** is a true and correct copy of the registration certificate for the BODBLADE, which was issued by the United States Patent and Trademark Office on January 21, 2020.

41.    Dryfhout is the owner of valid and subsisting United States Trademark Registration No. 6,188,545 on the Principal Register in the United States Patent and Trademark Office for BAKBLADE GROOMING CO. ("BAKBLADE GROOMING CO. Mark"). Attached as **Exhibit F** is a true and correct copy of the registration certificate for the '545 Trademark Registration, which was issued by the United States Patent and Trademark Office on November 3, 2020.

42.    Dryfhout is the owner of valid and subsisting United States Trademark Registration No. 6,465,471 on the Principal Register in the United States Patent and Trademark Office for MICROTEETH ("MICROTEETH Mark"). Attached as **Exhibit G** is a true and correct copy of the registration certificate for the MICROTEETH Mark, which was issued by the United States Patent and Trademark Office on August 24, 2021.

43.    Dryfhout is the owner of valid and subsisting United States Trademark

Registration No. 6,130,422 on the Principal Register in the United States Patent and Trademark

Office for the following illustration:  ("Ape Design Mark #1"). Attached as **Exhibit H** is a true and correct copy of the registration certificate for the Ape Design Mark #1, which was issued by the United States Patent and Trademark Office on August 18, 2020.

44.    Dryfhout is the owner of valid and subsisting United States Trademark Registration No. 6,334,918 on the Principal Register in the United States Patent and Trademark

Office for the following illustration:  ("Ape Design Mark #2). Attached as **Exhibit I** is a true and correct copy of the registration certificate for the Ape Design Mark #2, which was issued by the United States Patent and Trademark Office on April 27, 2021.

45.    Dryfhout is the owner of valid and subsisting United States Trademark Registration No. 6,495,368 on the Principal Register in the United States Patent and Trademark Office for BODBARBER ("BODBARBER Mark"). Attached as **Exhibit J** is a true and correct copy of the registration certificate for the BODBARBER Mark Registration, which was issued by the United States Patent and Trademark Office on September 21, 2021.

46.    Dryfhout is the owner of valid and subsisting United States Trademark Registration No. 6,589,364 on the Principal Register in the United States Patent and Trademark Office for BAKBLADE BODY GROOMING ("BAKBLADE BODY GROOMING Mark"). Attached as **Exhibit K** is a true and correct copy of the registration certificate for the BAKBLADE BODY GROOMING Mark, which was issued by the United States Patent and Trademark Office on December 14, 2021.

47.     Dryfhout is the owner of valid and subsisting United States Trademark Registration No. 6,436,199 on the Principal Register in the United States Patent and Trademark Office for GROIN GROOMER ("GROIN GROOMER Mark"). Attached as **Exhibit L** is a true and correct copy of the registration certificate for the GROIN GROOMER Mark, which was issued by the United States Patent and Trademark Office on July 27, 2021.

48.     As such, Dryfhout owns valid and subsisting federal statutory rights to the Asserted Trademarks.

## THE ASSERTED PATENTS

49.     On June 3, 2014, the USPTO duly and legally issued United States Patent No. 8,739,411 entitled "Back Hair Removal Using Comb and Integrated Blade" to inventors Iain Kinghorn and Matthew J. Dryfhout (the "'411 patent"). A copy of the '411 patent is attached as **Exhibit M**. The '411 patent is assigned to Dryfhout Properties, LLC.

50.     The '411 patent is valid and enforceable.

51.     On August 1, 2017, the USPTO duly and legally issued United States Patent No. 9,718,200 entitled "Safety Razor With Comb and Integrated Blade and Associated Methods" to inventor Matthew James Dryfhout (the "'200 patent"). A copy of the '200 patent is attached as **Exhibit N**. The '200 patent is assigned to Dryfhout Properties, LLC.

52.     The '200 patent is valid and enforceable.

53.     On April 10, 2018, the USPTO duly and legally issued United States Patent No. 9,937,629 entitled "Two-Point Discrimination Safety Razor Assembly" to inventor Matthew James Dryfhout (the "'629 patent"). A copy of the '629 patent is attached as **Exhibit O**. The '629 patent is assigned to Dryfhout Properties, LLC.

54.     The '629 patent is valid and enforceable.

55.     On November 20, 2018, the USPTO duly and legally issued United States Patent No. 10,131,062 entitled "Body Shaver with Comb and Blade" to inventor Matthew James Dryfhout (the "'062 patent"). A copy of the '062 patent is attached as **Exhibit P**. The '062 patent is assigned to Dryfhout Properties, LLC.

56.     The '062 patent is valid and enforceable.

57.     On December 3, 2019, the USPTO duly and legally issued United States Patent No. 10,493,643 entitled "Leveled Back Shaver" to inventor Matthew James Dryfhout (the "'643 patent"). A copy of the '643 patent is attached as **Exhibit Q**. The '643 patent is assigned to Dryfhout Properties, LLC.

58.     The '643 patent is valid and enforceable.

59.     On December 10, 2019, the USPTO duly and legally issued United States Patent No. 10,500,744 entitled "Safety Razor with Plurality of Comb and Integrated Blade Groups" to inventor Matthew James Dryfhout (the "'744 patent"). A copy of the '744 patent is attached as **Exhibit R**. The '744 patent is assigned to Dryfhout Properties, LLC.

60.     The '744 patent is valid and enforceable.

61.     On January 28, 2020, the USPTO duly and legally issued United States Patent No. 10,543,609 entitled "Elevated Shaver" to inventor Matthew James Dryfhout (the "'609 patent"). A copy of the '609 patent is attached as **Exhibit S**. The '609 patent is assigned to Dryfhout Properties, LLC.

62.     The '609 patent is valid and enforceable.

63.     On August 3, 2021, the USPTO duly and legally issued United States Patent No. 11,077,570 entitled "Flexible Back Shaver" to inventor Matthew James Dryfhout (the "'570 patent"). A copy of the '570 patent is attached as **Exhibit T**. The '570 patent is assigned to

Dryfhout Properties, LLC.

64.    The '570 patent is valid and enforceable.

65.    On August 31, 2021, the USPTO duly and legally issued United States Patent No. 11,104,018 entitled "Safety Razor with Comb and Blade" to inventor Matthew James Dryfhout (the "'018 patent"). A copy of the '018 patent is attached as **Exhibit U**. The '018 patent is assigned to Dryfhout Properties, LLC.

66.    The '018 patent is valid and enforceable.

67.    On April 22, 2025, the USPTO duly and legally issued United States Patent No. 12,280,512 entitled "Safety Razor with Comb and Blade" to inventor Matthew James Dryfhout (the "'512 patent"). A copy of the '512 patent is attached as **Exhibit V**. The '512 patent is assigned to Dryfhout Properties, LLC.

68.    The '512 patent is valid and enforceable.

69.    On August 14, 2018, the USPTO duly and legally issued United States Design Patent No. D825,852 entitled "Back Shaver Cartridge" to inventor Matthew James Dryfhout (the "D'852 patent"). A copy of the D'852 patent is attached as **Exhibit W**. The D'852 patent is assigned to Dryfhout Properties, LLC. The D'852 patent protects the ornamental appearance of certain Bakblade products.

70.    The D'852 patent is valid and enforceable.

71.    On August 21, 2018, the USPTO duly and legally issued United States Design Patent No. D826,474 entitled "Back Shaver Blade" to inventor Matthew James Dryfhout (the "D'474 patent"). A copy of the D'474 patent is attached as **Exhibit X**. The D'474 patent is assigned to Dryfhout Properties, LLC. The D'474 patent protects the ornamental appearance of certain Bakblade products.

72.     The D'474 patent is valid and enforceable.

73.     On April 20, 2021, the USPTO duly and legally issued United States Design Patent No. D917,097 entitled "Wide Shaver Handle" to inventor Matthew James Dryfhout (the "D'097 patent"). A copy of the D'097 patent is attached as **Exhibit Y**. The D'097 patent is assigned to Dryfhout Properties, LLC. The D'097 patent protects the ornamental appearance of certain Bakblade products.

74.     The D'097 patent is valid and enforceable.

75.     On March 22, 2022, the USPTO duly and legally issued United States Design Patent No. D946285 entitled "Backshaver Brush" to inventor Matthew James Dryfhout (the "D'285 patent"). A copy of the D'285 patent is attached as **Exhibit Z**. The D'285 patent is assigned to Dryfhout Properties, LLC. The D'285 patent protects the ornamental appearance of certain Bakblade products.

76.     The D'285 patent is valid and enforceable.

77.     On November 14, 2023, the USPTO duly and legally issued United States Design Patent No. D1,004,289 entitled "Backshaver Handle" to inventor Matthew James Dryfhout (the "D'289 patent"). A copy of the D'289 patent is attached as **Exhibit AA**. The D'289 patent is assigned to Dryfhout Properties, LLC. The D'289 patent protects the ornamental appearance of certain Bakblade products.

78.     The D'289 patent is valid and enforceable.

79.     As such, Dryfhout owns valid and subsisting federal statutory rights to the Asserted Patents.

## <u>COUNT I: FEDERAL TRADEMARK INFRINGEMENT</u>
### Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)

80.     Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

81.    Dryfhout is the owner of the BAKBLADE Marks, which are valid and subsisting and duly registered with the USPTO.

82.    Dryfhout has the exclusive right to use the BAKBLADE Marks in commerce in connection with the goods and services recited in their respective trademark registrations and applications, including without limitation, electric and non-electric razors, razor blades, safety razors, personal grooming supplies and accessories, and skin care products.

83.    PGC's use of marks identical or confusingly similar to the BAKBLADE Marks in connection with the sale, offering for sale, distribution, and/or advertising of its Infringing Products is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or associations of PGC with Dryfhout, or as to the origin, sponsorship, or approval of PGC's products by Dryfhout, in violation of 15 U.S.C. § 1114.

84.    **Exhibit BB** attached hereto includes examples of PGC's infringement of each of the Asserted Trademarks, using marks that are identical and/or substantially similar to the Asserted Trademarks.

85.    Without Dryfhout's consent, PGC has knowingly and willfully infringed Dryfhout's rights in its federally registered BAKBLADE Marks through the sale, offering for sale, distribution, and/or advertising of identical, overlapping, and/or substantially similar goods and services under a confusingly similar name and in the same channels of trade, i.e. direct to consumers and over the internet, all in violation of 15 U.S.C. § 1114(1)(a).

86.    PGC's unauthorized use of designations identical or highly similar to the BAKBLADE Marks violates 15 U.S.C. § 1114, and has also caused irreparable injury to Dryfhout's reputation and goodwill.  On information and belief, unless restrained and enjoined, PGC will continue to infringe Dryfhout's BAKBLADE Marks.

87.     Dryfhout's remedy at law is not adequate to redress the harm PGC has caused and will continue to cause until its conduct is restrained, entitling Dryfhout to preliminary injunctive relief pursuant to 15 U.S.C. § 1116 and the equitable authority of this Court and permanent injunctive relief.

88.     As a result of PGC's infringement, Dryfhout has suffered damages, including lost sales, lost profits, and lost goodwill.

89.     Dryfhout seeks monetary damages and statutory damages in an amount to be proven, pursuant to 15 U.S.C. §§ 1117(a) and (b).

### COUNT II: FALSE DESIGNATION OF ORIGIN
#### Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

90.     Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

91.     PGC's creation, production, offering for sale, advertisement, and/or distribution of goods in connection with the BAKBLADE Marks, have been and are without Dryfhout's permission or consent, and constitute designation of a term, symbol, device, or any combination thereof, that is false or misleading within the meaning of 15 U.S.C. § 1125(a).

92.     PGC's knowing use of reproductions or confusingly similar imitations of the BAKBLADE Marks in connection with PGC's goods is causing and will continue to cause confusion, deception, and mistake among the general purchasing public of the United States by creating the false and misleading impression that PGC's goods are manufactured or distributed by Dryfhout; or are affiliated, connected, or associated with Dryfhout; or have the sponsorship, endorsement, or approval of Dryfhout.

93.     Unless restrained and enjoined by this Court, PGC will persist in their activities, thereby causing Dryfhout irreparable harm.

94.     Dryfhout has no adequate remedy at law.

95.     Dryfhout's remedy at law is not adequate to redress the harm PGC has caused and will continue to cause until its conduct is restrained, entitling Dryfhout to preliminary injunctive relief pursuant to 15 U.S.C. § 1116 and the equitable authority of this Court and permanent injunctive relief.

96.     PGC's acts of unfair competition as alleged herein have been undertaken with knowledge of Dryfhout's exclusive rights to the BAKBLADE Marks, entitling Dryfhout to an award of treble PGC's profits, plus attorneys' fees in bringing and maintaining this action, pursuant to 15 U.S.C. § 1117(b), or alternatively statutory damages pursuant to 15 U.S.C. § 1117(c).

## COUNT III: INFRINGEMENT OF U.S. PATENT NO. 8,739,411

97.     Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

98.     PGC makes, uses, sells, and/or offers to sell in, and/or imports into, the United States men's personal grooming products that infringe one or more claims of the '411 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(a). As set forth in **Exhibit CC**, certain exemplary products made, used, sold, offered for sale, and/or imported into the United States by PGC directly infringe, either literally or under the doctrine of equivalents, certain exemplary claims of the '411 patent.

99.     PGC has had knowledge of the '411 patent and its infringing activities at least as early as August 20, 2025. PGC was indisputably aware that Dryfhout was the USPTO-listed owner of the patent, as evidenced by PGC seeking a declaratory judgment of ownership, yet continued infringing prior to any judgment on the merits in its favor. Accordingly, PGC has been willfully infringing the '411 patent at least since PGC first brought suit against Dryfhout.

100.    PGC, either directly and/or through intermediaries, also has induced and continues to induce infringement (literally and/or under the doctrine of equivalents) by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '411 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(b). For example, manufacturers and/or importers of PGC's products, including exemplary infringing products, directly infringe the '411 patent, either literally or under the doctrine of equivalents, through their importation of inventions claimed in the '411 patent. PGC induces this direct infringement through its affirmative acts of directing manufacturers and/or importers to import PGC's products, including exemplary infringing products, into the United States. With knowledge of the '411 patent since at least PGC first brought suit against Dryfhout, PGC's deliberate and/or willfully blind actions have induced and continue to induce the direct infringement of the '411 patent by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '411 patent.

101.    Dryfhout is the current assignee of the '411 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the '411 patent against infringers, and to collect damages for all relevant times.

102.    PGC has made, and continues to make, unlawful gains and profits from infringing the '411 patent, and from inducing others from infringing the '411 patent.

103.    PGC's willful acts of infringement and inducing infringement have caused damage to Dryfhout, and Dryfhout is entitled to recover from PGC the damages it has sustained as a result of PGC's wrongful acts in an amount subject to proof at trial.

104.    This is an exceptional case within the meaning of 35 U.S.C. § 285, which warrants reimbursement of Dryfhout's reasonable attorneys' fees.

**COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 9,718,200**

105.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

106.    PGC makes, uses, sells, and/or offers to sell in, and/or imports into, the United States men's personal grooming products that infringe one or more claims of the '200 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(a). As set forth in **Exhibit DD**, certain exemplary products made, used, sold, offered for sale, and/or imported into the United States by PGC directly infringe, either literally or under the doctrine of equivalents, certain exemplary claims of the '200 patent.

107.    PGC has had knowledge of the '200 patent and its infringing activities at least as early as August 20, 2025. PGC was indisputably aware that Dryfhout was the USPTO-listed owner of the patent, as evidenced by PGC seeking a declaratory judgment of ownership, yet continued infringing prior to any judgment on the merits in its favor. Accordingly, PGC has been willfully infringing the '200 patent at least since PGC first brought suit against Dryfhout.

108.    PGC, either directly and/or through intermediaries, also has induced and continues to induce infringement (literally and/or under the doctrine of equivalents) by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '200 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(b). For example, manufacturers and/or importers of PGC's products, including exemplary infringing products, directly infringe the '200 patent, either literally or under the doctrine of equivalents, through their importation of inventions claimed in the '200 patent. PGC induces this direct infringement through its affirmative acts of directing

17

manufacturers and/or importers to import PGC's products, including exemplary infringing products, into the United States. With knowledge of the '200 patent since at least PGC first brought suit against Dryfhout, PGC's deliberate and/or willfully blind actions have induced and continue to induce the direct infringement of the '411 patent by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '200 patent.

109.    Dryfhout is the current assignee of the '200 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the '200 patent against infringers, and to collect damages for all relevant times.

110.    PGC has made, and continues to make, unlawful gains and profits from infringing the '200 patent, and from inducing others from infringing the '200 patent.

111.    PGC's willful acts of infringement and inducing infringement have caused damage to Dryfhout, and Dryfhout is entitled to recover from PGC the damages it has sustained as a result of PGC's wrongful acts in an amount subject to proof at trial.

112.    This is an exceptional case within the meaning of 35 U.S.C. § 285, which warrants reimbursement of Dryfhout's reasonable attorneys' fees.

### COUNT V: INFRINGEMENT OF U.S. PATENT NO. 9,937,629

113.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

114.    PGC makes, uses, sells, and/or offers to sell in, and/or imports into, the United States men's personal grooming products that infringe one or more claims of the '629 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(a). As set forth in **Exhibit EE**, certain exemplary products made, used, sold, offered for sale, and/or imported into the United States by

PGC directly infringe, either literally or under the doctrine of equivalents, certain exemplary claims of the '629 patent.

115.    PGC has had knowledge of the '629 patent and its infringing activities at least as early as August 20, 2025. PGC was indisputably aware that Dryfhout was the USPTO-listed owner of the patent, as evidenced by PGC seeking a declaratory judgment of ownership, yet continued infringing prior to any judgment on the merits in its favor. Accordingly, PGC has been willfully infringing the '629 patent at least since PGC first brought suit against Dryfhout.

116.    PGC, either directly and/or through intermediaries, also has induced and continues to induce infringement (literally and/or under the doctrine of equivalents) by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '629 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(b). For example, manufacturers and/or importers of PGC's products, including exemplary infringing products, directly infringe the '629 patent, either literally or under the doctrine of equivalents, through their importation of inventions claimed in the '629 patent. PGC induces this direct infringement through its affirmative acts of directing manufacturers and/or importers to import PGC's products, including exemplary infringing products, into the United States. With knowledge of the '629 patent since at least PGC first brought suit against Dryfhout, PGC's deliberate and/or willfully blind actions have induced and continue to induce the direct infringement of the '629 patent by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '629 patent.

117.    Dryfhout is the current assignee of the '629 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the '629 patent against infringers, and to collect damages for all relevant times.

118.    PGC has made, and continues to make, unlawful gains and profits from infringing the '629 patent, and from inducing others from infringing the '629 patent.

119.    PGC's willful acts of infringement and inducing infringement have caused damage to Dryfhout, and Dryfhout is entitled to recover from PGC the damages it has sustained as a result of PGC's wrongful acts in an amount subject to proof at trial.

120.    This is an exceptional case within the meaning of 35 U.S.C. § 285, which warrants reimbursement of Dryfhout's reasonable attorneys' fees.

### COUNT VI: INFRINGEMENT OF U.S. PATENT NO. 10,131,062

121.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

122.    PGC makes, uses, sells, and/or offers to sell in, and/or imports into, the United States men's personal grooming products that infringe one or more claims of the '062 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(a). As set forth in **Exhibit FF**, certain exemplary products made, used, sold, offered for sale, and/or imported into the United States by PGC directly infringe, either literally or under the doctrine of equivalents, certain exemplary claims of the '062 patent.

123.    PGC has had knowledge of the '062 patent and its infringing activities at least as early as August 20, 2025. PGC was indisputably aware that Dryfhout was the USPTO-listed owner of the patent, as evidenced by PGC seeking a declaratory judgment of ownership, yet continued infringing prior to any judgment on the merits in its favor. Accordingly, PGC has been willfully infringing the '062 patent at least since PGC first brought suit against Dryfhout.

124.     PGC, either directly and/or through intermediaries, also has induced and continues to induce infringement (literally and/or under the doctrine of equivalents) by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '062 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(b). For example, manufacturers and/or importers of PGC's products, including exemplary infringing products, directly infringe the '062 patent, either literally or under the doctrine of equivalents, through their importation of inventions claimed in the '062 patent. PGC induces this direct infringement through its affirmative acts of directing manufacturers and/or importers to import PGC's products, including exemplary infringing products, into the United States. With knowledge of the '062 patent since at least PGC first brought suit against Dryfhout, PGC's deliberate and/or willfully blind actions have induced and continue to induce the direct infringement of the '062 patent by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '062 patent.

125.     Dryfhout is the current assignee of the '062 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the '062 patent against infringers, and to collect damages for all relevant times.

126.     PGC has made, and continues to make, unlawful gains and profits from infringing the '062 patent, and from inducing others from infringing the '062 patent.

127.     PGC's willful acts of infringement and inducing infringement have caused damage to Dryfhout, and Dryfhout is entitled to recover from PGC the damages it has sustained as a result of PGC's wrongful acts in an amount subject to proof at trial.

128.    This is an exceptional case within the meaning of 35 U.S.C. § 285, which warrants reimbursement of Dryfhout's reasonable attorneys' fees.

### COUNT VII: INFRINGEMENT OF U.S. PATENT NO. 10,493,643

129.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

130.    PGC makes, uses, sells, and/or offers to sell in, and/or imports into, the United States men's personal grooming products that infringe one or more claims of the '643 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(a). As set forth in **Exhibit GG**, certain exemplary products made, used, sold, offered for sale, and/or imported into the United States by PGC directly infringe, either literally or under the doctrine of equivalents, certain exemplary claims of the '643 patent.

131.    PGC has had knowledge of the '643 patent and its infringing activities at least as early as August 20, 2025. PGC was indisputably aware that Dryfhout was the USPTO-listed owner of the patent, as evidenced by PGC seeking a declaratory judgment of ownership, yet continued infringing prior to any judgment on the merits in its favor. Accordingly, PGC has been willfully infringing the '643 patent at least since PGC first brought suit against Dryfhout.

132.    PGC, either directly and/or through intermediaries, also has induced and continues to induce infringement (literally and/or under the doctrine of equivalents) by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '643 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(b). For example, manufacturers and/or importers of PGC's products, including exemplary infringing products, directly infringe the '643 patent, either literally or under the doctrine of equivalents, through their importation of inventions claimed in the '643 patent. PGC induces this direct infringement through its affirmative acts of directing

manufacturers and/or importers to import PGC's products, including exemplary infringing products, into the United States. With knowledge of the '643 patent since at least PGC first brought suit against Dryfhout, PGC's deliberate and/or willfully blind actions have induced and continue to induce the direct infringement of the '643 patent by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '643 patent.

133.    Dryfhout is the current assignee of the '643 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the '643 patent against infringers, and to collect damages for all relevant times.

134.    PGC has made, and continues to make, unlawful gains and profits from infringing the '643 patent, and from inducing others from infringing the '643 patent.

135.    PGC's willful acts of infringement and inducing infringement have caused damage to Dryfhout, and Dryfhout is entitled to recover from PGC the damages it has sustained as a result of PGC's wrongful acts in an amount subject to proof at trial.

136.    This is an exceptional case within the meaning of 35 U.S.C. § 285, which warrants reimbursement of Dryfhout's reasonable attorneys' fees.

**COUNT VIII: INFRINGEMENT OF U.S. PATENT NO. 10,500,744**

137.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

138.    PGC makes, uses, sells, and/or offers to sell in, and/or imports into, the United States men's personal grooming products that infringe one or more claims of the '744 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(a). As set forth in **Exhibit HH**, certain exemplary products made, used, sold, offered for sale, and/or imported into the United States by

PGC directly infringe, either literally or under the doctrine of equivalents, certain exemplary claims of the '744 patent.

139.    PGC has had knowledge of the '744 patent and its infringing activities at least as early as August 20, 2025. PGC was indisputably aware that Dryfhout was the USPTO-listed owner of the patent, as evidenced by PGC seeking a declaratory judgment of ownership, yet continued infringing prior to any judgment on the merits in its favor. Accordingly, PGC has been willfully infringing the '744 patent at least since PGC first brought suit against Dryfhout.

140.    PGC, either directly and/or through intermediaries, also has induced and continues to induce infringement (literally and/or under the doctrine of equivalents) by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '744 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(b). For example, manufacturers and/or importers of PGC's products, including exemplary infringing products, directly infringe the '744 patent, either literally or under the doctrine of equivalents, through their importation of inventions claimed in the '744 patent. PGC induces this direct infringement through its affirmative acts of directing manufacturers and/or importers to import PGC's products, including exemplary infringing products, into the United States. With knowledge of the '744 patent since at least PGC first brought suit against Dryfhout, PGC's deliberate and/or willfully blind actions have induced and continue to induce the direct infringement of the '744 patent by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '744 patent.

141.    Dryfhout is the current assignee of the '744 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the '744 patent against infringers, and to collect damages for all relevant times.

142.    PGC has made, and continues to make, unlawful gains and profits from infringing the '744 patent, and from inducing others from infringing the '744 patent.

143.    PGC's willful acts of infringement and inducing infringement have caused damage to Dryfhout, and Dryfhout is entitled to recover from PGC the damages it has sustained as a result of PGC's wrongful acts in an amount subject to proof at trial.

144.    This is an exceptional case within the meaning of 35 U.S.C. § 285, which warrants reimbursement of Dryfhout's reasonable attorneys' fees.

## COUNT IX: INFRINGEMENT OF U.S. PATENT NO. 10,543,609

145.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

146.    PGC makes, uses, sells, and/or offers to sell in, and/or imports into, the United States men's personal grooming products that infringe one or more claims of the '609 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(a). As set forth in **Exhibit II**, certain exemplary products made, used, sold, offered for sale, and/or imported into the United States by PGC directly infringe, either literally or under the doctrine of equivalents, certain exemplary claims of the '609 patent.

147.    PGC has had knowledge of the '609 patent and its infringing activities at least as early as August 20, 2025. PGC was indisputably aware that Dryfhout was the USPTO-listed owner of the patent, as evidenced by PGC seeking a declaratory judgment of ownership, yet continued infringing prior to any judgment on the merits in its favor. Accordingly, PGC has been willfully infringing the '609 patent at least since PGC first brought suit against Dryfhout.

148.    PGC, either directly and/or through intermediaries, also has induced and continues to induce infringement (literally and/or under the doctrine of equivalents) by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '609 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(b). For example, manufacturers and/or importers of PGC's products, including exemplary infringing products, directly infringe the '609 patent, either literally or under the doctrine of equivalents, through their importation of inventions claimed in the '609 patent. PGC induces this direct infringement through its affirmative acts of directing manufacturers and/or importers to import PGC's products, including exemplary infringing products, into the United States. With knowledge of the '609 patent since at least PGC first brought suit against Dryfhout, PGC's deliberate and/or willfully blind actions have induced and continue to induce the direct infringement of the '609 patent by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '609 patent.

149.    Dryfhout is the current assignee of the '609 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the '609 patent against infringers, and to collect damages for all relevant times.

150.    PGC has made, and continues to make, unlawful gains and profits from infringing the '609 patent, and from inducing others from infringing the '609 patent.

151.    PGC's willful acts of infringement and inducing infringement have caused damage to Dryfhout, and Dryfhout is entitled to recover from PGC the damages it has sustained as a result of PGC's wrongful acts in an amount subject to proof at trial.

152.    This is an exceptional case within the meaning of 35 U.S.C. § 285, which warrants reimbursement of Dryfhout's reasonable attorneys' fees.

### COUNT X: INFRINGEMENT OF U.S. PATENT NO. 11,077,570

153.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

154.    PGC makes, uses, sells, and/or offers to sell in, and/or imports into, the United States men's personal grooming products that infringe one or more claims of the '570 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(a). As set forth in **Exhibit JJ**, certain exemplary products made, used, sold, offered for sale, and/or imported into the United States by PGC directly infringe, either literally or under the doctrine of equivalents, certain exemplary claims of the '570 patent.

155.    PGC has had knowledge of the '570 patent and its infringing activities at least as early as August 20, 2025. PGC was indisputably aware that Dryfhout was the USPTO-listed owner of the patent, as evidenced by PGC seeking a declaratory judgment of ownership, yet continued infringing prior to any judgment on the merits in its favor. Accordingly, PGC has been willfully infringing the '570 patent at least since PGC first brought suit against Dryfhout.

156.    PGC, either directly and/or through intermediaries, also has induced and continues to induce infringement (literally and/or under the doctrine of equivalents) by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '570 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(b). For example, manufacturers and/or importers of PGC's products, including exemplary infringing products, directly infringe the '570 patent, either literally or under the doctrine of equivalents, through their importation of inventions claimed in the '570 patent. PGC induces this direct infringement through its affirmative acts of directing

manufacturers and/or importers to import PGC's products, including exemplary infringing products, into the United States. With knowledge of the '570 patent since at least PGC first brought suit against Dryfhout, PGC's deliberate and/or willfully blind actions have induced and continue to induce the direct infringement of the '570 patent by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '570 patent.

157.    Dryfhout is the current assignee of the '570 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the '570 patent against infringers, and to collect damages for all relevant times.

158.    PGC has made, and continues to make, unlawful gains and profits from infringing the '570 patent, and from inducing others from infringing the '570 patent.

159.    PGC's willful acts of infringement and inducing infringement have caused damage to Dryfhout, and Dryfhout is entitled to recover from PGC the damages it has sustained as a result of PGC's wrongful acts in an amount subject to proof at trial.

160.    This is an exceptional case within the meaning of 35 U.S.C. § 285, which warrants reimbursement of Dryfhout's reasonable attorneys' fees.

## COUNT XI: INFRINGEMENT OF U.S. PATENT NO. 11,104,018

161.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

162.    PGC makes, uses, sells, and/or offers to sell in, and/or imports into, the United States men's personal grooming products that infringe one or more claims of the '018 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(a). As set forth in **Exhibit KK**, certain exemplary products made, used, sold, offered for sale, and/or imported into the United States by

PGC directly infringe, either literally or under the doctrine of equivalents, certain exemplary claims of the '018 patent.

163.    PGC has had knowledge of the '018 patent and its infringing activities at least as early as August 20, 2025. PGC was indisputably aware that Dryfhout was the USPTO-listed owner of the patent, as evidenced by PGC seeking a declaratory judgment of ownership, yet continued infringing prior to any judgment on the merits in its favor. Accordingly, PGC has been willfully infringing the '018 patent at least since PGC first brought suit against Dryfhout.

164.    PGC, either directly and/or through intermediaries, also has induced and continues to induce infringement (literally and/or under the doctrine of equivalents) by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '018 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(b). For example, manufacturers and/or importers of PGC's products, including exemplary infringing products, directly infringe the '018 patent, either literally or under the doctrine of equivalents, through their importation of inventions claimed in the '018 patent. PGC induces this direct infringement through its affirmative acts of directing manufacturers and/or importers to import PGC's products, including exemplary infringing products, into the United States. With knowledge of the '018 patent since at least PGC first brought suit against Dryfhout, PGC's deliberate and/or willfully blind actions have induced and continue to induce the direct infringement of the '018 patent by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '018 patent.

165.    Dryfhout is the current assignee of the '018 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the '018 patent against infringers, and to collect damages for all relevant times.

166.    PGC has made, and continues to make, unlawful gains and profits from infringing the '018 patent, and from inducing others from infringing the '018 patent.

167.    PGC's willful acts of infringement and inducing infringement have caused damage to Dryfhout, and Dryfhout is entitled to recover from PGC the damages it has sustained as a result of PGC's wrongful acts in an amount subject to proof at trial.

168.    This is an exceptional case within the meaning of 35 U.S.C. § 285, which warrants reimbursement of Dryfhout's reasonable attorneys' fees.

### COUNT XII: INFRINGEMENT OF U.S. PATENT NO. 12,280,512

169.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

170.    PGC makes, uses, sells, and/or offers to sell in, and/or imports into, the United States men's personal grooming products that infringe one or more claims of the '512 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(a). As set forth in **Exhibit LL**, certain exemplary products made, used, sold, offered for sale, and/or imported into the United States by PGC directly infringe, either literally or under the doctrine of equivalents, certain exemplary claims of the '512 patent.

171.    PGC has had knowledge of the '512 patent and its infringing activities at least as early as August 20, 2025. PGC was indisputably aware that Dryfhout was the USPTO-listed owner of the patent, as evidenced by PGC seeking a declaratory judgment of ownership, yet continued infringing prior to any judgment on the merits in its favor. Accordingly, PGC has been willfully infringing the '512 patent at least since PGC first brought suit against Dryfhout.

172.    PGC, either directly and/or through intermediaries, also has induced and continues to induce infringement (literally and/or under the doctrine of equivalents) by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '512 patent, including at least Claim 1, in violation of 35 U.S.C. § 271(b). For example, manufacturers and/or importers of PGC's products, including exemplary infringing products, directly infringe the '512 patent, either literally or under the doctrine of equivalents, through their importation of inventions claimed in the '512 patent. PGC induces this direct infringement through its affirmative acts of directing manufacturers and/or importers to import PGC's products, including exemplary infringing products, into the United States. With knowledge of the '512 patent since at least PGC first brought suit against Dryfhout, PGC's deliberate and/or willfully blind actions have induced and continue to induce the direct infringement of the '512 patent by others who make, use, sell, and/or offer to sell in, and/or import into, the United States men's personal grooming products that infringe one or more claims of the '512 patent.

173.    Dryfhout is the current assignee of the '512 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the '512 patent against infringers, and to collect damages for all relevant times.

174.    PGC has made, and continues to make, unlawful gains and profits from infringing the '512 patent, and from inducing others from infringing the '512 patent.

175.    PGC's willful acts of infringement and inducing infringement have caused damage to Dryfhout, and Dryfhout is entitled to recover from PGC the damages it has sustained as a result of PGC's wrongful acts in an amount subject to proof at trial.

176.    This is an exceptional case within the meaning of 35 U.S.C. § 285, which warrants reimbursement of Dryfhout's reasonable attorneys' fees.

### COUNT XIII: INFRINGEMENT OF U.S. PATENT NO. D825,852

177.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

178.    Dryfhout is the current assignee of the D'852 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the D'852 patent against infringers, and to collect damages for all relevant times.

179.    PGC has had actual or constructive notice of their infringing activity since at least the filing of their Complaint in this action.

180.    PGC have been and are now infringing the D'852 patent in violation of 25 U.S.C. § 217 by importing, making, using, selling and offering to sell products embodying Dryfhout's patent design.

181.    Attached as **Exhibit MM** is a chart showing how certain exemplary PGC products appear substantially the same as the claimed design of the D'852 patent to an ordinary observer.

182.    PGC have undertaken infringing acts including at least importing, making, using, selling, and/or offering to sell products covered by the D'852 patent, including, but not limited to, certain exemplary products set forth in the attached exhibit.

183.    PGC have also infringed the D'852 patent by actively and knowingly inducing others to make, use, sell, offer for sale, and/or import into the United States products that infringe the D'852 patent.

184.    Upon information and belief, PGC have sold and made offers to sell products infringing the D'852 patent throughout the United States including here in the District of Delaware.

185.    Upon information and belief, PGC sells identical or mostly-identical products to the Bakblade products sold by Dryfhout, and have willfully and deliberately continued to undertake infringing activities with the knowledge that they do not have the right to use any part of the design claimed in the D'852 patent.

186.    Dryfhout has suffered and will continue to suffer damage as a direct and proximate result of PGC's infringement of the D'852 patent.

## COUNT XIV: INFRINGEMENT OF U.S. PATENT NO. D826,474

187.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

188.    Dryfhout is the current assignee of the D'474 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the D'474 patent against infringers, and to collect damages for all relevant times.

189.    PGC has had actual or constructive notice of their infringing activity since at least the filing of their Complaint in this action.

190.    PGC have been and are now infringing the D'474 patent in violation of 25 U.S.C. § 217 by importing, making, using, selling and offering to sell products embodying Dryfhout's patent design.

191.    Attached as **Exhibit NN** is a chart showing how certain exemplary PGC products appear substantially the same as the claimed design of the D'474 patent to an ordinary observer.

192.    PGC have undertaken infringing acts including at least importing, making, using, selling, and/or offering to sell products covered by the D'474 patent, including, but not limited to, certain exemplary products set forth in the attached exhibit.

193.    PGC have also infringed the D'474 patent by actively and knowingly inducing others to make, use, sell, offer for sale, and/or import into the United States products that infringe the D'474 patent.

194.    Upon information and belief, PGC have sold and made offers to sell products infringing the D'474 patent throughout the United States including here in the District of Delaware.

195.    Upon information and belief, PGC sells identical or mostly-identical products to the Bakblade products sold by Dryfhout, and have willfully and deliberately continued to undertake infringing activities with the knowledge that they do not have the right to use any part of the design claimed in the D'474 patent.

196.    Dryfhout has suffered and will continue to suffer damage as a direct and proximate result of PGC's infringement of the D'474 patent.

### COUNT XV: INFRINGEMENT OF U.S. PATENT NO. D917,097

197.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

198.    Dryfhout is the current assignee of the D'097 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the D'097 patent against infringers, and to collect damages for all relevant times.

199.    PGC has had actual or constructive notice of their infringing activity since at least the filing of their Complaint in this action.

200.    PGC have been and are now infringing the D'097 patent in violation of 25 U.S.C. § 217 by importing, making, using, selling and offering to sell products embodying Dryfhout's patent design.

201.    Attached as **Exhibit OO** is a chart showing how certain exemplary PGC products appear substantially the same as the claimed design of the D'097 patent to an ordinary observer.

202.    PGC have undertaken infringing acts including at least importing, making, using, selling, and/or offering to sell products covered by the D'097 patent, including, but not limited to, certain exemplary products set forth in the attached exhibit.

203.    PGC have also infringed the D'097 patent by actively and knowingly inducing others to make, use, sell, offer for sale, and/or import into the United States products that infringe the D'097 patent.

204.    Upon information and belief, PGC have sold and made offers to sell products infringing the D'097 patent throughout the United States including here in the District of Delaware.

205.    Upon information and belief, PGC sells identical or mostly-identical products to the Bakblade products sold by Dryfhout, and have willfully and deliberately continued to undertake infringing activities with the knowledge that they do not have the right to use any part of the design claimed in the D'097 patent.

206.    Dryfhout has suffered and will continue to suffer damage as a direct and proximate result of PGC's infringement of the D'097 patent.

### COUNT XVI: INFRINGEMENT OF U.S. PATENT NO. D946,285

207.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

208.    Dryfhout is the current assignee of the D'285 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the D'285 patent against infringers, and to collect damages for all relevant times.

209.    PGC has had actual or constructive notice of their infringing activity since at least the filing of their Complaint in this action.

210.    PGC have been and are now infringing the D'285 patent in violation of 25 U.S.C. § 217 by importing, making, using, selling and offering to sell products embodying Dryfhout's patent design.

211.    Attached as **Exhibit PP** is a chart showing how certain exemplary PGC products appear substantially the same as the claimed design of the D'285 patent to an ordinary observer.

212.    PGC have undertaken infringing acts including at least importing, making, using, selling, and/or offering to sell products covered by the D'285 patent, including, but not limited to, certain exemplary products set forth in the attached exhibit.

213.    PGC have also infringed the D'285 patent by actively and knowingly inducing others to make, use, sell, offer for sale, and/or import into the United States products that infringe the D'285 patent.

214.    Upon information and belief, PGC have sold and made offers to sell products infringing the D'285 patent throughout the United States including here in the District of Delaware.

215.    Upon information and belief, PGC sells identical or mostly-identical products to the Bakblade products sold by Dryfhout, and have willfully and deliberately continued to undertake infringing activities with the knowledge that they do not have the right to use any part of the design claimed in the D'285 patent.

216.    Dryfhout has suffered and will continue to suffer damage as a direct and proximate result of PGC's infringement of the D'285 patent.

**COUNT XVII: INFRINGEMENT OF U.S. PATENT NO. D1,004,289**

217.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

218.    Dryfhout is the current assignee of the D'289 patent, with all substantive rights in and to that patent, including the sole and exclusive right to prosecute this action and enforce the D'289 patent against infringers, and to collect damages for all relevant times.

219.    PGC has had actual or constructive notice of their infringing activity since at least the filing of their Complaint in this action.

220.    PGC have been and are now infringing the D'289 patent in violation of 25 U.S.C. § 217 by importing, making, using, selling and offering to sell products embodying Dryfhout's patent design.

221.    Attached as **Exhibit QQ** is a chart showing how certain exemplary PGC products appear substantially the same as the claimed design of the D'289 patent to an ordinary observer.

222.    PGC have undertaken infringing acts including at least importing, making, using, selling, and/or offering to sell products covered by the D'289 patent, including, but not limited to, certain exemplary products set forth in the attached exhibit.

223.    PGC have also infringed the D'289 patent by actively and knowingly inducing others to make, use, sell, offer for sale, and/or import into the United States products that infringe the D'289 patent.

224.    Upon information and belief, PGC have sold and made offers to sell products infringing the D'289 patent throughout the United States including here in the District of Delaware.

225.    Upon information and belief, PGC sells identical or mostly-identical products to the Bakblade products sold by Dryfhout, and have willfully and deliberately continued to undertake infringing activities with the knowledge that they do not have the right to use any part of the design claimed in the D'289 patent.

226.    Dryfhout has suffered and will continue to suffer damage as a direct and proximate result of PGC's infringement of the D'289 patent.

### COUNT XVIII: FRAUDULENT TRANSFER
**(Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301 *et seq*,)**

227.    Dryfhout incorporates the foregoing paragraphs as if fully SPA forth herein.

228.    Shellco's purported transfer of the IP Assets to PGC is a fraudulent transfer pursuant to Delaware Uniform Fraudulent Transfer Act (DUFTA), codified in Chapter 13 of Title 6 of the Delaware Code, which provides statutory causes of action for creditors to challenge transfers of debtor's assets. *See* 6 *Del. C.* §§ 1304(a)(1)-(2), 1305(a), (b). Shellco's purported transfer under the SPA is an actual fraudulent transfer and/or a constructive fraudulent transfer that occurred after Shellco agreed to the AAPA.

229.    Brothers Ollie and Sam Hörbye co-founded Olsam Group and Olsam Opco Limited ("Olsam") and served as Directors. Olsam's business was to identify e-commerce brands and offer a buyout. Ollie and Sam set up numerous subsidiaries under Olsam, such as Shellco and PGC, for each of the acquired brands that they controlled as Directors. Denali European Opportunities DAC ("Denali") funded these initial efforts through an original security agreement dated August 2021. Ollie Hörbye executed the initial security agreement on behalf of Olsam and each of its subsidiaries, causing the subsidiaries to be jointly and severely liable for the Denali loan. Upon information and belief, Ollie and Sam Hörbye controlled the Olsam subsidiaries

without regard to any corporate formalities, which is exemplified by the cross-corporation loan security agreement.

230.   In December 2023, Olsam entered into a second Security Agreement with Denali that was once again cross-collateralized by Olsam's subsidiaries. (*Id.* Ex. L.) In the Security Agreement, Olsam leveraged all the current subsidiaries of Olsam, including Shellco and PGC. (*Id.*) Ben Poynter, as the CFO of all Olsam entities, including Shellco and PGC, and Ollie, as the Director of all Olsam entities, including Shellco and PGC, signed this agreement on December 21, 2023. (*Id.*) Each of the signatories—including PGC and Shellco as well as 20+ other subsidiaries—were joint and severally liable for the debt incurred. (*Id.*) And PGC was a co-signor of the Security Agreement.

231.   To make it appear that PGC and Shellco were not one in the same prior to administration—Ollie and Sam resigned as directors of Shellco on September 17, 2024, having been replaced shortly before by Ran Oren. (*Id.* at Ex. G.) Ollie resigned from Director of PGC and on September 25, 2024 and Ben Poynter was appointed on October 1, 2024. (*Id.* at Ex. H.) Ollie and Sam also resigned from Olsam and Ben Poynter became Director. (*Id.* at Ex. D.)

232.   However, these entities continue to be related and controlled by the same individuals. Specifically, Denali entered into an investment management agreement with NorthWall which serves as its "Investment Manager." (*Id.* at Ex. J.) The purpose of Denali is to "provide loan origination facilities to a variety of borrowers across industries." (*Id.*) Along with Ben Poynter, NorthWall controls Olsam, Shellco, PGC, and the other Olsam subsidiaries. Olsam's Directors are Artem Kontyaev and Alexander Garnier of NorthWall and Ben Poynter and Fergus Niven, appointed as directors by NorthWall. Aside from Shellco, the directors of

each of the Olsam subsidiaries, including PGC, are no other than Ben Poynter and Scott Carpenter, the COO of NorthWall.

233.    Olsam, the parent company of all Olsam subsidiaries, is controlled by Fairweather Bidco Limited ("Fairweather"). (*Id.* at ¶ 10, Ex. I.)  Fairweather Bidco UK Limited's sole director is Scott Carpenter. (*Id.* at ¶¶ 9, 14.) In turn, Fairweather controls PGC and Shellco, as wholly-owned subsidiaries of Olsam.

234.    Around September 26, 2024, Shellco, through its then Director, Ran Oren (who was appointed by and can be removed as Director by NorthWall), advised Defendants that Shellco's parent company and affiliates were in financial distress. Mr. Oren informed Defendants that Denali would only continue to support Olsam if it could reach a full and final settlement of Shellco's $4 million dollar debt. If that could not be achieved, Denali threatened to call the loan.

235.    In fact, Shellco threatened that if the Defendants did not agree to renegotiate the Deferred Payments for a fraction of the amount owed, Olsam would force Shellco into administration. Supposedly, Denali provided Shellco's proposed administrators with an offer letter from Olsam Acq AA Limited, stating its intention not only to purchase Shellco's assets but also to release the guarantees and security on Shellco's assets, which the Administrators valued at €80,923,750, the amount of the guaranteed secured debt. In turn, the proposed administrators represented to Defendants that Denali would not support an offer from any other bidder unless the secured debt is paid in full in cash upon completion. In other words, for Defendants to purchase Shellco, they would have to pay no less than €80,923,750.

236.    As it turns out, Olsam Acq AA Limited is simply another Olsam entity controlled by NorthWall. The directors of Olsam Acq AA Limited are no other than Mr. Scott Carpenter and Mr. Ben Poynter. Thus, this supposed offer was really Denali pretending that it would

purchase its own debt to box anyone else out from buying Shellco so Shellco's assets could be delivered to PGC.

237.    When Defendants refused to negotiate, NorthWall hurriedly caused Shellco to go into administration and enter into the pre-pack sale with PGC. Defendants later learned that PGC purchased intellectual property assets through a pre-pack sale for less than £1,000,000.

238.    PGC's purchase of Shellco was woefully under market value. On or around December 31, 2022, Shellco filed a financial statement indicating the value of the IP assets and goodwill associated with those assets alone was £12,878,767.00. (D.I. 38, ¶ 24; *see also* D.I. 38-1.) However, less than two years later, October 2024, through Administration the value was less than £1 million. (D.I. 1, at pdf pg. 78; D.I. 60, ¶ 5.) Mr. Poynter now admits that sales of the Bakblade products are over $10 million annually (D.I. 60, ¶ 21) and $620,000 and $415,000 in monthly revenue and profits, respectively (D.I. 77).

239.    Upon information and belief, even though the transfer supposedly transferred the IP Assets from Shellco to PGC, the business arrangement through which goods sold under the IP Assets did not change. As established above, Ollie Hörbye was a director of Olsam Group, Olsam, and each of its subsidiaries, including Shellco and PGC. Upon information and belief, Ollie and Sam Hörbye controlled each of the entities, ignoring their corporate formalities and controlling their day-to-day operations through Olsam. Ollie and Sam Hörbye used the entities to leverage Olsam's debt, leaving each corporation undercapitalized due to the cross-corporation leverage. Upon information and belief, Olsam conducted Shellco's Bakblade business as Olsam and Olsam continued to operate the Bakblade business after the SPA. By way of example, Olsam was and is the Consignee on the Bills of Lading, the entity that receives the imported goods into the U.S. Consignees have legal claim on the goods and are responsible for paying duties and

41

taxes. Fairweather, Olsam, PGC, Shellco, and the other Olsam subsidiaries are all one in the same and each alter egos of the other. Indeed, Fergus Niven, an Olsam director, submitted sworn testimony that he "was involved in and knowledgeable of the actions by Shellco" which included "efforts to market the sale of Shellco's business and assets." (D.I. 18, at ¶ 4.)

240.    Under §1304(a)(i), a transfer is fraudulent when made with the intent to hinder, delay or defraud the debtor's creditor. In determining intent, the DUFTA lists several factors for consideration, nearly all of which are present here. *See* 6 *Del. C.* §1304(b). These factors are commonly referred to as "badges of fraud" and are used to infer intent. The transfer was made to an insider, specifically Shellco's sister company, PGC—i.e., from one Olsam entity to another, both controlled by NorthWall. *See id.* at §1304(b)(1); Upon information and belief, even though the transfer supposedly transferred the IP Assets to PGC, the business arrangement through which goods sold under the IP Assets did not change. Before the transfer, Defendants threatened to sue Shellco for non-payment. *See id.* at §1304(b)(4). The IP Assets were substantially all of Shellco's assets and Shellco "became insolvent." *See* 6 *Del. C.* § 1304(b)(5). Shellco absconded and refused to appear in the Default Action. *See* 6 *Del. C.* § 1304(b)(6). Also, the transfer occurred shortly after a substantial debt was incurred. *See id.* at § 1304(b)(10).

241.    Under 6 *Del. C.* § 1304(a)(ii), a transfer is fraudulent if the debtor did not receive reasonably equivalent value for the transfer, and the debtor's remaining assets were unreasonably small in relation to the business or transaction. Shellco transferred the intellectual property for pennies on the dollar. On or around December 31, 2022, Shellco filed a financial statement indicating the value of its intellectual property and goodwill associated therewith was £12,878,767.00. However, less than two years later, October 2024, the amount paid through Administration was less than £1 million. Mr. Poynter now admits that sales of the Bakblade

business are over $10 million annually, and the U.S. assets are currently generating $620,000 monthly and $415,000 in monthly profits. Further, Shellco incurred the Denali debt which was beyond its ability to pay (i.e., Denali's security interest).

242.    Under 6 *Del. C.* § 1305(a), a transfer is fraudulent if the debtor made the transfer without receiving a reasonably equivalent value in exchange and the debtor became insolvent as a result of the transfer or obligation. As discussed *supra*, Shellco did not receive a reasonable value for the intellectual property and became insolvent. Under § 1305(b), a transfer is fraudulent if it was made to an insider for an antecedent debt and the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent. Shellco transferred the intellectual property to cover debt owed to NorthWall, the very entity that controlled both PGC and Shellco, and collectively who were indebted to Denali.

243.    Dryfhout did not learn of the fraudulent assignment transfer had occurred until PGC filed assignment records at the USPTO for some of the IP Assets in July 2025, and provided Defendants a copy of the SPA shortly after filing this lawsuit, in September 2025.

## COUNT XIX: FRAUDULENT TRANSFER
### (In the Alternative to Count XVIII) (Section 423 of the UK Insolvency Act 1986)

244.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

245.    Alternatively, Shellco's purported transfer of the IP Assets to PGC is a fraudulent transfer pursuant to Section 423 of the UK Insolvency Act, 1986. This cause of action is alleged in the alternative to Count XVIII should English law, rather than US law, be found applicable to Dryfhout's claim.

246.    PGC, and the tightly-knit corporate spider web of subsidiaries under the Olsam name, (i) entered into a transaction (ii) for valuable assets for significantly undervalue

consideration (iii) to put those assets beyond the reach of Dryfhout, a creditor, or to otherwise prejudice Dryfhout's interests.

247.    As alleged above, PGC and Shellco engaged in a sham sale of Shellco's assets for the sole purpose of defrauding creditors of Shellco, including Defendants.

248.    PGC and Shellco used a hurried pre-pack sale to conceal their unlawful conduct. After being notified that Defendants were filing lawsuit against Shellco for its failure to pay for the IP Assets, on October 24, 2024, Shellco changed its name to Shellco from Bakblade, entered administration, and entered into a pre-pack sale of Shellco's assets with PGC, all within a single day. This all occurred on the same day that Defendants filed suit against Shellco in the Default Action.

249.    PGC hurriedly purchased the assets of its sister subsidiary Shellco, as directed by their common owners and parent entity, with an actual intend to defraud creditors of Shellco by putting assets beyond reach of creditors, thereby preventing them from recouping the monies owned to them.

250.    Defendants, including Dryfhout, was one such creditor.

251.    The purported "sale" of Shellco's assets to PGC was made without fair consideration, as the actual market value of Shellco was worth substantially greater than the amount paid by PGC.

252.    In October 2022, Shellco purchased the Bakblade brand from Defendants for consideration exceeding $12,000,000.

253.    A financial statement of Shellco (f/k/a Bakblade) for the year ending on December 31, 2022 indicated the value of Shellco's intangible assets, i.e., its trademarks, associated goodwill, and patents, were valued at £12,876,767 (~$15,900,000).

254.    However, in the pre-pack sale, PGC purchased Shellco's assets less than two years later for £1,300,000, with Shellco valuing its entire intellectual property portfolio at £999,995, which PGC paid. This is 7.8% of the value that Shellco valued its intellectual property less than 24 months earlier.

255.    PGC has now confirmed that its annual revenue associated with only the Bakblade brand (and its foundational IP) exceeds $10,000,000 annually, resulting in over $415,000 in monthly profits.

256.    As such, the actual market value of the Bakblade brand and its IP was worth substantially greater than the amount paid for by PGC.

257.    The rushed nature of the pre-pack sale, shortly after being notified of a forthcoming lawsuit by Defendants, demonstrates the transfer was executed, at least in part, to put the IP Assets beyond Dryfhout's reach, or to at least prejudice Dryfhout's interests therein.

258.    As a result of the foregoing, PGC has committed a fraudulent conveyance under the provisions of the UK Insolvency Act 1986 § 423(1)(c).

259.    As a result of PGC's fraudulent conduct, Dryfhout, a creditor, has suffered substantial financial losses.

**COUNT XX: UNJUST ENRICHMENT**

260.    Dryfhout incorporates the foregoing paragraphs as if fully set forth herein.

261.    By purchasing the IP Assets for below-market value and by excluding the 2022 APA and/or the 2023 AAPA from the SPA, without paying the amounts due to Defendants, PGC unjustly enriched. Fairweather, Olsam, PGC, and Shellco are all one in the same and each alter egos of the other, controlled by the same individuals. Denali purposefully caused Shellco to go into bankruptcy to hinder Defendants' ability to collect the Deferred Payments under the 2023

AAPA. Oliver Horbye who signed the 2023 AAPA on behalf of Shellco on October 13, 2023 shortly thereafter on December 21, 2023 signed the second security agreement on behalf Shellco to jointly and severally be responsible for Olsam's debt to Denali. He knew by collateralizing the Olsam loan, Denali could force Shellco into bankruptcy, enter into a pre-pack sale using another one of its subsidiaries, discharging its obligation to pay the Deferred Payments. Upon information and belief, Shellco renegotiated the Deferred Payments just before entering into the second security agreement with Denali to purposefully bring the IP Assets within the grips of the second security agreement for Denali. Upon information and belief, the Administrators of Shellco advised Denali on how to structure this shell game.

262.    Had Defendants known that Shellco's arrangement with Denali would allow Shellco to escape liability for failing to pay the Deferred Payments by having Denali push Shellco into administration and transfer the IP Assets to another Olsam subsidiary, such as PGC, Defendants would not have entered into the 2023 AAPA.

## **DEMAND FOR JURY TRIAL**

263.    According to Fed. R. Civ. P. 38(b), Dryfhout respectfully requests a trial by jury on all issues triable by a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Dryfhout prays for the following relief against PGC as follows:

A.    Judgement be entered that PGC has willfully infringed the BAKBLADE Marks in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114); Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a));

B.     Enter an order preliminarily and permanently enjoining PGC, its employees, agents, officers, directors, successors, affiliates, subsidiaries, assigns, and all those acting in concert and participation with them from:

i.     distributing, providing, selling, marketing, advertising, promoting, using or authorizing any third party to distribute, provide, sell, market, advertise, promote or use the BAKBLADE Marks, or any other mark that is confusingly similar to the BAKBLADE Marks;

ii.     engaging in any activity that infringes or interferes with Dryfhout's rights to its BAKBLADE Marks; and

iii.     making or displaying any statement, representation or depiction that is likely to lead the public or the trade to believe that 1) PGC's goods and services are in any manner approved, endorsed, licensed, sponsored, authorized, associated, affiliated or otherwise connected with Dryfhout; and 2) PGC's goods and services are in any manner approved, endorsed, licensed, sponsored, authorized, associated, affiliated or otherwise connected with Dryfhout;

C.     Award Dryfhout an amount up to three times the amount of its actual damages, in accordance with 15 U.S.C. § 1117(a);

D.     Award Dryfhout statutory damages under 15 U.S.C. § 1117(d);

E.     Direct PGC to account to and pay over to Dryfhout all profits realized through their wrongful conduct in accordance with 15 U.S.C. § 1117(a), enhanced as appropriate to compensate Dryfhout for the damages caused thereby;

F.     Entering a judgment against PGC in favor of Dryfhout that PGC has and will continue to infringe at least one claim of the Asserted Patents;

G.    For an order permanently enjoining PGC, and its respective officers, directors, shareholders, agents, servants, employees, attorneys, all parent, subsidiary and affiliate corporations, their successors in interest and assigns, and all other entities and individuals acting in concert with it or on its behalf, including customers, from making, importing, using, offering for sale, and/or selling any product or service falling within the scope of any claim of the Asserted Patents.

H.    For damages arising from PGC's infringement of the Asserted Patents, including lost profits suffered as a result of PGC's infringement and in an amount not less than a reasonably royalty;

I.    That this Court declare PGC's infringement to be willful and award increased damages in an amount not less than three times the damages assessed for PGC's infringement for the period of such willful infringement pursuant to 35 U.S.C. § 284;

J.    Declare this an exceptional case and order that PGC pay to Dryfhout its reasonable attorneys' fees and costs, pursuant to 15 U.S.C. § 1117(a) and 35 U.S.C. § 285.

K.    Award Dryfhout interest, including prejudgment and post-judgment interest, on the foregoing amounts;

L.    Declare that any transfer of title from Shellco to PGC pursuant to the Sales and Purchase Agreement any intellectual property assignments is void and unenforceable;

M.    Award such further and other relief to Dryfhout as the Court deems just, together with its costs and disbursements in this action.

Dated: December 5, 2025

Respectfully submitted,

*/s/ Stephanie S. Riley*
Stephanie S. Riley (#5803)
Zachary Murphy (#6881)
Alexander P. Wharton (#7304)
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
stephanie.riley@wbd-us.com
zachary.murphy@wbd-us.com
alexander.wharton@wbd-us.com

*Of Counsel:*

Carrie J. Richey
WOMBLE BOND DICKINSON (US) LLP
50 California Street, Suite 2740
San Francisco, California 94111
Telephone: (415) 433-1900
carrie.richey@wbd-us.com

*Counsel to Dryfhout Enterprises, LLC,*
*Dryfhout Properties, LLC, Matthew Dryfhout,*
*and Angelina Dryfhout*